1
2
3
4

ALMADANI LAW
Yasin M. Almadani (SBN 242798)
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660
Ph: 949-877-7177
Fax: 949-877-8757
yma@lawalm.com

5

*Attorney for Plaintiffs*

6

7

## UNITED STATES DISTRICT COURT

8

## EASTERN DISTRICT OF CALIFORNIA

9

## SACRAMENTO DIVISION

10
11
12
13

NAKIA VICTORIA PORTER, an individual, and JOE BERRY POWELL, JR., an individual,

Plaintiffs,

v.

14
15
16
17
18

SOLANO COUNTY SHERIFF'S OFFICE, COUNTY OF SOLANO, DEPUTY DALTON MCCAMPBELL, an individual, DEPUTY LISA MCDOWELL, an individual, SGT. ROY STOCKTON, an individual, and DOES 1 to 10, inclusive,

Defendants,

19
20

Case No. 2:21-CV-00766

**CIVIL RIGHTS COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

21
22
23
24
25
26
27
28

---

**COMPLAINT**

Plaintiffs NAKIA VICTORIA PORTER and her father JOE BERRY POWELL, JR. (collectively, "Plaintiffs") bring this action demanding a jury trial against Defendants SOLANO COUNTY SHERIFF'S OFFICE, COUNTY OF SOLANO, DEPUTY DALTON MCCAMPBELL, DEPUTY LISA MCDOWELL, SERGEANT ROY STOCKTON, and DOES 1 to 10 (collectively, "Defendants") for violations of their constitutional and civil rights.  Plaintiffs allege the following based upon personal knowledge and information and belief:

## I.     NATURE OF THE ACTION

1.     On August 6, 2020, Defendants Dalton McCampbell and Lisa McDowell, who are Solano County Sheriff's deputies, arrested and assaulted Ms. Nakia Victoria Porter, as well as then brutally beat her out of consciousness, without cause outside her vehicle in front of her father, Mr. Joe Berry Powell, Jr., and three children—her two daughters (ages 3 and 4) and her niece (age 6). After tossing Ms. Porter in the back of their Sheriff's vehicle, unconscious, the same defendants proceeded to handcuff and falsely imprison Mr. Powell in the back of another Sheriff's vehicle, leaving the three children alone and scared inside the vehicle at night for about an hour while numerous Sheriff's deputies illegally searched the vehicle finding no evidence of any crime whatsoever.

## II.     JURISDICTION AND VENUE

2.     This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights), as well as Article III of the U.S. Constitution. Supplemental jurisdiction over state law claims is proper under 28 U.S.C. § 1367 because all claims arise from a common nucleus of operative facts that are so intertwined that they cannot be reasonably separated.

3.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in and can be found in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred within the County of Solano, State of California, within the Eastern District of California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   PARTIES

**A.    Plaintiffs**

4.      Plaintiff NAKIA VICTORIA PORTER ("Ms. Porter") is a 33-year-old, Black woman and resident of Orangevale, California. She is an accomplished software engineer at one of the leading semiconductor companies in the world, a mother of three children under seven years old, a dance instructor, and a motivational speaker. She holds bachelor's and master's degrees in computer science from North Carolina A&T State University, a top-ten Historically Black College & University where she graduated *summa cum laude*, was awarded the Cyber Corps Scholarship for Service, and served as Co-President of the Association of Computing Machinery. She was also a Step Team member of the National Society of Black Engineers.

5.      Ms. Porter graduated with a published thesis entitled, "Introduction of Cloud Computing into the Computer Science Curriculum," which serves as curriculum material at North Carolina A&T State University. She also served as a Cyber Analyst at Johns Hopkins University's Applied Physics Laboratory ("JHUAPL"), one of the nation's largest university-affiliated research centers. Ms. Porter contributed to the Laboratory's work on cyber security, identity management security, and data privacy, and served as a coordinator for JHUAPL's ATLAS Program, which provides opportunities to minority students. In addition, Ms. Porter has interned for the U.S. Department of Energy and Naval Sea Systems Command in Washington, D.C., the largest of the U.S. Navy's five-system commands.

6.      Beyond her accomplishments in computer science, Ms. Porter is an accomplished athlete, musician, and community leader. She was a Mid-Eastern Atlantic Conference Championship cheerleader and now teaches dance and gymnastics to young children in Northern California. She also plays the cello, consistently volunteers her time at community events, and is often asked to give motivational talks.

7.      Ms. Porter is five (5) feet, two (2) inches tall, and weighs 125 pounds.

8.      Plaintiff JOE BERRY POWELL, JR. ("Mr. Powell") is Ms. Porter's father.

He is a 61-year-old, Black man and resident of Orangevale, California. He is an accomplished computer operations manager. Prior to retiring and starting his own computer media company, Mr. Powell worked for almost 30 years in computer operations, networking, and database management, including working for NAVAIR, which is one of the Echelon II Navy systems commands providing support for aircraft and airborne weapon systems for the U.S. Navy. Mr. Powell is the proud grandfather of six children.

### B. Defendants

9. Defendant Solano County Sheriff's Office (the "SCSO" or "Sheriff's Office") is a public entity and law enforcement agency operating in Solano County, California. Defendant SCSO has a clear and present duty to follow California and United States law. *See, e.g.*, California Const. Art. III § 3.5. Defendant SCSO is sued both in its own capacity pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and on the basis of *respondeat superior* under California Government Code Section 815.2 ("Cal. Gov. Code § 815.2").

10. Defendant County of Solano (the "County" or "Solano County") is a public entity and political subdivision duly organized and existing under the laws of the State of California. The County has a clear and present duty to follow California and United States law. *See, e.g.*, Cal. Const. Art. III § 3.5.  Upon information and belief, the County, through its Board of Supervisors, oversees the Solano County Sheriff's Office. The County is sued both in its own capacity pursuant to *Monell*, 436 U.S. 658, and *Shaw v. State of California Dept. of Alcoholic Beverage Control*, 788 F.2d 600 (9th Cir. 1986), and on the basis of *respondeat superior* under Cal. Gov. Code § 815.2.

11. Under *Monell*, a local governing body can be sued directly under 42 U.S.C. § 1983 when a constitutional violation "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U.S. at 690. This includes liability for customs which "ha[ve] not received formal approval through the body's official decision-making channels." *Id*.

12.     Upon information and belief, SCSO and the County have a policy, practice, pattern, and/or custom of unlawfully permitting the use of excessive force in violation of the U.S. Constitution and California law. This policy, practice, pattern, and/or custom is carried out with municipal funds and directly causally related to the constitutional deprivations that Plaintiffs suffered by the unlawful actions of SCSO deputies.

13.     Upon information and belief, SCSO and the County have a policy, practice, pattern, and/or custom of unlawfully permitting and overlooking racially discriminatory tendencies and practices by their deputies against communities of color in violation of the U.S. Constitution and California law. This policy, practice, pattern, and/or custom is carried out with municipal funds and directly causally related to the constitutional deprivations that Plaintiffs suffered by the unlawful actions of SCSO deputies.

14.     Defendant DALTON MCCAMPBELL ("McCampbell") (#12259) is a male SCSO deputy and employee of the County and/or Sheriff's Office sued in his individual capacity. Deputy McCampbell is White. With Defendant McDowell, Deputy McCampbell unlawfully arrested, assaulted, and detained Ms. Porter and Mr. Powell, and fabricated charges against Ms. Porter to have her prosecuted.

15.     Defendant LISA MCDOWELL ("McDowell") is a female SCSO deputy (#13610) and employee of the County and/or Sheriff's Office sued in her individual capacity. Deputy McDowell is White. With Defendant McCampbell, Deputy McDowell unlawfully arrested, assaulted, and detained Ms. Porter and Mr. Powell, and fabricated charges against Ms. Porter to have her prosecuted.

16.     Defendant ROY STOCKTON ("Stockton") is a male SCSO sergeant (#07668) and employee of the County and/or Sheriff's Office sued in his individual capacity. Sergeant Stockton is White and, upon information and belief, affiliated with the extremist group The Three Percenters, whose members have espoused antigovernment and racist rhetoric. Sergeant Stockton, acting on authority of the SCSO, supervised Deputies McCampbell and McDowell in connection with this case and approved their falsified reports so that they could be submitted to the Solano County District Attorney's

Office to have Ms. Porter prosecuted on fabricated charges and cover up the Defendant Deputies' unlawful acts. The District Attorney's Office declined to prosecute Ms. Porter.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### A. The Arrests, Assault, & Battery by Solano County Sheriff's Deputies

17.     On August 6, 2020, at approximately 9:00 p.m., Ms. Porter and Mr. Powell (her father) were driving from Oakland, California to their home in Sacramento County. They had gone to Oakland to visit and console Ms. Porter's friend and fellow dance instructor whose student had recently undergone a medical difficulty. Ms. Porter had taken her daughters (ages 4 and 6) and niece (age 3) along to visit the Malanga Center in Oakland to learn about the history of African drums, dance, and culture. On the drive back, the occupants in the vehicle were Ms. Porter, Mr. Powell, and the three children. Ms. Porter was/is the owner of the vehicle, which is a Toyota Highlander.

18.     The distance between Oakland and Orangevale is approximately 106 miles and the drive takes approximately two hours.

19.     Ms. Porter had been driving for approximately an hour at night when she decided to let Mr. Powell drive the rest of the way home. At approximately 9:13 p.m., Ms. Porter took the Midway Road exit off the 80 freeway in Solano County and turned into Chevron Way in Dixon—a dark, small, unpopulated, dead-end road with no traffic. She stopped her vehicle at a location where it was safe to switch drivers. With no traffic on the street, Ms. Porter—a small woman, 5 feet 2 inches tall, weighing 125 pounds— exited her vehicle and proceeded to walk around to the back of the vehicle to the passenger's side, where Mr. Powell had also opened his door and started to exit the vehicle to switch seats. The three children remained in the backseat of the car.

20.     The area was dark and neither Ms. Porter nor Mr. Powell realized that there were Sheriff's patrol cars on Chevron Way when they parked the car to switch seats. The patrol car's lights had come on after Ms. Porter had already stopped her vehicle and put the car in park, and Plaintiffs were in the process of exiting their vehicle to switch drivers. In other words, the Defendant Deputies did not initiate any traffic stop. Rather,

they simply approached Plaintiffs while Plaintiffs were parked and had initiated the process to switch seats. Ms. Porter was walking towards the rear of her vehicle when she first noticed a Sheriff's patrol car with its lights on. As Ms. Porter reached the back of her vehicle to go around to the passenger's side to switch seats with her father, she noticed a female deputy (Deputy McDowell) saying something to her.

21.     Ms. Porter had not violated any traffic laws and thereby could not fathom that the officer intended to stop her for any reason. She also could not believe that the officer would object to her switching seats with her father, which is advisable from a safety perspective to avoid driver fatigue. It was unclear to Ms. Porter why the deputy was there. As such, Ms. Porter innocently greeted the deputy, saying, "Hi." Deputy McDowell asked Ms. Porter to "get back in the car." Ms. Porter explained very calmly and respectfully that she was just switching seats with her father. Deputy McDowell acknowledged this and responded, "Okay. But get back in the car," in a way that indicated to Ms. Porter that she should continue to switch seats and go inside the car. Ms. Porter waved her hand to acknowledge the deputy's request and complied by continuing to walk to the passenger's side to switch seats. Ms. Porter's father also calmly came out of the vehicle to make the switch.

22.     However, at this point, a male deputy (Deputy McCampbell) appeared and pointed his gun at Ms. Porter and her car, saying, "Get back in the car now. This is a traffic stop. Get back in the car." Ms. Porter, extremely confused because she had not been stopped for a traffic violation, responded, "Huh?" Ms. Porter then calmly explained to Deputy McCampbell, as she had done so to Deputy McDowell, that she was switching seats with her father and that there were children in the car. Still confused by the deputies' commands, Ms. Porter explicitly asked if the deputies wanted her to go back to the driver's seat. Deputy McCampbell responded, "Yes, get back in the car." Ms. Porter then immediately began to walk back to the driver's side, and Mr. Powell went inside to the passenger's seat, in full compliance with the deputies' commands.

23.     Throughout the encounter with the deputies, Ms. Porter, a woman of very

small stature, was clearly visible to the deputies. She made no threatening movements at all and was clearly not armed or attempting to flee. She and her father also calmly and fully complied with the deputies' commands, even though Ms. Porter had not violated any traffic laws to her knowledge and had explained to both deputies that there were children in the car and she and her father were simply switching seats – and seemingly received permission from Deputy McDowell to do so.

24.     There was absolutely no cause for Defendants McCampbell and McDowell to put their hands on, arrest, or handcuff Ms. Porter or take her into custody. In fact, the Constitution and California Penal Code Section 853.5(a) explicitly prohibited them from doing so. Nevertheless, as Ms. Porter was walking back to the driver seat, Deputy McCampbell (the male deputy) unexpectedly yelled, "You know what, detain her!" This was only about one minute after the initial encounter between Ms. Porter and Deputy McDowell. As Mr. Powell closed his car door to comply with the command, he explained once again that they were simply switching drivers. The deputies did not care and Deputy McDowell arm-locked Ms. Porter and began to handcuff her to take her into custody without having probable cause that Ms. Porter had committed any crime.

25.     Ms. Porter did not understand what was happening and feared for her life and the lives of her father, daughters, and niece. She had been complying with the deputies' orders and had not provoked them in any way. Ms. Porter attempted to straighten her arm and ask what was happening, as anyone in her situation would; she did not make any threatening movements against the deputies or attempt to flee. Instead, she pleaded for her rights to be read and respected. Despite this, in a show of unjustified, brute force and power, Defendant McCampbell joined Defendant McDowell, and the two deputies forcibly pinned Ms. Porter up against her car in front of her children and father and handcuffed her.

26.     As the deputies engaged in excessive force and unjustifiably assaulted and arrested Ms. Porter, body camera footage shows that Ms. Porter had relented to being handcuffed and was only pleading for her rights. The confusion, panic, and fear in her

voice and face are clear and palpable in the video.

27.    The pretextual reason the deputies gave for taking Ms. Porter into custody was that they had noticed a mismatched license plate. However, the deputies had called in the rear license plate to their dispatch and knew that it matched the description of the car and that there was no report of the car being stolen. Furthermore, a mistake or error in the display of license plates is a non-moving traffic *infraction* under California Vehicle Code Section 5200 *et seq.* for which "a peace officer shall *only* require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear[.]" Cal. Penal Code § 853.5(a) (emphasis added). "*Only if* the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody." *Id.* (emphases added). As such, even if the Defendant deputies' pretextual reason for the arrest was to be believed, clearly established statutory law prohibited the deputies from taking Ms. Porter into custody.

28.    At that point, during the encounter, the Defendant Deputies had already used unreasonable, excessive force and unlawfully taken Ms. Porter into custody without probable cause and in violation of a clear statute. If they had left her standing there handcuffed, this would have been a clear constitutional violation, but they decided to violate the law even more egregiously. They dragged Ms. Porter away from her vehicle and outside the view of the Sheriff's patrol car dashboard camera, each large officer grabbing one of her arms as Ms. Porter fearfully pleaded for an explanation and her children and father watched helplessly in horror.

29.    Outside the view of the dashboard camera, McCampbell and McDowell— both of whom are much larger than Ms. Porter—brutally beat Ms. Porter. They repeatedly punched, kicked, kneed, and struck her in the back of the neck, head, face, and stomach, as she struggled and prayed for her life in desperation, pleading, "God, bless me! Bless me, God!"

30.    After beating her and knocking her to the ground, Defendant McCampbell

1  (the male deputy) forced Ms. Porter onto her stomach and mounted her while Defendant

2  McDowell, who is a large female deputy, grabbed Ms. Porter by the hair and shoved her

3  face into the concrete. Ms. Porter gasped for air as her life flashed before her eyes; she

4  thought she was going to die on this abandoned side road wondering what would become

5  of her father, daughters, and niece. She struggled for her life as Deputy McCampbell sat

6  on her with all his weight, screaming, "You're going to get tased!"

7  31.    Ms. Porter quickly lost consciousness from the severe beating and the

8  weight of the large male deputy. Body-camera footage shows McCampbell's brooding

9  shadow mounted on top of Ms. Porter's tiny frame for almost a minute even after she lost

10  consciousness; he appeared to be sitting on her catching his breath from the beating he

11  had just given her. (Later, he would tell the paramedics, "I had full mount on her.")

12  32.    Deputy McCampbell then dragged Ms. Porter to the Sheriff's vehicle and

13  tossed her inside while she was still unconscious. She was unconscious for over five

14  minutes before waking up inside the Sheriff's vehicle. Upon information and belief, loss

15  of consciousness for five minutes or longer from head trauma is considered a Grade III

16  concussion, which is the most severe on a scale of I to III. *See,*

17  *e.g.,* https://mayfieldclinic.com/pe-concussion.htm. Such a concussion should be

18  reported, examined, and treated by a medical professional to avoid risks of long-term,

19  adverse consequences. *Id*. Nevertheless, when describing the beating to the paramedics

20  for treatment later that night, Deputies McCampbell and McDowell grossly lied about

21  how long Ms. Porter had remained unconscious, further placing her life and limb in

22  danger to conceal the seriousness of their own violations of the law. *See infra* ¶ 39.

23  33.    After assaulting Ms. Porter and locking her up in the Sheriff's vehicle while

24  unconscious, the Defendant Deputies proceeded to remove Mr. Powell from his vehicle,

25  where they had detained him while he helplessly witnessed the same deputies assault and

26  beat his daughter and tried to calm his young granddaughters, fearing for all of their

27  lives. The deputies had no cause to take Mr. Powell into custody. He had committed no

28  crime and had been fully compliant with the deputies' unreasonable orders in the face of

an immensely trying situation.

34.     Nevertheless, the Defendant Deputies ordered Mr. Powell out of the car and terrorized and humiliated him by making him walk backwards over 30 feet at gunpoint with his hands on the back of his head. McCampbell handcuffed him and placed him in a Sheriff's vehicle different from the vehicle in which Ms. Porter was detained. Mr. Powell is 61 years old, decades older than Deputy McCampbell. Still, throughout the encounter, McCampbell demeaned Mr. Powell by calling him "young man," which to Mr. Powell sounded like the racial slur "boy" used to demean Black men.

35.     After all this, Mr. Powell continued to explain in a remarkably calm and polite way that he and his daughter were just switching seats so that he could drive. His three granddaughters (ages 3, 4, and 6) were left alone in the car in the dark, scared without their caretakers and having witnessed their mother/aunt being arrested and beaten, and their grandfather also being taken from them. To make matters worse, the entire time the young girls were alone, their mother's assailants, the Defendant Deputies, along with other Sheriff's deputies were illegally searching the car. Of course, they found no evidence of a crime because there was no crime.

36.     After Ms. Porter regained consciousness, Deputy McCampbell proceeded to question her while handcuffed and in the Sheriff's vehicle. She was in shock and in tears. She did not resist and politely provided her name and identification. Deputy McCampbell called in the identification to the dispatch who immediately confirmed that Ms. Porter was the owner of the vehicle. The time it took for Deputy McCampbell to obtain Ms. Porter's identification and confirm that it was her vehicle was less than two minutes. Neither Deputy McCampbell nor Deputy McDowell asked about the mismatched license plate, and they did not issue Ms. Porter any infraction citation or fix-it ticket.

37.     The confusion with the license plate was that Ms. Porter had moved from Maryland to California and had forgotten to remove the Maryland front license plate. Defendant Deputies simply needed to follow California law (California Penal Code § 853.5(a)) and allow Ms. Porter to provide her identification and an explanation, which

she was more than willing to do. Instead, they chose to arrest, detain, and beat her without cause in violation of the U.S. Constitution and California law and caused considerable injury to the entire family.

38.     After the assault, when other officers arrived at the scene, Deputies McDowell and McCampbell made false statements and fabricated evidence in collusion with one another to justify their unlawful attack and to arrest and jail Ms. Porter and submit false evidence against her to the District Attorney for charges to be filed. Specifically, the Deputies McCampbell and McDowell made the following false statements: (i) that Ms. Porter "did this to herself" (untrue); (ii) that the deputies initiated a traffic stop (untrue); (iii) that Ms. Porter was non-compliant and refused to get back in the car (untrue); (iv) that the Defendant Deputies put their hands on Ms. Porter because she tried to flee and attacked Deputy McDowell first (untrue); and (v) that Ms. Porter punched Deputy McCampbell in the face (untrue). All of these statements are provably false by video and audio evidence recorded by the Sheriff's deputies' body and dashboard cameras.

39.     When the paramedics arrived at the scene, Ms. Porter requested that they transport her to the hospital. Deputies McCampbell and McDowell denied the request, continuing to lie to the paramedics by minimizing the assault and the injuries they had inflicted on Ms. Porter. Deputy McCampbell said that Ms. Porter had been unconscious for a total of "no more than twenty (20) seconds." Deputy McDowell minimized the assault even more egregiously, saying that Ms. Porter had been unconscious for "five (5) seconds." Both of these descriptions are provably false as Ms. Porter was unconscious for over five (5) minutes, and the deputies knew they were lying. In fact, Deputy McCampbell had dragged Ms. Porter to the Sheriff's vehicle and tossed her inside while she was unconscious (as recorded on video and audio), but he lied that she was able to move her legs and walk to the car so that he could minimize her injuries. As a result of the Defendant Deputies' deliberate lies to avoid accountability, Ms. Porter's head injuries were never properly examined.

40.     Instead of allowing the paramedics to take Ms. Porter to the hospital, as Ms. Porter had specifically requested, Deputy McDowell transported Ms. Porter in a Sheriff's vehicle to a hospital of their choice. Deputy McDowell made it clear that she was taking Ms. Porter to the hospital only to be "medically cleared" en route to jail, continuing to minimize the attack and injuries.

41.     Ms. Porter was checked into the emergency room of the North Bay Medical Center. She felt scared and intimidated in the hospital to fully share what had happened to her, since Deputy McDowell had participated in the beating and lied about it, and still had control over her. Ms. Porter had no privacy as Sheriff's deputies made sure that they were present during the medical examination.

42.     In addition to lying about how long Ms. Porter was unconscious, Sheriff's deputies continued to lie to hospital staff about the incident, making Ms. Porter appear like the assailant and criminal and mocking her. Ms. Porter recalls that she was not properly examined at the hospital, and it appeared that the hospital staff were there simply to "clear" her to be taken to jail, not to legitimately examine her. Despite the severe beating Ms. Porter had suffered and the likelihood that she had a Grade III concussion, her head was not properly examined for a concussion. There was no MRI done that would normally have been performed in such a situation so that she could receive the proper treatment to avoid long-term consequences.

43.     Ms. Porter was thus swiftly moved through the hospital and transported by Sheriff's deputies to the Solano County jail. They continued to treat her like a criminal based on Deputies McCampbell and McDowell's false and fabricated statements.

44.     The SCSO booked Ms. Porter on charges of obstruction and resisting executive officers and set bail for $25,000. The SCSO had no probable cause to hold Ms. Porter and yet they continued to violate her civil rights. She was used as an example for new Sheriff's trainees on how to book and jail an arrestee. They seized Ms. Porter's purse containing her identification and cash. Using threats, Sheriff's deputies forced Ms. Porter to divulge her social security number, provide a DNA swab, and took her

1   fingerprints. They were not entitled to do any of this information because there was no

2   justification for her arrest in the first place.

3       45.    Sheriff's deputies kept Ms. Porter imprisoned in a jail cell overnight on

4   fabricated charges until Ms. Porter's husband, who was out of town, posted a $25,000

5   bond, which cost the couple $2,500 just to post. At the time of release, Ms. Porter was

6   not allowed to make a phone call to have someone pick her up. Moreover, the SCSO

7   released her without giving her the cash they had seized from her, which left her isolated

8   without a ride or cash to make a phone call using a pay phone. Ms. Porter's mobile phone

9   had been left in her own vehicle when Deputies McCampbell and McDowell

10  unexpectedly took her into custody. Ms. Porter thus found herself lost in a strange area

11  without a phone or any cash. Fortunately, she was able to find a Starbucks and briefly

12  borrow a mobile phone from a stranger to call her family for help. Strangers living

13  outside the Starbucks showed Ms. Porter more humanity than the Sheriff's deputies did.

14  One man (without a home) bought her a drink from Starbucks and another woman (also

15  without a home) shared some bread with her. Ms. Porter conversed with these people

16  until her family arrived to pick her up.

17      46.    Regarding the cash that the SCSO seized from Ms. Porter, the SCSO placed

18  it in a strange account that required Ms. Porter and her husband to go through a

19  convoluted process to retrieve their money. They were charged significant fees.

20      47.    Based on Deputy McCampbell and McDowell's false statements, the SCSO

21  recommended to the Solano County District Attorney's Office that Ms. Porter be

22  criminally prosecuted for preventing an executive officer from performing a duty by

23  means of threat or violence in violation of California Penal Code Section 69. Ms. Porter

24  was restricted from traveling and was required to check in with the bail bond company on

25  a weekly basis, which was very stressful and humiliating for a professional in her

26  position who had done nothing wrong and had *her* rights violated.

27      48.    On September 28, 2020, the District Attorney's Office declined prosecution,

28  filing a Notice of Intent Not to Prosecute. Ms. Porter showed up to the courthouse in

early October, on the date she was required to appear, and received this Notice at the courthouse.

49.     Sheriff's deputies also detained Mr. Powell and restricted his freedom for approximately 45 minutes to an hour, a significant portion of which he was detained in the rear of a Sheriff's vehicle in handcuffs, all of which was unjustified and unreasonable, as neither Ms. Porter nor Mr. Powell had done anything wrong.

50.     Eventually, on the same night that he was detained, Mr. Powell was released and allowed to drive back home in Ms. Porter's vehicle with the children.

**B.     Plaintiffs' Injuries**

51.     As a result of the unlawful seizure, assault, and excessive force by Defendant Deputies McCampbell and McDowell, Ms. Porter and Mr. Powell suffered physical and psychological trauma—trauma that would scar anyone for life—and they are still dealing with the effects of this trauma.

52.     Ms. Porter suffered physical injuries to the head, face, neck, and body—all where officers had admittedly punched and kicked her. Her bruising showed that she was visibly struck in the neck and head areas near the spine that could have paralyzed or killed her. She had signs of a severe Grade III concussion. She was unconscious for more than five minutes and experienced long-term headaches, trouble sleeping, confusion, mood swings, irritability, feelings of sadness, feelings of nervousness and anxiety, sensitivity to light and noise, and dizziness.

53.     Ms. Porter was bruised all over her body and experienced pain in her neck, face, head, wrists, shoulders, and stomach from the arm lock, handcuffs, punches, knees, kicks, and strikes. The acute pain was extreme and persisted for approximately four weeks. Mr. Powell also experienced pain and bruising from the handcuffs that persisted for weeks.

54.     In addition, the Sheriff's deputies violently pulled out Ms. Porter's braids from her head, which was extremely painful. Over the course of the days that followed the beating, Ms. Porter found her braids falling out because they had been pulled out and

weakened in multiple places. She eventually had to cut off the hair that she had grown for approximately ten years, because the pain of the hair being ripped out was too much for her to take and reminded her too much of the assault she had endured.

55.     The psychological trauma has been severe and long-lasting. Both Ms. Porter and Mr. Powell constantly relive the horror on a daily basis, experiencing fear, insecurity, mistrust, anxiety, and difficulty relaxing. They have nightmares.

56.     As a result of the experience, Ms. Porter has had difficulty connecting with her children, husband, family, and friends as she did in the past. She has experienced feelings of shame and isolation, as well as frequent feelings of sadness and mistrust that she did not have before the incident. She even feels panic and anxiety upon physical touch. She finds it difficult to receive healing and engage in self-care as she did prior to the incident. She finds that she has a diminished feeling of self-love and struggles to continue living with the sense of dignity she felt before she was brutally attacked. She describes it like living in a box.

57.     Mr. Powell also feels constant guilt and powerlessness for not being able to protect his daughter and family. As a father, he was made to watch his daughter be handcuffed and beaten by law enforcement without any provocation. Like any father, he wanted to stop the deputies, but he could not because they had badges and guns, and they had ordered him to stay inside the car. He believed that if had he gotten out of the car, the deputies would have shot them both, which happens to people of color—people like him and his family—far too often. Mr. Powell knows logically that it is not his fault, that there is nothing he could have done differently, yet he still feels a sense of shame and loss of dignity that he constantly grapples with.

58.     The young children in the car have also been psychologically scarred, which places additional stress and burden on Ms. Porter, Mr. Powell, and their family, who must now worry about having to help their daughters and granddaughters deal with and process the trauma. For example, the children are now afraid to travel, which is a basic activity that children should be able to freely enjoy with their parents. It is well known in

the psychology field that for children who are at the formative age range of three to six (as Ms. Porter's children and niece were), the psychological trauma of watching their mother, aunt, or other caretaker be physically assaulted leaves deep feelings of insecurity and is developmentally scarring—it is clinically considered child abuse.

59. Ms. Porter and Mr. Powell reside in Sacramento County and still travel periodically to the Oakland area. Each trip causes fear and anxiety as a result of what they experienced at the hands of the Sheriff's deputies. They legitimately fear that they may fall victim to excessive force and constitutional violations at the hands of Sheriff's deputies yet again driving through Solano County.

## C. Pattern and Practice of Racial Profiling and Excessive Force

60. Upon information and belief, the use of racial profiling and excessive force has become a pattern and practice among Sheriff's deputies in Solano County. In fact, excessive force practices in Solano County are so numerous and rampant that it led to the creation of the Solano County Major Crimes Task Force by the District Attorney in November 2020. The Task Force is responsible for conducting independent investigations into the use of deadly force by law enforcement officers in the County. However, the Task Force has not done an adequate job, and deputies continue to engage in excessive force, which, upon information and belief, the County and the SCSO condone and overlook, permitting it to continue.

61. Upon information and belief, Deputies McDowell and McCampbell's gross assault and terror inflicted upon Plaintiffs' family is consistent with the excessive force pattern and practice that exist within the SCSO. Indeed, despite the fact that these deputies' lies were caught on tape, the SCSO and County have done nothing to address the constitutional violations or hold the deputies accountable for their illegal actions, cover-up, and fabrication of charges. These actions, in combination with the frequency of excessive force incidents engaged in by Solano County deputies, show that the SCSO and County have a policy of covering up and condoning excessive force and racial profiling rather than investigating and ending it.

62.     Upon information and belief, Defendant Sgt. Roy Stockton is a member of or otherwise affiliated with the extremist group "The Three Percenters" (*see* discussion below), and he knowingly approved Deputies McCampbell and McDowell's crime reports containing the false statements and fabrication of evidence that were submitted to the District Attorney's Office to have Ms. Porter prosecuted on false charges.

63.     Upon information and belief, deputies at the SCSO, including Sgt. Roy Stockton, belong to, are affiliated with, and/or support the extremist group known as The Three Percenters. *See* Scott Morris, *Solano deputies, Vacaville councilmember promote anti-government militia*, OPEN VALLEJO, February 4, 2021. Upon information and belief, members and affiliates of The Three Percenters show a consistent penchant for extreme force and violence and racist ideologies. *See infra*.

64.     Upon information and belief, the SCSO and County refuse to appropriately and transparently investigate their deputies' membership and affiliation with this extremist group, instead covering up, condoning, and permitting deputies to engage in unlawful enforcement tactics based on extremist and racist ideologies within their ranks. *See* Kim Fu, *Solano sheriff's staff accused of supporting anti-government militia group*, THE MERCURY NEWS, February 11, 2021; Scott Morris, *FBI rebuffs sheriff's claim it cleared deputies of extremist ties*, OPEN VALLEJO, April 26, 2021; *Solano County Sheriff Slammed Over Response to Claim Some Deputies Belong to Extremist Groups*, CBS, April 16, 2021; John Glidden, *Community Group Slams Sheriff for Lack of Transparency*, SFGATE, April 15, 2021; Scott Morris, *Amid calls for investigation, sheriff stands by deputies who displayed militia support,* OPEN VALLEJO, March 9, 2021; Scott Morris, *Solano deputies, Vacaville councilmember promote anti-government militia*, OPEN VALLEJO, February 4, 2021.

65.     Upon information and belief, the Three Percenters is a far-right, pro-gun militia group opposed to the U.S. government. It was founded in 2008 as a reaction to the election of President Barak Obama. *See Jury convicted man in Oklahoma City federal bomb plot trial*, ASSOCIATED PRESS, February 25, 2019. Upon information and belief, in

response to Black Lives Matter protests following the 2014 shooting of Michael Brown in Ferguson, Missouri, the Three Percenters' Facebook page featured numerous racist comments made by its supporters. *See* Mockaitis, Thomas R., *Violent Extremists: Understanding the Domestic and International Terrorist Threat*, Santa Barbara, California: PRAEGER, pp. 80–81, ISBN 978-1-4408-5949-6 (2019).

66.     Upon information and belief, many members of the Three Percenters group are former and current members of the military, police, and other law-enforcement agencies, as well as other anti-government groups such as the Oath Keepers. *See Spencer Sunshine, Profile on the Right: Three Percenters*, POLITICAL RESEARCH ASSOCIATE, January 5, 2016; Avlon, John, *Anti-government hate militias on the rise*, CNN, March 31, 2010.

67.     Upon information and belief, the group's members have a record of involvement in criminal activity and have been associated with acts of violence as well as violent threats. *See* Spencer Sunshine, *Profile on the Right: Three Percenters*, POLITICAL RESEARCH ASSOCIATES, January 5, 2016.

68.     Upon information and belief, supporters of The Three Percenters, among others, were reportedly present and wore emblematic gear or symbols during the riots and storming of the U.S. Capitol on January 6, 2021. *See* Thomas Pallini, *Photos show the aftermath of an unprecedented and destructive siege on the US Capitol that left 4 rioters dead*, BUSINESS INSIDER, January 7, 2021; *Trump supporters storm Capitol; DC National Guard activated; woman fatally shot*, THE WASHINGTON POST, January 7, 2021. After breaching or being let through multiple police perimeters, these groups occupied, vandalized, and ransacked parts of the building for several hours. *Id*. At least one man tied to the Three Percenter movement was arrested and charged with involvement in the attack; the man was also reportedly tied to two other extremist groups, the Oath Keepers and Proud Boys, who are known for their racist rhetoric. *See* Devlin Barrett & Spencer S. Hsu, *FBI probes possible connections between extremist groups at heart of Capitol violence*, WASHINGTON POST, January 17, 2021; Jaclyn Peiser, *Texas man at Capitol riot*

allegedly threatened to kill his kids if they turned him in: 'Traitors get shot',
WASHINGTON POST, January 19, 2021.

69.     Upon information and belief, the Three Percenter group also operates in
Canada, and one Canadian expert, Maxime Fiset, a former neo-Nazi who works with the
Centre for the Prevention of Radicalization Leading to Violence, created in 2015 by the
City of Montréal with the support of the Quebec Government, considers the Three
Percenter group the "most dangerous extremist group" in Canada. *See* Hutter, Christy,
*Three Percenters are Canada's 'most dangerous' extremist group, say some experts*,
CBC, May 10, 2018. Upon information and belief, in June 2021, six men associated with
the group were indicted for conspiracy in Canada, and Canada declared the group a
terrorist entity. *Canada puts U.S. Three Percenters militia on terror list, cites risk of
violent extremism*, REUTERS, June 25, 2021.

70.     California Government Code Section 25307.7 authorizes Solano County to
establish an oversight board to oversee the Sheriff's Office, but the County has actively
resisted and gone out of its way to strike down any measure that would establish such a
board, which would actively and independently investigate the pattern and practice of
excessive force and racial discrimination that is currently being condoned and permitted
by the Solano County Sheriff's Office.

**D.     Concealment and Spoliation of Evidence**

71.     After the Defendant Deputies had assaulted and imprisoned Ms. Porter,
numerous other Sheriff's officers arrived at the scene, including the Defendants
Deputies' supervisor, who was, upon information and belief, Sergeant Roy Stockton.

72.     As Defendant Stockton was walking over to the Defendant Deputies, a
paramedic could be heard on Stockton's body camera saying, "Going to look out for one
of your boys . . . he messed up"; to which Stockton responds, "Yeah. Thanks."

73.     After that, Stockton approached the Defendant Deputies. As he began
speaking to Deputy McDowell, she signaled to him and said that they should turn off
their body cameras, quite obviously to avoid being recorded. Stockton agreed and they

both quickly turned off their body cameras before discussing what had occurred. McDowell can actually be seen turning off her body camera. Nevertheless, the SCSO and County have refused to turn over McDowell's body camera footage during the assault despite the fact that Plaintiff has made numerous requests for preservation as well as production under Gov. Code Section 6250 et seq. The SCSO and County claim that the footage does not exist, but video evidence shows this to be untrue.

74.     Similarly, the SCSO and County have also not produced footage of Deputy McCampbell's dash camera even though, on information and belief, the SCSO dash cameras are programmed to record constantly, and the footage should exist.

75.     Plaintiffs believe that by concealing these videos Defendants are engaged in spoliation activity to conceal or destroy evidence that would further demonstrate their assault and falsification of evidence against Ms. Porter.

76.     Defendants have been and continue to be on notice that they are under an obligation to preserve all evidence. Moreover, if they continue to claim that this footage does not exist, Plaintiffs will move the Court for a forensic examination of the subject cameras—McDowell body camera and McCampbell's dash camera from August 6, 2020. The devices should be preserved.

**E.     Administrative Claim**

77.     On January 13, 2021, Plaintiffs submitted an administrative claim form with a blue ink signature that was scanned and complied in all respects with Cal. Gov. Code § 910. However, on January 20, 2021, a representative from Solano County left a voicemail stating that the forms would not be accepted and needed to be resubmitted because they appeared to be scanned or photocopied instead of the signatures being in original blue ink. The County required Plaintiffs to resubmit the claim forms with "original blue ink" signatures before the claims could be considered and processed even though Cal. Gov. Code § 910 includes no such requirement. Plaintiffs contend that this "original blue ink" signature requirement is an arbitrary and capricious requirement above and beyond what Cal. Gov. Code § 910 requires—it is a nonsensical measure by

Solano County blatantly intended to make it difficult for people to file claims and it has the effect of assisting bad actors at the County to avoid liability for their malfeasance.

78.     On January 20, 2021 (the same day the County official informed their counsel that an original blue ink signature was required), Plaintiffs resubmitted their administrative claim forms with original blue ink signatures.

79.     On February 24, 2021, an adjuster representing Solano County called to request additional information about the administrative claim in order to process the claim. Plaintiffs' counsel called back the adjuster and left a voicemail but did not hear from him again.

80.     To date, Defendants have not responded to Plaintiffs' administrative claim. Therefore, in this case, Cal. Gov. Code § 945.6 authorizes Plaintiffs to file this suit within two years from the accrual of the cause of action. Cal. Gov. Code § 945.6(a)(2).

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### FOURTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### 42 U.S.C. § 1983

### (UNLAWFUL SEIZURE)

### (AIDING AND ABETTING)

### (*Against All Defendants*)

81.     Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

82.     "The Fourth Amendment protects against unreasonable seizures by the government." *Gonzalez v. ICE*, 975 F.3d 788, 819 (9th Cir. 2020) (citing U.S. Const. amend. IV). "The infringement on personal liberty of any 'seizure' of a person can only

be 'reasonable' under the Fourth Amendment if we require the police to possess 'probable cause' *before* they seize him." *Id.* (emphasis in original) (quoting *Terry v. Ohio*, 392 U.S. 1, 38 (1968)). "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

83.     When a person is seized for a traffic infraction, so too are all other persons in the vehicle. *Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021). The California Penal Code clearly provides that, for traffic infractions, "a peace officer shall *only* require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear. . . . *Only if* the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody." Cal. Penal Code § 853.5(a).

84.     As described in detail above in Section IV(Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments, by seizing, arresting, unreasonably taking into custody, and prolonging the detention of Plaintiffs without cause and in violation of clearly established state and federal law. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

85.     As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

86.     Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

87.     The County and SCSO are liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because SCSO has a policy, practice, pattern, and/or

custom of unlawfully condoning, permitting, and not sufficiently addressing its law enforcement officers' use of unlawful detention and excessive force in violation of the Fourth and Fourteenth Amendments. This policy, practice, pattern, and/or custom is carried out with municipal funds and directly causally related to the deprivations of Plaintiffs' Fourth and Fourteenth Amendment rights by Defendants.

88.     The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this federal constitutional violation. Cal. Gov. Code § 815.2.

## SECOND CLAIM FOR RELIEF

### FOURTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION

### VIOLATION OF 42 U.S.C. § 1983

### (EXCESSIVE FORCE)

### (AIDING AND ABETTING)

### (*Against All Defendants*)

89.     Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

90.     "Excessive use of force in effectuating a seizure violates the Fourth Amendment." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1165 (9th Cir. 2014) (citing *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989)). Drawing and pointing a gun at an unarmed, compliant suspect constitutes excessive force. *Id*. (citing *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir. 2002) (en banc)). Handcuffing and detaining a person not suspected of any crime also constitutes excessive force. *Id*.

91.     As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights,

privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments, by unreasonably pointing a gun at, handcuffing, detaining, and assaulting Plaintiffs. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

92.     As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

93.     Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

94.     The County and SCSO are liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because SCSO has a policy, practice, pattern, and/or custom of unlawfully condoning, permitting, and not sufficiently addressing its law enforcement officers' use of unlawful detention and excessive force in violation of the Fourth and Fourteenth Amendments. This policy, practice, pattern, and/or custom is carried out with municipal funds and directly causally related to the deprivations of Plaintiffs' Fourth and Fourteenth Amendment rights by Defendants.

95.     The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this federal constitutional violation. Cal. Gov. Code § 815.2.

### THIRD CLAIM FOR RELIEF

**FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION**

**VIOLATION OF 42 U.S.C. § 1983**

**(FALSE STATEMENTS AND FABRICATION OF EVIDENCE)**

**(AIDING AND ABETTING)**

(*Against All Defendants*)

96.    Plaintiff Nakia Porter ("Plaintiff") brings this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and realleges and incorporates by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

97.    "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).

98.    As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth, Fifth, and Fourteenth Amendments, by imprisoning Plaintiff on fabricated charges and submitting false evidence against her to conceal their own unlawful acts. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

99.    As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

100.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

101.   The County and SCSO are liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because SCSO has a policy, practice, pattern, and/or custom of unlawfully condoning, permitting, and not sufficiently addressing its law enforcement officers' use of excessive force in violation of the Fourth and Fourteenth Amendments. This policy, practice, pattern, and/or custom is carried out with municipal funds and directly causally related to the deprivations of Plaintiffs' Fourth and Fourteenth Amendment rights by Defendants.

102.   The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this federal constitutional violation. Cal. Gov. Code § 815.2.

**FOURTH CLAIM FOR RELIEF**

**FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION**

**VIOLATION OF 42 U.S.C. § 1983**

**(EQUAL PROTECTION)**

**(AIDING AND ABETTING)**

(*Against All Defendants*)

103.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

104.   The Fourteenth Amendment prohibits law enforcement officers from acting in an intentionally discriminatory manner. *Lacy v. Villeneuve*, No. C03-2442JLR, 2005 U.S. Dist. LEXIS 31639, at *12 (W.D. Wash. Nov. 21, 2005) (citing *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003)).

105.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally deprived Plaintiffs of rights,

privileges, and immunities secured by the Constitution and laws of the United States, including the Fourth and Fourteenth Amendments, by unreasonably pointing a gun at, handcuffing, detaining, and assaulting Plaintiffs, and additionally jailing and fabricating evidence against Plaintiff Porter and submitting her case for prosecution. Plaintiffs had done nothing wrong, and their only distinguishing characteristic was that they are identifiably Black. Indeed, Deputy McCampbell had racially demeaned Mr. Powell by referring to him as "young man," which to Mr. Powell sounded like the racial slur "boy" used to demean Black men. The Defendant Deputies together pulled out Ms. Porter's braids as they were beating her, which, for a Black woman, is not only very painful but soul crushing because it takes years of care and grooming to grow and develop the locks.

106.   As discussed in greater detail above, Deputies McCampbell and McDowell are supervised by Defendant Sergeant Roy Stockton, who is reported to have ties to the extremist group The Three Percenters, whose members have openly espoused racists beliefs and made racist remarks. Sergeant Stockton knowingly approved the false reports written by Deputies McDowell and McCampbell to cover up their racially motivated attack on Plaintiffs and to have Plaintiff Porter charged based on false evidence.

107.   Upon information and belief, the SCSO and County refuse to appropriately and transparently investigate their deputies' membership and affiliation with the extremist group The Three Percenters, instead concealing, condoning, and permitting deputies to engage in unlawful enforcement tactics based on extremist and violent racist ideologies within their ranks.

108.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

109.   Individual defendants are personally liable under 42 U.S.C. § 1983 and not immune based on the doctrine of qualified immunity.

110.   The County and SCSO are liable pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because SCSO has a policy, practice, pattern, and/or custom of unlawfully condoning, permitting, and not sufficiently addressing its law

enforcement officers' discriminatory enforcement and excessive force, in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. This policy, practice, pattern, and/or custom is carried out with municipal funds and directly causally related to the deprivations of Plaintiffs' Fourteenth Amendment rights by Defendants.

111. The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this federal constitutional violation. Cal. Gov. Code § 815.2.

## FIFTH CLAIM FOR RELIEF

### CAL. CIV. CODE § 52.1 (TOM BANE CIVIL RIGHTS ACT)

### (AIDING AND ABETTING)

#### (*Against All Defendants*)

112. Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

113. The Tom Bane Civil Rights Act provides for liability when a defendant's threats, intimidation, or coercion interferes or attempts to interfere with "the exercise or enjoyment by any individual of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a).

114. As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, engaged in threats, intimidation, or coercive acts that interfered with or attempted to interfere with the rights of Plaintiffs secured under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution, Sections 7 and 13 of Article I of the California Constitution, and Cal. Pen. Code § 853.5. Defendant

Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

115.   Defendants unlawfully took Plaintiffs into custody and imprisoned and detained them without probable cause for an unreasonably lengthy period, with the particular purpose of depriving Plaintiffs of the protections that applied to them under the U.S. and California Constitutions and state law.

116.   Defendants additionally unlawfully applied excessive force against Plaintiffs with the particular purpose of depriving Plaintiffs of the protections that applied to them under the U.S. and California Constitutions and state law.

117.   Defendants also fabricated evidence against Ms. Porter in an attempt to have her falsely charged with the particular purpose of depriving her of the protections that applied to her under the U.S. and California Constitutions and state law

118.   Defendants' deliberate and reckless actions caused Plaintiffs to suffer significant harm.

119.   Individual defendants are personally liable under the Bane Civil Rights Act.

120.   The County and the Sheriff's Department are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable under the Bane Act. Cal. Gov. Code § 815.2.

### SIXTH CLAIM FOR RELIEF

### CAL. CIV. CODE § 51.7 (RALPH CIVIL RIGHTS ACT)

### (AIDING AND ABETTING)

*(Against All Defendants)*

121.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and

1  every allegation of the preceding paragraphs, with the same force and effect as though

2  fully set forth herein.

3      122.   The Ralph Civil Rights Act provides that "[a]ll persons within the

4  jurisdiction of this state have the right to be free from any violence, or intimidation by

5  threat of violence, committed against their persons or property because of political

6  affiliation, or on account of [their sex, race, color, religion, ancestry, national origin,

7  disability, medical condition, genetic information, marital status, sexual orientation,

8  citizenship, primary language, or immigration status] . . . because another person

9  perceives them to have one or more of those characteristics." Cal. Civ. Code §§ 51 and

10  51.7.

11      123.   As described in detail above in Section IV (Facts Common to All Counts),

12  Defendants, acting under color of state law, intentionally committed violence and

13  intimidation by threat of violence against Plaintiffs on account of their race, color, and

14  ancestry by unreasonably pointing a gun at, handcuffing, detaining, and assaulting

15  Plaintiffs, and additionally jailing and fabricating evidence against Plaintiff Porter and

16  submitting that evidence to have her falsely prosecuted. Plaintiffs had done nothing

17  wrong, and their only distinguishing characteristic was that they are identifiably Black.

18  Indeed, Deputy McCampbell had racially demeaned Mr. Powell by referring to him as

19  "young man," which to Mr. Powell sounded like the racial slur "boy" used to demean

20  Black men. The Defendant Deputies together pulled out Ms. Porter's braids as they were

21  beating her, which, for a Black woman, is not only very painful but soul crushing

22  because it takes years of care and grooming to grow and develop the locks.

23      124.   As discussed in detail above, Deputies McCampbell and McDowell are

24  supervised by Defendant Sgt. Roy Stockton, who is reported to have ties to the extremist

25  group The Three Percenters, whose members have openly espoused racists beliefs and

26  made racist remarks. Sgt. Stockton knowingly approved the false reports written by

27  Deputies McDowell and McCampbell to cover up their racially motivated attack on

28  Plaintiffs and to have Ms. Porter falsely charged.

125.   The SCSO and County refuse to appropriately and transparently investigate their deputies' membership and affiliation with the extremist group The Three Percenters, and/or other such racist and extremist groups, and instead conceal, condone, and permit racist and violent extremist ideologies within their ranks.

126.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

127.   Individual defendants are personally liable under the Ralph Civil Rights Act.

128.   The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

## SEVENTH CLAIM FOR RELIEF

### CAL. GOV. CODE § 815.6

### (Aiding & Abetting)

*(Against All Defendants)*

129.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

130.   "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cal. Gov. Code § 815.6.

131.   California Penal Code Section 853.5 imposes a duty upon peace officers to *not* take into custody any person seized for a traffic infraction, and the person may be taken into custody *only if* that person is unable to present identification or refuses to sign

a notice to appear. Cal. Pen. Code § 853.5(a). The statute is clearly designed to protect the public from unreasonably being taken into custody by peace officers investigating a traffic infraction.

132.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, failed to discharge their duty in that, for the pretextual reason they claim they approached Ms. Porter—a mismatched license plate— Defendants took Ms. Porter into custody without so much as asking for an identification or explanation even though she was more than willing to provide those. They never questioned her about the mismatched license plate or presented her with any citation or notice to appear. Instead, Deputies McCampbell and McDowell took Plaintiffs into custody without cause. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

133.   Defendants are therefore liable under Cal. Gov. Code § 815.6.

### EIGHTH CLAIM FOR RELIEF

#### FALSE IMPRISONMENT

#### (AIDING AND ABETTING)

*(Against All Defendants)*

134.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

135.   "False imprisonment involves the intentional confinement of another against the person's will. The elements are (1) nonconsensual, intentional confinement of a

person, (2) without lawful privilege, (3) for an appreciable period of time, however brief." *Bocanegra v. Jakubowski*, 241 Cal. App. 4th 848, 854 (2015) (citations omitted). *See also Young v. City of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011).

136.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally, recklessly, and negligently took and held Plaintiffs in custody and confined them against their will for an appreciable period of time, even though they had no privilege to do so, and constitutional and state statutory law explicitly prohibited Defendants from doing so. *See* U.S. Const., amend. IV and XIV; Cal. Const., art. 1, §§ 7 and 13; Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

137.   Individual defendants are personally liable for false imprisonment.

138.   The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

### NINTH CLAIM FOR RELIEF
### ASSAULT & BATTERY
### (AIDING AND ABETTING)
### (*Against All Defendants*)

139.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

140.   "The essential elements of a cause of action for assault are: (1) defendant

acted with intent to cause harmful or offensive contact, or threatened to touch plaintiff in a harmful or offensive manner; (2) plaintiff reasonably believed she was about to be touched in a harmful or offensive manner or it reasonably appeared to plaintiff that defendant was about to carry out the threat; (3) plaintiff did not consent to defendant's conduct; (4) plaintiff was harmed; and (5) defendant's conduct was a substantial factor in causing plaintiff's harm." *So v. Shin*, 212 Cal.App.4th 652, 668-69 (2013).

141.   "The essential elements of a cause of action for battery are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching." *Id.* at 669.

142.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally, recklessly, and negligently, and with the intent to harm Plaintiffs, pointed one or more guns at Plaintiffs, placed Plaintiffs in handcuffs, took Plaintiffs into custody and confined them against their will, and beat Plaintiff Porter out of consciousness even though constitutional and state statutory law explicitly prohibited Defendants from doing so. *See* U.S. Const., amend. IV and XIV; Cal. Const., art. 1, §§ 7 and 13; Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

143.   Plaintiffs did not consent to Defendants' offensive conduct and reasonably believed that they were going to be harmed and were harmed, as any reasonable person in Plaintiffs' position would have been.

144.   Defendants' offensive conduct directly and proximately injured Plaintiffs.

145.   Individual defendants McCampbell and McDowell are personally liable for assault and battery.

146.   The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

### TENTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (AIDING AND ABETTING)

*(Against All Defendants)*

147.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

148.   "A cause of action for intentional infliction of emotional distress exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal.4th 1035,1050-1051 (2009) (internal quotation marks omitted).

149.   As described in detail above in Section IV (Facts Common to All Counts), Defendants, acting under color of state law, intentionally, recklessly, and negligently, and with the intent to harm Plaintiffs, pointed one or more guns at Plaintiffs, placed Plaintiffs in handcuffs, took Plaintiffs into custody and confined them against their will, beat Plaintiff Porter out of consciousness, and imprisoned and attempted to bring fabricated charges against Ms. Porter on the basis of false statements in order to conceal their own unlawful acts, even though constitutional and state statutory law explicitly prohibited Defendants from doing so. *See* U.S. Const., amend. IV and XIV; Cal. Const., art. 1, §§ 7 and 13; Cal. Pen. Code § 853.5. Defendant Stockton failed to perform his duty to

appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

150.   Defendants' conduct was extreme and outrageous and was done with the intention of causing, or in reckless disregard of the probability of causing, emotional distress to Plaintiffs. Defendants' conduct was carried out in direct violation of constitutional and statutory law and in a willful abuse of power; it was intended to cause extreme injury to Plaintiffs and their children with the realization that it would do so. Defendants' conduct was so extreme as to exceed all bounds of that usually tolerated in a civilized community.

151.   Plaintiffs suffered severe or extreme emotional distress and injury as a direct and proximate result of Defendants' outrageous conduct.

152.   Defendants' offensive conduct directly and proximately injured Plaintiffs.

153.   Individual defendants McCampbell and McDowell are personally liable for assault and battery.

154.   The County and the SCSO are separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

### ELEVENTH CLAIM FOR RELIEF

#### NEGLIGENCE PER SE

#### (AIDING AND ABETTING)

##### (*Against All Defendants*)

155.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this claim for relief against all Defendants, who aided and abetted one another in the acts alleged in this claim, and reallege and incorporate by reference in this claim each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

156.   To establish negligence per se, "plaintiff must show that (1) defendant violated a statute, ordinance or regulation of a public entity, (2) the violation proximately caused his injury, (3) the injury resulted from an occurrence of the nature which the statute was designed to prevent; [and] (4) he was one of the class of persons for whose protection the statute was adopted." *Sierra-Bay Fed. Land Bank Assn. v. Superior Court*, 227 Cal. App. 3d 318, 336 (1991).

157.   Plaintiffs belong to the class of persons that Cal. Pen. Code § 853.5 was designed to protect.

158.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants McCampbell and McDowell violated Cal. Pen. Code § 853.5, and Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

159.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence the nature of which Cal. Pen. Code § 853.5 was designed to prevent.

160.   Plaintiffs belong to the class of persons that the Bane Civil Rights Act was designed to protect.

161.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants McCampbell and McDowell violated the Bane Civil Rights Act, and Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

162.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence of the nature which the Bane Civil Rights Act was designed to prevent.

163.   Plaintiffs belong to the class of persons that the Ralph Civil Rights Act was designed to protect.

164.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants McCampbell and McDowell violated the Ralph Civil Rights Act, and Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

165.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence of the nature which the Ralph Civil Rights Act was designed to prevent.

166.   Plaintiffs belong to the class of persons that the Cal. Gov. Code § 815.6 was designed to protect.

167.   As detailed in Section IV (Facts Common to All Counts) and the claims above, acting under color of state law, Defendants McCampbell and McDowell violated Cal. Gov. Code § 815.6, Defendant Stockton failed to perform his duty to appropriately supervise the Defendant Deputies, and rather aided and abetted them in covering up the violations, knowingly approving their falsified reports for submission to the District Attorney's Office to recommend prosecution against Ms. Porter in order to shield Defendants from liability.

168.   These violations directly and proximately caused injury to Plaintiffs and the injury resulted from an occurrence of the nature which Cal. Gov. Code § 815.6 was designed to prevent.

169.   Individual defendants are personally liable for negligence *per se*.

1    170.   The County and the SCSO are separately vicariously liable under state law,

2  because their employees, acting within the course and scope of their duties, are liable for

3  this state law violation. Cal. Gov. Code § 815.2.

4

5                              **TWELFTH CLAIM FOR RELIEF**

6                                        **NEGLIGENCE**

7                              **(MALICE AND OPPRESSION)**

8                                  (*Against All Defendants*)

9    171.   Plaintiffs Nakia Porter and Joe Berry Powell, Jr. ("Plaintiffs") bring this

10  claim against all Defendants, and reallege and incorporate by reference in this claim each

11  and every allegation of the preceding paragraphs, with the same force and effect as

12  though fully set forth herein.

13    172.   At all times material to this complaint, Defendants, and specifically Sgt.

14  Stockton, under color of law, had a duty to supervise Deputies McCampbell and

15  McDowell (the "Defendant Deputies").

16    173.   As described in detail above in Section IV (Facts Common to All Counts),

17  the Defendant Deputies, acting under color of state law, unlawfully seized Plaintiffs and

18  used excessive force against them and intentionally committed violence and intimidation

19  by threat of violence against Plaintiffs on account of their race, color, and ancestry, all by

20  unreasonably pointing a gun at, handcuffing, detaining, and assaulting Plaintiffs, as well

21  as jailing and fabricating evidence against Plaintiff Porter and submitting that evidence to

22  have her falsely prosecuted. Plaintiffs had done nothing wrong, and their only

23  distinguishing characteristic was that they are identifiably Black. Indeed, Deputy

24  McCampbell had racially demeaned Mr. Powell by referring to him as "young man,"

25  which to Mr. Powell sounded like the racial slur "boy" used to demean Black men. The

26  Defendant Deputies together pulled out Ms. Porter's braids as they were beating her,

27  which, for a Black woman, is not only very painful but soul crushing because it takes

28  years of care and grooming to grow and develop the locks. At a minimum, the Defendant

Deputies acted negligently and, in doing so, engaged in malice and oppression and despicable conduct with a willful and conscious disregard of the rights or safety of Plaintiffs.

174.   As discussed in detail above, Deputies McCampbell and McDowell are supervised by Defendant Sgt. Roy Stockton, who is reported to have ties to the extremist group The Three Percenters, whose members have openly espoused violent, extremist beliefs and made racist remarks. Sgt. Stockton knowingly or, at a minimum, negligently approved the false reports written by Deputies McDowell and McCampbell to cover up their attack on Plaintiffs and to have Ms. Porter falsely charged, all of which appears to be racially motivated and unconstitutional regardless of racial bias. Sgt. Stockton thus engaged in malice and oppression and despicable conduct with a willful and conscious disregard of the rights or safety of Plaintiffs.

175.   Despite this and despite having video evidence of misconduct, the SCSO and County refuse to appropriately and transparently investigate their deputies' use of excessive force and membership and affiliation with the extremist group The Three Percenters, and/or other such racist and extremist groups, and instead conceal, condone, and permit racist and violent extremist ideologies within their ranks, permitting a pattern of constitutional violations to persist. At a minimum, the SCSO and County have acted negligently in refusing to appropriately investigate and condoning the unlawful activities of Deputies McCampbell and McDowell, and Sgt. Stockton.

176.   As a direct and proximate result of Defendants' aforementioned acts, Plaintiffs were injured as set forth above.

177.   Sgt. Stockton is personally liable for his negligence.

178.   The County and the SCSO are directly for their negligence, and separately vicariously liable under state law, because their employees, acting within the course and scope of their duties, are liable for this state law violation. Cal. Gov. Code § 815.2.

## VI.   **PRAYER FOR RELIEF**

WHEREFORE, on the basis of the foregoing claims, Plaintiffs pray that the Court grant judgment against Defendants as follows:

1. General and compensatory damages in an amount according to proof;

2. Special damages according to proof;

3. Injunctive relief;

4. Costs, restitution, and multiple damages according to proof;

5. Punitive and exemplary damages according to proof;

6. Any and all applicable statutory and civil penalties;

7. Pre- and post-judgment interest on any amounts awarded;

8. An award of attorneys' fees and costs, including expert costs;

9. Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

10. Such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all triable issues.


Dated:  August 18, 2021                    ALMADANI LAW

                                                     By:  _____*/s/ Yasin M. Almadani*_____
                                                            Yasin M. Almadani, Esq.

                                                            *Attorney for Plaintiffs*