Yasin M. Almadani (Cal. Bar No. 242798)
ALMADANI LAW
4695 MacArthur Ct., Suite 1100
Newport Beach, CA 92660
(949) 877-7177 | YMA@LawAlm.com

Ahmed Ibrahim (Cal. Bar No. 238739)
AI LAW, PLC
4695 MacArthur Ct., Suite 1100
Newport Beach, CA 92660
Tel: (949) 266-1240
Fax: (949) 266-1280
aibrahim@ailawfirm.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

# SACRAMENTO DIVISION

| | |
|---|---|
| NAKIA V. PORTER, an individual on her own behalf and on behalf of her minor children, L.P. and A.P; JOE BERRY POWELL, JR., an individual; and CLIFTON POWELL, on behalf of his minor child, O.P., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SOLANO; SOLANO COUNTY SHERIFF'S OFFICE; SHERIFF THOMAS A. FERRARA, in his official capacity as Sheriff of Solano County; DEPUTY DALTON MCCAMPBELL, an individual; DEPUTY LISA MCDOWELL, an individual; SERGEANT ROY STOCKTON, an individual; DEPUTY CONNOR HAMILTON, an individual; DEPUTY CHRIS CARTER, an individual; CITY OF DIXON; DIXON POLICE DEPARTMENT; DIXON POLICE CHIEF ROBERT THOMPSON, in his official capacity as Dixon Chief of Police; OFFICER GABRIEL HOLLINGSHEAD, an individual, OFFICER AARON WILLIAMS, an individual, and DOES 1 to 10, inclusive, <br><br> Defendants. | Case No. 2:21-CV-01473-KJM-JDP <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; STATEMENT OF UNDISPUTED FACTS; DECLARATION OF YASIN M. ALMADANI; DECLARATION OF NAKIA V. PORTER; DECLARATION OF JOE BERRY POWELL, JR.** <br><br> Hon. Kimberly J. Mueller <br> United States District Judge <br><br> **Hearing Information:** <br> Date:        December 13, 2024 <br> Time:        10:00 a.m. <br> Judge:      Hon. Kimberly J. Mueller <br> Courtroom:  3, 15th Floor |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**

PLEASE TAKE NOTICE THAT on December 13, 2024 at 10:00 a.m. or as soon thereafter as counsel may be heard in Courtroom 3 of the above-captioned Court located on the 15th floor of the Robert T. Matsui United States Courthouse, 501 I Street, Sacramento, California 95814, Plaintiffs Nakia V. Porter, on behalf of herself and her two daughters, L.P. and A.P., Joe Berry Powell, Jr., and Clifton Powell, on behalf of his daughter, O.P. (collectively, "Plaintiffs"), by and through their undersigned counsel of record, will and hereby do move for partial summary judgment also referred to as summary adjudication pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 260, respectively.

The motion seeks partial summary judgment for liability concerning federal law Claims One (Unreasonable Seizure), Claim Two (Excessive Force), and Claim Three (Unreasonable Search), along with related state law Claims Ten (false imprisonment), Eleven (assault & battery), and Seven (violations of the Bane Act).

Because this case involves successive stages of constitutional violations, each stage requires its own analysis. The motion is thus organized into five stages, each analyzed separately vis-à-vis the constitutional violations.

STAGE ONE: (Implicating Claims One, Two, Ten, Eleven, and Seven) Plaintiffs seek the following findings: **(1)** Defendants McCampbell and McDowell engaged in excessive force against Ms. Porter and Mr. Powell when McCampbell pointed a firearm at Plaintiffs during a traffic stop for a non-moving violation and McDowell assisted; **(2)** McCampbell and McDowell engaged in excessive force and unreasonable seizure when they handcuffed Ms. Porter and dragged her away from her car without reasonable suspicion of a crime, and despite her being polite and non-threatening, and attempting to comply with their commands; **(3)** When the Deputies engaged in excessive force, Ms. Porter had a legal right to reasonably resist the excessive force, and she lawfully exercised this right by trying to avoid and question her illegal handcuffing; and **(4)** In doing the above, McDowell and McCampbell also engaged in the related state law violations of false imprisonment, assault & battery, and the Bane Act.

STAGE TWO: (Implicating Claims One, Two, Ten, Eleven, and Seven) Plaintiffs seek the following findings: **(1)** When McCampbell and McDowell beat Ms. Porter unconscious and confined her

in a patrol car, they engaged in additional acts of excessive force and unreasonable seizure against her; and **(2)** In doing the above, McDowell and McCampbell also engaged in the related state law violations of false imprisonment, assault &battery, and the Bane Act.

STAGE THREE: (Implicating Claims One, Two, Ten, Eleven, and Seven) Plaintiffs seek the following findings: McCampbell and McDowell engaged in additional acts of excessive force and unreasonable seizure when, despite having no reasonable suspicion of a crime and Mr. Powell being polite and compliant, they pulled Mr. Powell out of his vehicle and made him walk backwards with his hands on his head at gunpoint, handcuffed him, and confined him in a patrol car, seizing him for a total of approximately 45 minutes; and **(2)** In doing the above, McDowell and McCampbell also engaged in the related state law violations of false imprisonment, assault & battery, and the Bane Act.

STAGE FOUR: (Implicating Claims One, Two, Ten, Eleven, and Seven) Plaintiffs seek the following finding: McCampbell and McDowell engaged in excessive force and unreasonable seizure against the Children when they pointed a gun at the children, isolated them from the caretakers, and seized them for a total of approximately 45 minutes; and **(2)** In doing the above, McDowell and McCampbell also engaged in the related state law violations of false imprisonment, assault & battery, and the Bane Act.

STAGE FIVE: (Implicating Claims One, Ten, and Seven) Plaintiffs seek the following findings: **(1)** After arriving on the scene, Defendants Stockton, Carter, and Hamilton integrally participated in Mr. Powell and the Children's prolonged unlawful seizure despite knowing that there was no basis to continue the seizure; **(2)** As McCampbell and McDowell's supervisor on the scene, Sgt. Stockton additionally bears supervisory liability for Mr. Powell and the Children's prolonged unlawful seizure because he knew or should have known that there was no basis to continue the seizure; and **(3)** In doing the above, Stockton, Carter, and Hamilton engaged in the related state law violations of false imprisonment and the Bane Act.

VEHICLE SEARCH: (Implicating Claim Three) Plaintiffs seek the following finding: McCampbell and McDowell engaged in an unreasonable search of Plaintiffs' vehicle (and caused other officers to do so) when they searched Plaintiffs' vehicle without a warrant or any reasonable basis to avail a legally cognizable exception to the warrant requirement.

Undersigned counsel certify that meet and confer efforts have been exhausted through multiple

conferences via Zoom conferences, telephone calls, and emails. During these conferences, undersigned counsel explained the bases for this Motion and answered opposing counsel's questions, after which no resolution was reached.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Declarations of Yasin M. Almadani, Nakia V. Porter, and Joe Berry Powell, Jr., the Statement of Undisputed Facts, the pleadings and papers on file herein, and any other written and oral arguments that the Court may consider.

Dated: September 20, 2024                     ALMADANI LAW


                                              */s/ Yasin M. Almadani*
                                              Yasin M. Almadani, Esq.



                                              AI LAW, PLC


                                              */s/ Ahmed Ibrahim*
                                              Ahmed Ibrahim, Esq.

                                              *Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................................ 1

II.  STATEMENT OF FACTS ............................................................................................. 2

III. LEGAL STANDARD ................................................................................................... 10

IV.  ARGUMENT ................................................................................................................ 11

    A.   UNREASONABLE SEIZURE ........................................................................................... 11

    B.   EXCESSIVE FORCE ....................................................................................................... 12

    C.   DURING STAGE ONE, DEPUTIES MCCAMPBELL AND MCDOWELL ENGAGED IN EXCESSIVE FORCE AND UNREASONABLE SEIZURE BY POINTING A GUN AT MS. PORTER AND MR. POWELL, AND ARM-LOCKING, HANDCUFFING, AND DRAGGING MS. PORTER AWAY FROM HER VEHICLE WHILE SHE WAS HAVING A POLITE CONVERSATION AND TRYING TO BE COMPLAINT ................................................................................................................. 12

    D.   DURING STAGE ONE, MS. PORTER HAD THE RIGHT TO QUESTION AND REASONABLY RESIST THE EXCESSIVE FORCE BEING USED AGAINST HER ...................................................................... 17

    E.   DURING STAGE TWO, MCCAMPBELL ENGAGED IN ADDITIONAL EXCESSIVE FORCE AND UNREASONABLE SEIZURE WHEN HE SLAMMED MS. PORTER TO THE ASPHALT BY HER HEAD, BEAT HER UNCONSCIOUS, AND LOCKED HER UP IN A PATROL CAR AS MCDOWELL ASSISTED ................................... 19

    F.   DURING STAGE THREE, MCCAMPBELL AND MCDOWELL ENGAGED IN ADDITIONAL EXCESSIVE FORCE AND UNREASONABLE SEIZURE WHEN THEY FORCED MR. POWELL OUT OF HIS VEHICLE AT GUNPOINT, HANDCUFFED HIM, AND LOCKED HIM UP IN A PATROL CAR .................................................. 22

    G.   DURING STAGE FOUR, MCCAMPBELL AND MCDOWELL ENGAGED IN EXCESSIVE FORCE AND UNREASONABLE SEIZURE AGAINST THE CHILDREN WHEN THEY APPROACHED THE CHILDREN (AGES 3 TO 6) WITH A GUN POINTED AND UNNECESSARILY ISOLATED THEM FROM THEIR CARETAKERS FOR 45 MINUTES DURING A TRAFFIC STOP VIOLATED ........ 24

    H.   STAGE FIVE INCLUDES THE UNCONSTITUTIONALLY PROLONGED SEIZURE OF MR. POWELL AND THE CHILDREN BY STOCKTON, CARTER, AND HAMILTON AFTER THEY ARRIVED ON SCENE .............................. 25

        1. *Stockton, Carter, and Hamilton are Liable as Integral Participants for the Prolonged Seizure of Mr. Powell, and Minors L.P. and A.P.* ........................................................................... 25

        2. *Liability of Sergeant Stockton as the Supervising Sergeant on Scene* ............................... 26

    I.   THE SEARCH OF PLAINTIFFS' VEHICLE VIOLATED THEIR CONSTITUTIONAL AND STATE LAW RIGHTS TO BE FREE FROM UNREASONABLE SEARCH ...................................................................... 27

        1. *The Automobile Exception Does Not Apply* ...................................................................... 27

        2. *The Search Incident to Lawful Arrest Exception Does Not Apply* ...................................... 28

    J.   STATE LAW CLAIMS ................................................................................................... 29

        1. *Claim Ten (False Imprisonment)* ....................................................................................... 29

2.  *Claim Eleven (Assault & Battery)* ..................................................................... 29

3.  *Claim Seven (Civ Code § 52.1)* ....................................................................... 30

K.  Affirmative Defense No. 8 for Comparative Fault or Apportionment of Fault and No. 30 for Assumption of Risk Must Be Dismissed as to the Federal Claims ................................. 30

V.  **CONCLUSION** ................................................................................................. **31**

# Table of Authorities

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ............................................... 10

*Arizona v. Gant*, 556 U.S. 332, 335, 338, 343 (2009) ......................................................... 28

*Benavides v. City of Arvin*, No. F-CV-12-0405-LJO, 2012 U.S. Dist. LEXIS 73313, at *16 (E.D. Cal. May 25, 2012) ............................................................................................................. 18

*Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) ........................... 17, 18, 21, 25

*Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004) ..................................................... 17, 25

*Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) ..................................................... 11

*Brown v. Grinder*, No. 2:13-cv-01007-KJM-KJN, 2019 WL 280296, at *8 (E.D. Cal. Jan. 22, 2019)   19

*California v. Acevedo*, 500 U.S. 565, 580 (1991) ................................................................. 28

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ........................................................... 10

*Chinaryan v. City of L.A.*, No. 2:19-cv-09302 MCS (Ex), 2021 U.S. Dist. LEXIS 194937, at *19 (C.D. Cal. Jan. 25, 2021) ..................................................................................................... 14

*Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996) ................................................... 17

*Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) .......................................................... 14

*Cty. of Los Angeles v. Mendez*, 581 U.S. 420, 427-28 (2017) ............................................ 12

*Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006) ........................................ 28

*Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1051 (E.D. Cal. 2013) ............................ 11

*Dragna v. White*, 45 Cal. 2d 469, 471 (1955) ..................................................................... 29

*Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) ................ 14

*Estate of Simpson v. Yellowstone Cty.*, 229 F. Supp. 3d 1192, 1208 (D. Mont. 2017) ....... 14

*Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) ................................................... 26

*Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) ....................................................... 14

*Graham v. Connor*, 490 U.S. 386, 388 (1989) .................................................................... 12

*Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097-98 (9th Cir. 2013) .............................. 11

*Green v. City & Cty. of S.F.*, 751 F.3d 1039, 1050 (9th Cir. 2014) .................................... 13, 22, 23

*Gutierrez v. City of Sacramento*, No. 2:22-cv-00802-KJM-JDP, 2023 U.S. Dist. LEXIS 73567, at *16 (E.D. Cal. Apr. 26, 2023).................................................................. 23

*Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) ......................................... 26

*Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000) .................. 14

*Huerta v. Cty. of Tulare*, No. 1:17-cv-01446-EPG, 2024 U.S. Dist. LEXIS 34430, at *17 (E.D. Cal. Feb. 28, 2024)............................................................................... 19

*Illinois v. Caballes*, 543 U. S. 405, 407 (2005) ................................................. 12

*Illinois v. Gates*, 462 U.S. 213, 238 (1983) ...................................................... 28

*James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) ................. 17, 25

*Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1175 (9th Cir. 2013).................... 14

*Jones v. Williams*, 297 F.3d 930, 937 n.6 (9th Cir. 2002) ................................. 25

*Katz v. United States*, 389 U.S. 347, 357 (1967) .............................................. 27

*Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (2012) ........................................ 11

*L.F. by & through Brown v. City of Stockton*, No. 2:17-CV-01648-KJM-DB, 2018 WL 3817558, at *6, 8 (E.D. Cal. Aug. 10, 2018) ..................................................... *31*

*Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) .............................. 14

*Matsushita Elec. v. Zenith Radio*, 475 U.S. 574, 587 (1986) ............................ 10

*Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) ............ 26

*Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) .................................. 17, 25

*Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012)................................. 12

*Meredith v. Erath*, 756 F.3d 1154, 1163 (9th Cir. 2014)................................... 22

*Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) ...................... 11

*Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (*en banc*)................. 14, 24

*Nathanson v. United States*, 290 U.S. 41, 47 (1933) ....................................... 15

*Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) .................. 10

*Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019) ............... 26

*Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) .......... 10

*Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022)........................................ 25

*People v. Curtis*, 70 Cal.2d 347, 354-56, 357 n.9, (1969) ............................... 18

*People v. Olguin*, 119 Cal. App. 3d 39, 45 (1981) ................................................................ 18

*People v. White*, 101 Cal. App. 3d 161, 167 (1980) ............................................................ 18

*Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).................................... 30

*Robinson v. Solano Cnty.*, 278 F.3d 1007, 1015-16 (9th Cir. 2002) (*en banc*) .................... 14, 22, 24, 27

*Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015)...........................................*passim*

*Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1165 (9th Cir. 2014) .................... 12, 22

*Scott v. Harris*, 550 U.S. 372, 380 (2007) .......................................................................... 11

*Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016)........................................ 23

*Smith v. City of Hemet*, 394 F.3d 689, 695 (2005)............................................................... 18

*So v. Shin*, 212 Cal.App.4th 652, 668-669 (2013) ............................................................... 30

*Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).............................. 11

*Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) .......................................................... 26

*Stein*, Case No. 3:97CV7814, 1999 U.S. Dist. LEXIS 4523, at *6 (N.D. Ohio Mar. 17, 1999) ........... 11

*Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1409 (2002)...................................... 18

*Tekle v. United States*, 511 F.3d 839, 845 (9th Cir.2007)................................................... 14

*Tennessee v. Garner*............................................................................................................. 12

*Terry v. Ohio*, 392 U.S. 1, 23-27 (1968).............................................................................. 11

*United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)......................................... 22

*United States v. Cervantes*, 678 F.3d 798, 803 (9th Cir. 2012)........................................... 15

*United States v. Choudhry*, 461 F.3d 1097, 1100–01 (9th Cir. 2006) .................................... 25

*United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990) .............................................. 24

*United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc) .......................................... 24

*United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000)........................... 15

*United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993)............................................... 15

*United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009)................................................ 29

*United States v. Sokolow*, 490 U.S. 1, 7 (1989).................................................................... 23

*United States v. Thomas*, 211 F.3d 1186, 1189-90 (9th Cir. 2000) ...................................... 16

*United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).................................... 11

*United States v. Ventresca*, 380 U.S. 102, 108-09 (1965) ........................................................ 15

*Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011) ................................. 10

*Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) ................................................. 14\

**<u>STATUTES</u>**

Cal. Civil Code § 52.1(b) ........................................................................................................ 30

Cal. Penal Code § 853.5 ........................................................................................................... 15

Cal. Pen. Code § 148(a) ........................................................................................................... 18

**<u>RULES</u>**

Fed R. Civ. Proc. 56 ................................................................................................................. 10

1

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

Plaintiffs seek partial summary judgment on liability for select claims, because the undisputed evidence shows, as a matter of law, that the individual Defendants[1] engaged in excessive force, unreasonable seizure, and unreasonable search at successive stages during their encounter with Plaintiffs.[2]

The Plaintiffs in this case are: (1) Ms. Porter, a female of Black descent, 5'2" tall weighing 125-130 pounds, who was at the time of the incident an Intel computer engineer; (2) her minor daughters A.P. and L.P. (ages 4 and 6 at the time of the incident), and (3) her elderly father, Mr. Joe Berry Powell, Jr. (age 60 at the time of the incident), a Black male and retired Navy network administrator.

On the night of August 6, 2020, Plaintiffs were driving home from a long-distance family trip when they pulled over in Solano County to switch drivers to avoid driver fatigue. Deputies McCampbell and McDowell were at the location and noticed a mismatched license plate, which is a non-moving *traffic infraction*. The Deputies did not notice any evidence of a crime. Nevertheless, while Ms. Porter was having a polite conversation with Deputy McDowell, Deputy McCampbell rushed the family with his gun pointed at them yelling orders. Ms. Porter tried to explain and comply, but the Deputies handcuffed her and beat her unconscious without justification, locking her up in a patrol car to take to jail for allegedly "resisting" the officers. They then forced Mr. Powell out of the vehicle at gunpoint and locked him up in a patrol car handcuffed, seizing him for a total of 45 minutes without any suspicion of a crime. The young children in the car were left alone in the dark without their guardians. Knowing there were only children left in the car, McCampbell and McDowell swarmed the car at gunpoint with other officers, after which they conducted a warrantless search of it without legal authority. They found no evidence of a crime.

Thereafter, McCampbell and McDowell's supervisor, Sergeant Stockton, along with Deputies Carter and Hamilton, arrived on the scene and joined the investigation. They assisted in the continued and prolonged unlawful seizure of Mr. Powell and the Children despite having no justification to do so.

---

[1] The individual Defendants implicated in this Motion are Solano County Sheriff's Deputies Dalton McCampbell, Lisa McDowell, Sergeant Roy Stockton, Chris Carter, and Connor Hamilton. The case also includes entity Defendants including Solano County, Solano County Sheriff's Office, and Sheriff Thomas A. Ferrara, in his official capacity, but this Motion concerns the individual Defendants only. The claims against the entity Defendants are left for trial.

[2] Plaintiffs also move on state law violations closely tied to these federal claims.

The Court should grant summary judgment of liability on select claims because there can be no dispute that, during this routine traffic stop, the officers had no reasonable suspicion or probable cause to: (1) seize Plaintiffs in the manner and for the duration they did; (2) apply the level of force they did; and (3) search Plaintiffs' vehicle; and the Deputies unnecessarily escalated a polite, routine traffic encounter into a deeply egregious assault in violation of Plaintiffs' constitutional rights.

Because this case involves successive stages of constitutional violations, each stage requires its own analysis. The motion is thus organized into five stages, each analyzed separately.

## II.    STATEMENT OF FACTS

**The Scene Prior to Stage One:** On the night of August 6, 2020, Ms. Porter (age 32), her father, Mr. Powell (age 60), her two daughters, A.P. and L.P (ages 4 and 6), and her niece, O.P. (age 3) (collectively, the "Children") were returning home to Orangevale after a family trip to the Malanga Center in Oakland to learn about the history of African culture. Statement of Undisputed Facts ("SUF") 1. Ms. Porter was driving her Toyota Highlander that was registered to her. SUF 2. Ms. Porter was petite, 5'2" tall, weighing 125-130 lbs. SUF 2. At the time, Ms. Porter was a successful software engineer at Intel, having graduated *summa cum laude* with both Bachelor's and Master's degrees. SUF 4. Mr. Powell was a retired network administrator who had worked for one of the Echelon II Navy systems commands providing support to the U.S. Navy. SUF 5. The family is racially Black. SUF 6.

Because the distance between Oakland and Orangevale is over 100 miles, about halfway through the trip, Ms. Porter decided to let Mr. Powell drive the rest of the way home to be safe. SUF 7. At approximately 9:12 p.m., Ms. Porter took an exit in Solano County and turned into an unpopulated, dead-end side road with no traffic. *Id*. She stopped her vehicle at a location that was safe to switch drivers and began to do so. SUF 8

When Ms. Porter happened to pull into this location, Solano County Sheriff's Office ("SCSO") Deputies McDowell and McCampbell were already there with McDowell being the primary or lead deputy. SUF 9. They were inspecting an unoccupied 2002 Ford truck that had been abandoned there. SUF 10. The Ford truck "bore no resemblance to Ms. Porter's vehicle" (a Toyota) and was "unrelated"— "[t]here was no confusion" between the two vehicles. SUF 11. Moreover, the Deputies had already determined that the unrelated Ford truck had *not* been reported stolen, and they were waiting for their

dispatch to contact the registered owner of the truck. SUF 12.

**Relative Size of Ms. Porter and the Deputies:** At the time, Ms. Porter was a "small" and "very petite" woman at 5'2" tall, while McDowell was a female deputy at 5'7", 180 lbs., and McCampbell was a male deputy at 5'10", 185 lbs. SUF 13. At the time, McDowell had been a peace officer for approximately 14 years, and McCampbell had been a peace officer for approximately 4 years. SUF 14.

**STAGE ONE:** Stage One occurred from the time Plaintiffs voluntarily stopped in front of McDowell and McCampbell to switch drivers to the time the Deputies forcibly handcuffed Ms. Porter and dragged her away from her car and outside of the view of the Dashcam. Stage One is captured on the Dashcam (Ex. 101) from 0:00 to 2:21 and on McCampbell's Bodycam (Ex. 103) from 0:20 to 1:30.[3]

In Stage One, Ms. Porter conducted a three-point turn in front of McDowell and McCampbell's marked police vehicles and voluntarily stopped to switch seats with her father; they began to make the switch. SUF 15. In other words, Ms. Porter had not been pulled over while driving. SUF 16. After Ms. Porter had stopped at a safe spot, she exited her vehicle and proceeded to walk around to the back of the vehicle en route to the passenger's side, where Mr. Powell had also opened his door and started to exit the vehicle. SUF 17. The three Children remained in the backseat of the car. SUF 18.

When Ms. Porter had pulled into the area, the Deputies had noticed that the vehicle had mismatched license plates, which they knew to be a *traffic infraction*, "a fix-it ticket." SUF 19. McDowell understood at the time that, under Pen. Code § 853.5, a person could be taken into custody for a traffic infraction "*only if*" the person refuses to present identification or sign a promise to appear. SUF 20.

At approximately 9:13 p.m., as Ms. Porter was already outside her vehicle on her way to switching seats, McDowell approached her, and they had a polite and courteous conversation during which they greeted each other saying, "hi," and Ms. Porter explained that they were switching drivers. SUF 21. Deputy McDowell responded, "Okay, but get back in the car" (at 1:13 on the Dashcam). SUF 22. McDowell testified that there was nothing unlawful about Ms. Porter being out of her vehicle at that time. SUF 23. McDowell also testified that when she said, "Okay, but get back in the car," it was reasonable for a person in Ms. Porter's position to believe that she had permission to proceed to the passenger side.

---

[3] Time stamps without a "p.m." indicator denote time elapsed in a video that is shown on the computer program bar that a user may move forward and back to go forward and back in the video.

SUF 24. According to McDowell, Ms. Porter's demeanor was polite, and McDowell was also being polite. SUF 25. McDowell was able to see both of Ms. Porter's hands and confirmed that Ms. Porter, who was wearing a half-sleeved shirt and sweatpants, did not appear to have any weapons and was not making any threatening movements. SUF 26.

After conversing politely with Dep. McDowell, Ms. Porter waved her hand in acknowledgment and walked around to the passenger side. SUF 27. McDowell did not object or order Ms. Porter back to the driver side *for the next five seconds* (bearing in mind that the entire encounter before the Deputies decided to handcuff Ms. Porter was 25 seconds). SUF 28. McDowell testified that, from the time Ms. Porter exited her vehicle to the time she went around to the passenger side, her hands were visible, she did not appear to have any weapons, did not lunge at McDowell, did not speak aggressively to McDowell, and did not take any sort of a fighting stance. SUF 29.

According to McDowell's testimony (as well as Dashcam video from 1:18 to 1:36), the following events occur once McCampbell came into the picture with his gun drawn yelling, "Get back in the car": (1) Ms. Porter came back around to the back of the car and "tried -- to explain something," (2) "[McDowell] could see her hands" and "her demeanor wasn't aggressive;" (3) McDowell then motioned Ms. Porter "to go to the driver's side" (which was the first clear message Ms. Porter was given to go to the driver side); (4) "immediately after which [Ms. Porter] start[ed] walking back to the driver side;" and (5) "at this point, [McDowell], instead of allowing [Ms. Porter] to go back to the driver's seat, approached her and grabbed her." SUF 30. In the same moment, McCampbell could be heard on his Bodycam saying, "You know what, detain her. Detain her." SUF 31. McCampbell testified that, when he said, "Detain her," Ms. Porter had "not taken any aggressive stance," and it appeared that she "was simply walking around to the driver's side," consistent with Deputy McDowell's direction to do so. SUF 32.

McCampbell's Bodycam shows that he had his firearm drawn and pointed it at both Ms. Porter and Mr. Powell. SUF 33. With McCampbell's gun pointed at Mr. Powell, Mr. Powell calmly picked up his cellphone from the ground and reaffirmed, "We were about to switch drivers." SUF 34.

According to McDowell, at the time McCampbell appeared with his firearm drawn, Ms. Porter had been courteous, had not acted in any threatening way, and tried to comply when the Deputies motioned her back to the driver side. SUF 35. Yet Deputy McDowell did not follow her legal duty to

intervene and tell Deputy McCampbell to holster his firearm and prevent escalation of the situation, which did not square with the law and California's standards for peace officers. SUF 36. Instead, the Deputies arm-locked and handcuffed Ms. Porter at the backseat window (in front of her children), and forcibly dragged her away from her vehicle out of the view of the Dashcam. SUF 37. They engaged in this violence despite seeing children in the backseat, as later evidenced by McCampbell's words. SUF 38.

McDowell acknowledged that under the law, excessive force from a law enforcement officer triggers a legally recognized right to reasonably resist such unlawful force. SUF 39.

The objective video evidence further shows that, when the Deputies initially grabbed Ms. Porter, she pleaded, "Can you read me my rights? Ma'am? Ma'am?" as she attempted to free her hands. SUF 40. Ms. Porter then relented to being handcuffed, albeit against her will, as McDowell and McCampbell forcibly pinned her up against her car to arm-lock and handcuff her. SUF 41. As they did this, Ms. Porter prayed, "Bless me," and explained, "I am not resisting arrest." SUF 42. She objected that they were "putting [her] on the car with force." *Id.* While handcuffing Ms. Porter, McDowell explained, "You have two different plates on your vehicle." *Id*. To this, Ms. Porter responded, "Two different plates? But you're pressing on me. You're not reading me my rights." *Id*. As McDowell and McCampbell dragged Ms. Porter away from her car, she continued to plead with them, "Excuse me. What are you doing? Why are you pulling me away from the car?" *Id*. There is no dispute as to this sequence of events. Not only is it captured on video, but McDowell admitted to it, conceding that Ms. Porter sounded "nervous and worried," and "a little shaky," after the Deputies started applying force. SUF 43.

**STAGE TWO:**  Stage Two occurred from the time the Deputies handcuffed and dragged Ms. Porter out of the view of the Dashcam to the time they beat her unconscious and locked her up in the back of a patrol car. It is captured on McCampbell's Bodycam video (Ex. 103) from 1:30 to 3:35.

In sum, the footage confirms that McCampbell slammed Ms. Porter to the pavement with a hair-pull takedown. SUF 44. As Ms. Porter struggled for her life, praying, "God, bless me. Bless me," McCampbell beat her unconscious with punches while McDowell assisted. SUF 45. Ms. Porter lay unconscious on the pavement, and McCampbell sat mounted on her for nearly a minute catching his breath. SUF 46. He acknowledged multiple times that she was unconscious, saying, "I believe she's unconscious," and "I think she's out," and he locked her up in McDowell's patrol car. SUF 47. The facts

---

in this stage are not in dispute and are confirmed not only by video evidence but also deposition testimony.

McCampbell testified that he conducted a "hair-pull takedown" on Ms. Porter and proceeded to punch her while she was on the ground with her face up toward the sky. SUF 48. He admitted that he punched Ms. Porter in the face and abdomen. SUF 49. As Ms. Porter was lying on the pavement in a fetal position, her right wrist appeared to have come out of the handcuff, but her left wrist remained in the handcuff. SUF 50. McCampbell wrist-locked Ms. Porter to turn her prone with her face in the ground and noticed that she was unconscious; McDowell reapplied the handcuffs. SUF 51. McCampbell admitted that Ms. Porter went unconscious because he struck her in the face. SUF 52. He acknowledged that she was later complaining of "facial pain, back pain, and stomach pain, all where she was struck." SUF 53.

At 9:23:42 p.m.—approximately 11 minutes after initial contact with Ms. Porter and after she regained consciousness from McCampbell's beating—McCampbell confirmed that Ms. Porter had lost consciousness and was in pain, and, for the very first time, asked for her identification (at 9:24:13 p.m.). SUF 63. Ms. Porter was readily willing to provide it, but because she was handcuffed, McCampbell looked through her purse—bringing his hands very close to her intimate parts (even though a female deputy was on scene)—as Ms. Porter whimpered but allowed her identification to be located SUF 63. McCampbell obtained Porter's identification at 9:25:12 p.m. and called it in at 9:25:40; he was informed within 25 seconds (at 9:26:05 p.m.) that she was the vehicle's current registered owner. SUF 64.

**STAGE THREE:** Stage Three occurred from the time Deputies forced Mr. Powell out of the car at gunpoint to the time they locked him up in the back of the patrol car handcuffed, as he confirmed that only children remained in the car. Stage Three is captured on McCampbell's Bodycam (Ex. 103) from 3:35 to 7:41, and partially on the Dashcam (Ex. 101) from 6:30 to 7:40.

With Ms. Porter locked up, McCampbell pointed his gun at the Plaintiffs' vehicle. SUF 65. McCampbell and McDowell then proceeded to order Mr. Powell out of the vehicle and make him walk backwards with his hands on the back of his head at gun point. SUF 66.

When the Deputies ordered Mr. Powell out of the car, he fully complied after confirming that McCampbell's instructions to come out of the car were for him; McCampbell was referring to Mr. Powell as "young man," despite being aware that Mr. Powell was an older gentleman in his early 60s. SUF 67. Mr. Powell followed the Deputies' commands. SUF 68. While Mr. Powell walked backwards towards

the Deputies with his hands behind his head, Deputy McDowell had her pistol pointed at Mr. Powell. SUF 69. There were other officers with guns drawn, as well, including a pistol and a shotgun. *Id.*

McCampbell handcuffed Mr. Powell and put him in the back of a patrol car with a cage-like structure where he was confined. SUF 70. However, neither McDowell nor McCampbell were able to articulate any particularized facts sufficient to handcuff and lock up Mr. Powell for a suspected crime. SUF 71. McCampbell even testified that Mr. Powell had not committed any felony or misdemeanor and that his seizure was "not because he committed a crime." SUF 72. While Mr. Powell was being handcuffed, he asked, "What did we do?" to which McCampbell responded, "Well, considering she [Ms. Porter] just fought two deputies, that's why you're being detained." SUF 73.

McCampbell and McDowell further testified that Mr. Powell was compliant with their commands and was polite the entire time. SUF 74. At the time he was directed out of the car to be put in handcuffs and even prior to that, no one had observed any weapons on Mr. Powell. SUF 75.

The Deputies testified that they decided to seize Mr. Powell not based on any suspected crime, but rather based on the following: (1) *Ms. Porter's* alleged resistance before she was beaten and locked-up; (2) Mr. Powell's role as a mere "occupant of the vehicle," (3) general "officer safety," and (4) supposedly not knowing the number of additional occupants. SUF 76. None of these bases included any facts suggesting that Mr. Powell was armed, dangerous, or a crime suspect in any way. *Id.*

Moreover, *before* taking Mr. Powell into custody, the Deputies already knew the "additional occupants" in the car were *children*, proven by McCampbell's statements to McDowell *prior to* Mr. Powell's arrest, including, "There's kids in the car so I can't use my dog," and "Did you see how many kids were back there? I saw two." SUF 77. He made no mention of any other occupants. *Id.*

Mr. Powell remained seized in the back of the police car in handcuffs even after McCampbell learned from dispatch at approximately 9:26 p.m. that Ms. Porter was the registered owner of the vehicle "clear and current." SUF 78. McCampbell's only justification for prolonging Mr. Powell's seizure was that he was purportedly trying to get Ms. Porter medical attention and update incoming medical personnel, and later that he had to report the use of force to his "incoming supervisor," Sergeant Stockton. SUF 79. In addition, even after confirming Ms. Porter was the registered owner, McCampbell and McDowell kept Mr. Powell confined in a patrol car until 9:52 p.m. and seized until 9:58 p.m. SUF 80.

1      **STAGE FOUR:** Stage Four occurred from the time Mr. Powell was forced out of the vehicle at

2      gunpoint, through the time Deputies approached the Children at gunpoint and kept them isolated from

3      for nearly 40 minutes. During this time, McCampbell and other officers at his direction (strangers to the

4      Children) searched the vehicle. Stage Four is captured on the Dashcam (Ex. 101) from 6:57 to 43:01 (end

5      of the video). It is also partially captured on McCampbell's Bodycam (Ex. 103) from 5:42 to 9:20.

6      After locking up Mr. Powell, the Deputies approached the Children's vehicle, McDowell with her

7      gun pointed at it. SUF 81. At the time, the Deputies were aware that the occupants in the vehicle were

8      three young children aged three, four, and six, and the Deputies had no particularized basis to think

9      otherwise. SUF 82. They could not articulate an objectively reasonably basis to approach the vehicle at

10     gunpoint, and instead justified it as "standard operating procedure" of the Sheriff's Office done "out of

11     an abundance of caution." SUF 83.

12     They acknowledged that no weapons had been observed or found on Ms. Porter or Mr. Powell.

13     SUF 84. And they were unable to articulate any reasonable and particularized basis to believe the Children

14     had access to weapons, narcotics, or contraband, or that they posed any threat to the Deputies; instead,

15     McCampbell tried to justify the force against kids on the following bases: (1) Ms. Porter had exited the

16     vehicle (to switch seats) prior to McDowell making contact; (2) Ms. Porter's alleged (and unsupported)

17     non-compliance and resistance; (3) at the very beginning of the encounter, *before being locked up*, Mr.

18     Powell had bent down and reached for something in his vehicle; and (4) the "juveniles" needed to be kept

19     safe. SUF 85. None of it made sense. *Id*.

20     McDowell's justification was merely that she could not see inside the vehicle and needed to

21     confirm that the children were, in fact, three, four, and six. SUF 86.

22     Ultimately, the Deputies did not locate any firearms, narcotics, or contraband. SUF 87.

23     **Total Duration of Mr. Powell and the Children's Seizure:** The total duration of Mr. Powell

24     and the Children's seizure was 45 minutes, from the time the Deputies made contact with Ms. Porter and

25     restrained all Plaintiffs' movement (Ex. 101 (Dashcam) at 1:06 corresponding to 9:13 p.m. on Ex. 103

26     (McCampbell Bodycam) at 0:13), to the time McDowell and Stockton permitted Mr. Powell to go back

27     to his car (Ex. 105 at 7:54-8:45 (corresponding to 9:58 p.m.)). *See also* Ex. 362 at 1:07; Ex. 101 at 43:01

28     (even by the end of the Dashcam video, Mr. Powell was still not back in his car.).

**STAGE FIVE:** Stage Five is a subset of Stages Three and Four, and covers the integral participation of Stockton, Carter, and Hamilton in the prolonged, unlawful seizure of Mr. Powell and the Children, as well as Sergeant Stockton's additional duty and liability as the supervisor on scene.

Sergeant Stockton arrived at the scene of the incident at approximately 9:30:40 p.m. SUF 89. Carter and Hamilton arrived together at the scene of the incident at approximately 9:31 p.m. SUF 90.

Stockton, Carter, and Hamilton testified that they were each there at the scene to assist their fellow officers with various parts of the investigation. SUF 91. In addition, Stockton testified that he was the Sergeant supervising McDowell and McCampbell and was responsible for reviewing and approving their reports. SUF 92. As a supervisor, Stockton was in a leadership role within the SCSO and the highest ranking SCSO officer on the scene of the incident who had authority over McCampbell, McDowell, Carter, and Hamilton. SUF 93. Had he given a legal order, it was incumbent upon the other SCSO deputies to follow the order. SUF 94. If another officer was doing something wrong or a citizen's rights were being violated, Stockton acknowledged that it was incumbent upon him as the ranking officer to give an order to rectify whatever unlawful thing was happening. SUF 95. As a sergeant, it was also incumbent upon Stockton to ensure that the deputies he was supervising that night conducted themselves within the bounds of the Constitution and the law. SUF 96.

A "Code 33" was in effect over the radio that night during the incident, which meant that information provided by dispatch over the radio was broadcasted to all vehicles. SUF 97. Therefore, even before Stockton, Carter, and Hamilton arrived on scene, radio traffic dispatched to all Solano County deputies on duty (including to each of them) at around 9:26 p.m. informed them that Ms. Porter was the "[registered owner] of the vehicle, clear and current." SUF 98. Thus, by the time Stockton, Hamilton, and Carter arrived on the scene, it had been announced all over the radio that Ms. Porter was indeed the registered, clear and current owner of the vehicle. *Id.*

Carter and Hamilton were unable to identify any crime Mr. Powell had committed to justify his continued seizure. SUF 99.

As for Stockton, despite having the duties described above to ensure a person's rights were not being violated by his deputies, he was unable to articulate what Mr. Powell did that was criminal in nature to continue his prolonged seizure. SUF 100. Stockton was also unable to name anything that the Children

1   did that was criminal in nature to justify continuing to isolate them from their guardians. SUF 101.

2        Video footage shows that Mr. Powell was not removed from the back of the patrol car, and his

3   handcuffs were not removed, until about 9:52 p.m.; but it was not until 9:58 p.m. that McDowell and

4   Stockton gave Mr. Powell permission to return to his vehicle. SUF 102. This means that Mr. Powell and

5   the Children's prolonged seizure was a total of 45 minutes, where approximately half-an-hour of that

6   occurred after Stockton, Carter, and Hamilton joined the investigation.

7        **SEARCH OF VEHICLE:** After locking up Ms. Porter and Mr. Powell in patrol cars, with only

8   young children left inside Plaintiff's vehicle in the dark and alone, McCampbell searched the passenger

9   compartment of the vehicle. SUF 103. Finding no evidence of contraband, McCampbell whispered to

10   himself, "F*ck." SUF 104. McCampbell also admitted that, during this period, he not only searched

11   Plaintiff's vehicle himself, he also caused other officers to do the same. SUF 105. After the initial search,

12   McCampbell came back again six minutes later to search the vehicle a second time, rummaging through

13   Plaintiffs' things, including the glove box. SUF 106. The Deputies did not locate any firearms, narcotics,

14   or contraband. SUF 107.

15   **III.   LEGAL STANDARD**

16        Where, based on the record as a whole, a rational trier of fact could not find for the non-moving

17   party on a genuine issue of material fact, summary judgment or partial summary judgment should be

18   granted. Fed R. Civ. Proc. 56(c); *Matsushita Elec. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Wash. Mut.*

19   *Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the

20   outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir.

21   2012). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

22   nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

23        The moving party bears the initial burden of establishing the absence of a genuine issue of material

24   fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden,

25   Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by

26   the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing

27   that there is a genuine issue for trial.'" *Id*. at 324; *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th

28   Cir. 2010) (*en banc*). "In judging evidence at the summary judgment stage, the court does not make

credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Inferences are drawn favorable to the nonmoving party. *Id.*

*However*, "when opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

When faced with cross-motions for summary judgment, the Court considers each motion on its own merits to determine whether the Rule 56 summary-judgment standard is satisfied. *Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). Where the issues before the Court are questions of law, the case is particularly "well suited" for summary judgment. *Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1051 (E.D. Cal. 2013); *Stein*, Case No. 3:97CV7814, 1999 U.S. Dist. LEXIS 4523, at *6 (N.D. Ohio Mar. 17, 1999) (granting summary adjudication in favor of § 1983 plaintiff, finding liability for unreasonable search by Defendant).

## IV.   ARGUMENT

### A.   Unreasonable Seizure

A seizure is a "a governmental termination of freedom of movement through means intentionally applied." *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis in original). "A seizure conducted without a warrant is *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). "A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification." *Lacey*, 693 F.3d at 918. "Probable cause exists if the arresting officers had knowledge and reasonably trustworthy information of facts and circumstances sufficient to lead a prudent person to believe that [the arrestee] had committed or was committing a crime." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097-98 (9th Cir. 2013). In addition, a police officer may conduct a *brief* stop for investigatory purposes when the officer has "reasonable suspicion" to believe the stopped individual is engaged in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 23-27 (1968). "Reasonable suspicion" is defined as "a *particularized and objective* basis for suspecting the particular person stopped of criminal activity." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (emphasis added). A traffic stop of a vehicle is akin to a *Terry*

investigatory stop. *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012). "A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015) (quoting *Illinois v. Caballes*, 543 U. S. 405, 407 (2005)).

### B.     Excessive Force

Excessive use of force in effectuating a seizure violates the Fourth Amendment. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1165 (9th Cir. 2014) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)). The "settled and exclusive" test for deciding whether an officer's force was excessive, and thus unreasonable under the Fourth Amendment, is the "objective" standard described in *Graham* and *Tennessee v. Garner. See Cty. of Los Angeles v. Mendez*, 581 U.S. 420, 427-28 (2017) (citing 490 U.S. 386 (1985) and 471 U.S. 1 (1985)). In this test, the court must assess reasonableness "from the perspective of a *reasonable* officer on the scene," *Graham*, 490 U.S. at 396 (emphasis added), and "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8.

### C.     During Stage One, Deputies McCampbell and McDowell Engaged in Excessive Force and Unreasonable Seizure by Pointing a Gun at Ms. Porter and Mr. Powell, and Arm-Locking, Handcuffing, and Dragging Ms. Porter Away from Her Vehicle While She Was Having a Polite Conversation and Trying to Be Compliant

As detailed in section II, *supra* pp. 2-5, during Stage One, the following facts are not subject to dispute: (1) prior to Plaintiffs arrival at the scene, the 2002 Ford truck the Deputies were inspecting had not been reported stolen, bore no resemblance to Plaintiffs' Toyota, and was unrelated; (2) Plaintiffs included a petite, skinny woman 5'2", (Ms. Porter), her elderly father (Mr. Powell), and three small children (who would appear to any reasonable person as a family); (3) Plaintiffs voluntarily (without police intervention or contact) stopped their car at a relatively safe location to switch drivers; (4) Ms. Porter was already outside her vehicle when McDowell made contact with her; (5) it is not illegal to be outside one's vehicle during a traffic stop; (6) the basis for stopping Ms. Porter was a mismatched license plate, a non-moving traffic infraction; (7) when Ms. Porter first encountered McDowell, they politely greeted each other and Ms. Porter explained that she was switching drivers; (8) McDowell responded, "Okay, but get back in the car," (not saying that Ms. Porter should go back to the driver side);

(9) McDowell acknowledged that Ms. Porter could have reasonably interpreted the command to mean that Ms. Porter could proceed to switch drivers and get back in the car on the passenger side; (10) Ms. Porter waived in acknowledgment and proceeded to the passenger side; (11) McDowell did not object to this or tell Ms. Porter to go back to the driver side; (12) McCampbell came into the scene pointing his gun and screaming in rapid succession, "Get back in the car!"; (13) Ms. Porter came back around from the passenger side and politely explained something to McDowell after which McDowell motioned Ms. Porter "to go to the driver's side" (which was the first clear message Ms. Porter was given to go to the driver side); (14) "immediately after which [Ms. Porter] start[ed] walking back to the driver side;" (15) "And at this point, [McDowell], instead of allowing [Ms. Porter] to go back to the driver's seat, approached her and grabbed her." *Supra* § II, pp. 2-5.

Furthermore, McDowell and McCampbell testified that, prior to being grabbed by the Deputies: (1) Ms. Porter was polite and calm; (2) not aggressive or threatening; (3) her hands were visible; (4) there was no indication she had any weapon; and (5) she did not make furtive movements or try to flee. *Id*. Nevertheless, the Deputies grabbed Ms. Porter, forcibly arm-locked and handcuffed Ms. Porter and dragged her away from her vehicle, restraining her movement and taking custody. *Id*.

<u>Based on these indisputable facts, the Court must find that: (1) the Deputies had no objectively reasonable basis other than a minor, non-moving traffic infraction to seize Plaintiffs; (2) When McCampbell came into the scene with his gun drawn, pointing it at Ms. Porter and Mr. Powell, he committed excessive force; and (3) the Deputies had no objectively reasonable basis to grab Ms. Porter, arm-lock and handcuff her, and drag her away from her vehicle, and they committed excessive force and unreasonable seizure when they did so.</u> These findings are so well-supported by the law, no finding to the contrary could be reasonable.

The Supreme Court has held that prolonging a stop beyond what is necessary to address the subject traffic infraction is unlawful "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. The Ninth Circuit has also consistently held that, "under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints *will* violate the Fourth Amendment." *Green v. City & Cty. of S.F.*, 751 F.3d 1039, 1050 (9th Cir. 2014) (handcuffing and pointing guns at the

plaintiff on the mistaken belief that plaintiff's car was stolen violates the Fourth Amendment); *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) (drawing weapons and handcuffing "*greatly* increases the seriousness of the stop") (emphases added); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1015-16 (9th Cir. 2002) (*en banc*) (pointing a gun at an apparently unarmed misdemeanor subject was excessive force in violation of the Fourth Amendment even though that subject had previously been armed with a shotgun that he used to shoot a neighbor's dog but was not armed at the time of detention). Thus, in such cases, very little force—or no force at all—is often the only objectively reasonable force permissible.

Indeed, "[w]here there is no need for force, *any* force used is constitutionally unreasonable." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) (citing *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000)) (emphasis added); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) (any force beyond that which is necessary is unconstitutional); *Estate of Simpson v. Yellowstone Cty.*, 229 F. Supp. 3d 1192, 1208 (D. Mont. 2017) (where an officer has no reason to suspect danger, it is a Fourth Amendment violation for an officer to employ aggressive tactics such as drawing a weapon, forcing a suspect to lie prone on the ground, and using handcuffs); *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) ("police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever"); *Tekle v. United States*, 511 F.3d 839, 845 (9th Cir.2007) ("the pointing of a gun at someone can constitute excessive force, even if it does not cause physical injury"); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) ("pointing a loaded gun at a suspect, employing the threat of deadly force, is use of a high level of force"); *Motley v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005) (*en banc*) (holding an infant at gunpoint constitutes excessive force); *Chinaryan v. City of L.A.*, No. 2:19-cv-09302 MCS (Ex), 2021 U.S. Dist. LEXIS 194937, at *19 (C.D. Cal. Jan. 25, 2021) (ordering suspects out of their car at gunpoint when the suspects were compliant and did not pose a threat can be excessive force).

Indeed, detaining an individual without probable cause, even a suspected misdemeanant, violates the Fourth Amendment where there is an insufficient basis to conclude that there is a "likelihood for ongoing or repeated danger or escalation." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1175 (9th Cir. 2013); *Robinson*, 278 F.3d at 1014 (a 15- to 30-minute detention of an innocent person was actionable). Moreover, for traffic stops, the seizure *cannot* go beyond what is necessary to address the

subject traffic infraction. *Rodriguez*, 575 U.S. at 350-51, 355. Statutory law adds an additional bar specifically for traffic infractions such as here. That is, California Penal Code ("CPC") § 853.5 curtails "the authority [of peace officers] to execute custodial arrests for offenses so minor that they are designated as infractions" by allowing an officer to take an arrestee into custody "'[o]nly if the arrestee refuses to present written identification or to sign the written promise to appear.'" *United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993) (quoting Cal. Pen. Code § 853.5); ECF 51 (Court Order) at 18-19. Here, the Deputies were dealing with a traffic infraction and had not developed sufficiently *"particularized"* reasonable suspicion or probable cause for any felony or misdemeanor. <u>Hence, as a matter of law, they were prohibited from seizing Plaintiffs beyond what was permitted under *Rodriguez*, 575 U.S. at 350-51, 355, and Pen. Code § 853.5.</u> *See also Valdes-Vega*, 738 F.3d at 1078 (even reasonable suspicion requires a "particularized and objective basis").

To save themselves from this obvious conclusion, Defendants may argue that they wished to investigate whether Plaintiffs' car was "stolen" because the vehicle had mismatched license plates. But this argument is Monday-morning pretext and would fail as a matter of law, because it is indisputable that the Deputies did not develop a sufficiently *particularized* basis to support even reasonable suspicion for a stolen vehicle let alone probable cause.

"[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). Similarly, "[o]ne of the themes which runs through the decisions on the Fourth Amendment probable cause requirement is that . . . mere conclusions will not suffice." *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965) ("purely conclusory" statements of officers, without detailing the supporting facts, will be insufficient to establish probable cause); *Nathanson v. United States*, 290 U.S. 41, 47 (1933) (an officer's "mere affirmance of suspicion without disclosure of supporting facts or circumstances" is insufficient to establish probable cause); *United States v. Cervantes*, 678 F.3d 798, 803 (9th Cir. 2012) (internal citations omitted); *see, e.g., Illinois v. Gates*, 462 U.S. at 239 ("wholly conclusory" statements of officers are insufficient to establish probable cause). In *Cervantes*, the Ninth Circuit explained, "a conclusory allegation by law-enforcement that a particular house was a suspected narcotics stash house, was entitled

to little (if any) weight in determining whether officers had satisfied the lower reasonable suspicion standard required to stop a vehicle leaving the house," holding that "the conclusory allegation, without any foundational facts, was akin to an anonymous tip and, consequently, was entitled to little weight." 678 F.3d at 803 (citing *United States v. Thomas*, 211 F.3d 1186, 1189-90 (9th Cir. 2000)).

Based on the video and deposition testimony, there is no dispute that, when the Deputies handcuffed and dragged Ms. Porter away, they knew: (1) they were dealing with a small, polite, non-threatening, compliant woman who had voluntarily stopped near them and explained that she was simply switching drivers; (2) there was also a polite, compliant older man who confirmed the same thing; and (3) there were children in the car, who they observed. To say that, in this circumstance, a mismatched license plate establishes reasonable suspicion that the vehicle is stolen is absurd. If this were true, the same could be said for just about any traffic infraction—for example, people who steal cars may speed, not fully stop at a stop sign, not indicate to change lanes, speed up through a yellow light, have an expired tag (because the car does not belong to them), etc.—which would bulldoze the Supreme Court's precedent in *Rodriguez*, at 350-51, 355, and protections of Pen. Code § 853.5. Isolated, singular traffic infractions by themselves are not sufficient to establish reasonable suspicion of a stolen vehicle, especially where, as here, there are a multitude factors that militate against such an unsupported conclusion. *See id*.

Moreover, assuming *arguendo* there even was reasonable suspicion to suspect a stolen vehicle, which there was clearly not, reasonable suspicion of a polite, compliant individual like Ms. Porter merits only *brief* stop, and the only lawful course of action still was to allow Ms. Porter to return to her vehicle and run the tags against her license, which would have resolved and did resolve even the *un*particularized and *un*reasonable suspicion in less than a minute. Indeed, it is undisputed that, once McCampbell obtained Ms. Porter's identification (albeit after beating her unconscious and seizing the family for far too long), it took him less than a minute to determine that Ms. Porter was the "registered owner of the vehicle clear and current." *See supra* p.6. Had the Deputies followed the law by allowing Ms. Porter return to the driver side and present her identification, the entire encounter should not have taken more than five to seven minutes, even if they did decide to issue a fix-it ticket for he mismatched license plate, which is all the time the Deputies were entitled here as a matter of law under *Rodriguez*, 575 U.S. at 350-51, 355.  On this indisputable record, no reasonable jury can find that drawing a gun at Ms. Porter and Mr. Powell,

1   and handcuffing Ms. Porter and dragging her away did not amount to excessive force.

2          Finally, McDowell may attempt to argue that she should not be liable for McCampbell pointing a

3   gun at Plaintiffs. Such an argument would fail as a matter of law because an officer is liable under § 1983

4   for "integral participation" in a constitutional violation. *Blankenhorn v. City of Orange*, 485 F.3d 463,

5   481 n.12 (9th Cir. 2007) (quoting *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)). "'[I]ntegral

6   participation' does not require that each officer's actions themselves rise to the level of a constitutional

7   violation." *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004). "But it does require some fundamental

8   involvement in the conduct that allegedly caused the violation." *Blankenhorn*, 485 F.3d at 481 n.12.

9   "Being a mere bystander [is] insufficient." *Chuman*, 76 F.3d at 294. For example, officers who provide

10  armed backup during an unconstitutional search are "integral" to that search and thus participants rather

11  than mere bystanders even if they do not actually conduct the search. *Boyd*, 374 F.3d at 780 (citing *James

12  ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990)). In *Boyd*, the Court examined an excessive

13  force claim against several officers even though only one of them had used the flash-bang device under

14  the claim. The Court found that the other officers could be held liable for excessive force as integral

15  participants because they stood by and did not object to the use of that flash-bang device by their fellow

16  officer, watched him use it to gain entry, and then participated in the subsequent search knowing that the

17  flash-bang device had been used. *Id.* In another example, an officer who did not enter an apartment, but

18  stood at the door armed with his gun while other officers conducted the search was a "full, active

19  participant" in the search. *Id.* (citing *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989)).

20         Here, McDowell and McCampbell were together conducting their alleged "investigation," and

21  McDowell was undoubtedly an integral, if not equal, participant in the actions taken against Plaintiffs at

22  every step of the encounter. They are both equally liable for excessive force and unreasonable seizure.

23         **D.     During Stage One, Ms. Porter Had the Right to Question and Reasonably Resist the
               Excessive Force Being Used Against Her**

24
25         As discussed above in section II (*supra* pp.3-5), video evidence shows that, when Deputies

26  McCampbell and McDowell began to unlawfully handcuff Ms. Porter, she at first attempted to free her

27  hands, questioning why she was being handcuffed and pleading for her rights to be read; she ultimately

28  relented and started praying and explaining that she was not resisting arrest and force was being used

against her, as the Deputies shoved her up against her car, arm-locked, handcuffed, and dragged her away.

Defendants may argue that these acts by Ms. Porter amounted to "resisting arrest" under Pen. Code § 148(a), thus justifying their continued force against Ms. Porter. *See, e.g.,* ECF 17 (Affirmative Defenses 7, 9, 15, and 21). The argument must be rejected as a matter of law. That is, if the Court finds that McCampbell and McDowell engaged in excessive force against Ms. Porter at the point they grabbed her and prevented her from returning to the driver side—as the Court should—it is well-settled law that Ms. Porter had a right to reasonably resist and question the unlawful force being used against her.

 "[I]t has long been established that a police officer is not permitted to use unreasonable or excessive force in making an otherwise lawful arrest, and if the officer does use such force the arrestee may use reasonable force to protect himself in accordance with the principles of self-defense." *Blankenhorn*, 485 F.3d at 484 (internal violations omitted).

"In California, the lawfulness of the officer's conduct is an essential element of the offense of resisting, delaying, or obstructing a peace officer." *Smith v. City of Hemet*, 394 F.3d 689, 695 (2005) (citing *People v. Curtis*, 70 Cal.2d 347, 354-56, 357 n.9, (1969)). "Excessive force used by a police officer at the time of the arrest is not within the performance of the officer's duty." *Smith*, 394 F.3d at 696); *People v. White*, 101 Cal. App. 3d 161, 167 (1980) (excessive force vitiates guilt for resisting and evading crimes). "If the officer was not performing his or her duties at the time of the arrest, the arrest is unlawful and the arrestee cannot be convicted under [a resisting arrest statute].'" *Susag v. City of Lake Forest*, 94 Cal. App. 4th 1401, 1409 (2002). "[It] is a public offense for a peace officer to use unreasonable and excessive force in effecting an arrest." *People v. Olguin*, 119 Cal. App. 3d 39, 45 (1981) (internal citations omitted). Based on this authority, a person cannot be lawfully convicted of California Penal Code § 69 (resisting an officer by force) if the officer used excessive force during the time of the arrest. *Benavides v. City of Arvin*, No. F-CV-12-0405-LJO, 2012 U.S. Dist. LEXIS 73313, at *16 (E.D. Cal. May 25, 2012); *see also* Pen. Code § 693 ("Resistance sufficient to prevent [a public offense] may be made by the party about to be injured: (1) To prevent an offense against his person, or his family, or some member thereof."); Pen. Code § 149 (When California peace officers engage in excessive force, they commit a public offense under Pen Code § 149, which states, "Every public officer who, under color of authority, without lawful necessity, assaults or beats any person," is guilty of a crime and public offense.).

1    Based on the foregoing authority and video and deposition evidence (Ex. 101 and 103), the Court

2    must find that Ms. Porter acted reasonably and lawfully when she made some initial attempts to free her

3    hands and question McDowell and McCampbell's excessive force as they handcuffed her.

4    **E.    During Stage Two, McCampbell Engaged in Additional Excessive Force and**
        **Unreasonable Seizure When He Slammed Ms. Porter to the Asphalt by Her Head,**
5        **Beat Her Unconscious, and Locked Her Up in a Patrol Car as McDowell Assisted**

6        As detailed above in section II (*supra* pp.5-6), Stage Two occurred when Deputy Campbell (a

7    man weighing 185 pounds) began his assault on Ms. Porter (a petite woman 5'2"), slamming her on the

8    pavement with a "hair-pull takedown" and beating her unconscious with punches. As Ms. Porter lay

9    unconscious, McCampbell sat mounted on her for about a minute catching his breath, and then locked

10   her up handcuffed in McDowell's police car. McDowell assisted with all this and was both an active and

11   integral participant, as liable as McCampbell. *See supra* p.17 (discussing integral participant doctrine).

12       There is no genuine issue of material fact as to McCampbell and McDowell's liability for

13   additional excessive force and unlawful seizure as to Ms. Porter for their actions in Stage Two.

14       The Ninth Circuit defines "lethal force" as "force that creates a substantial risk of death or serious

15   bodily injury." *Smith*, 394 F.3d at 705-07. Non-lethal head strikes alone are a "significant use of force"

16   and "are a sufficiently serious intrusion upon liberty that it must be justified by a commensurate state

17   interest." *Brown v. Grinder*, No. 2:13-cv-01007-KJM-KJN, 2019 WL 280296, at *8 (E.D. Cal. Jan. 22,

18   2019) (internal citations omitted). Head strikes inflict deadly force if employed in a manner that creates

19   a substantial risk of death or serious bodily injury. *Huerta v. Cty. of Tulare*, No. 1:17-cv-01446-EPG,

20   2024 U.S. Dist. LEXIS 34430, at *17 (E.D. Cal. Feb. 28, 2024).

21       There is no dispute here that McCampbell (a large male 5'10" tall, 185 lbs.) with the assistance

22   of McDowell (a large female 5'7" tall, 180 lbs.) slammed a petite Ms. Porter (a female 5'2", weighing

23   125-130 lbs.) to the ground by the head using a "hair pull takedown" and beat her unconscious with

24   punches, including to the head, *supra* section II, pp.5-6, which is undoubtedly *significant* use of force,

25   even deadly force by creating a substantial risk of serious bodily injury.[4] *See id.*

26

27   _____

[4] Indeed, Ms. Porter has been informed by doctors that she suffered traumatic brain injury from the beating; she is
28   no longer able to work in the computer science field. Porter Decl. at ¶ 9. While this fact is not necessary for the
     resolution of this Motion and not in the SUF, it will be presented at trial on damages.

For Stage Two, McCampbell may argue that slamming Ms. Porter to the ground by the head and beating her unconscious was justified and proportional under the circumstances because Ms. Porter *allegedly* punched him in the face first. This argument would suffer two fatal flaws: (1) the record blatantly contradicts McCampbell's story; and (2) even if Ms. Porter had used a strike in desperation and self-defense, McCampbell's severe beating was disproportionate and far too excessive as matter of law.

*As to the first point*, Ms. Porter resoundingly denies striking anyone. SUF 54. The Supreme Court holds that, "when opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (2007).

Here, under *Scott*, the Court should reject McCampbell's story of an alleged phantom punch because it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id*. The Dashcam shows that Ms. Porter was handcuffed, as the Deputies were dragging her away facing away from them. SUF 55. McDowell had hold of Ms. Porter's *right* arm while McCampbell had hold of her *left* arm. *Id*. This distinction will become important.

On McCampbell's Bodycam, both of Ms. Porter's hands are observed in handcuffs just before the takedown and beating begin. SUF 56. Later when Ms. Porter is already on the ground in a fetal position, the video reveals that the left arm (the one McCampbell was holding) still has the handcuff on it; and it is the *right* arm (the one McDowell was holding) that has come out of the handcuff. SUF 57. Importantly, McDowell (the deputy holding the right hand) testified, she did not see when handcuff came off Ms. Porter's right arm. SUF 58. **Very importantly, McDowell further testified, "I had lost, you know, my grip on Ms. Porter's arm, <u>*because* [Ms. Porter] was being taken down</u>,"** undisputedly by McCampbell. SUF 59 (emphasis added). To cement the issue, McDowell also testified *she did not see "any punch delivered by [Ms. Porter] to anyone."* SUF 60. But she did see McCampbell striking Ms. Porter while she was on the ground. SUF 61.

This testimony of McDowell—McCampbell's partner, fiercely allied with him in this case as a direct and integral participant—blatantly contradicts any notion that Ms. Porter punched McCampbell. McDowell testified that it was McCampbell's takedown that broke McDowell's hold of Ms. Porter's right arm (the arm that had come out of the handcuff), *ergo*, McDowell had hold of Ms. Porter's arm until the

point McCampbell broke that hold by initiating his "hair-pull takedown." The only possible inference the undisputed evidence leads to is that Ms. Porter could not have punched McCampbell prior to him taking her down. Indeed, the way Ms. Porter was oriented to the Deputies—they grabbing her arms dragging her with her back to them—it is not possible for Ms. Porter to have made the significant move of coming out of her handcuff and punching McCampbell (with either hand) without McDowell noticing or seeing this. That McDowell denies seeing Ms. Porter come out of the handcuff or punch McCampbell is proof positive that McCampbell's story is *blatantly contradicted by the record* and must be rejected.

The account of McDowell and Ms. Porter is further corroborated by Plaintiffs' expert Jason Fries, who provides a slow-motion breakdown of McCampbell's Bodycam footage further confirming that Ms. Porter did not punch McCampbell prior to him taking her down to beat her. SUF 62.

Hence, the Court must find that McCampbell's assertion of this phantom punch (which not even his partner saw) is so contradicted by the record and devoid of support that it cannot create a triable issue.

*Second*, assuming *arguendo* that the tiny Ms. Porter somehow defied physics and was able to manage a desperate punch quicker than the Flash such that McDowell (standing right there grabbing her right arm) missed it—which is absurd—McCampbell was still the first aggressor and provocateur, as shown in Stage One. Ms. Porter had every right to "use reasonable force to protect [herself] in accordance with the principles of self-defense" against the excessive force being used against her during an *unlawful* arrest. *See Blankenhorn*, 485 F.3d at 484 (holding that a person has the right to use reasonable force to defend themself against excessive force even during a *lawful* arrest). Thus, McCampbell's deadly response of slamming Ms. Porter to the pavement by the head and bludgeoning her unconscious with punches was far too disproportionate and excessive a response to a much smaller woman's attempt at self-defense. *Young*, 655 F.3d at 1162-63 (head strikes are a "significant use of force" and "are a sufficiently serious intrusion upon liberty that it must be justified by a commensurate state interest"). A fitting analogy drives home this point. Had McCampbell (a large man trained in police tactics) arm-locked his much smaller girlfriend to drag her away, and then beaten her unconscious when she struck back to defend herself, there is no doubt he would belong in jail probably for felony assault or attempted manslaughter. That result does not change when it is Ms. Porter instead of another woman. Here, in this *civil* case, no reasonable jury can find that McCampbell's force was not disproportionate or excessive,

---

especially given the size and gender difference and severity of Ms. Porter's beating. Thus, regardless of any punch alleged by McCampbell, the Court should find that the force used by McCampbell at Stage Two was excessive as a matter of law.

**F.      During Stage Three, McCampbell and McDowell Engaged in Additional Excessive Force and Unreasonable Seizure When They Forced Mr. Powell Out of His Vehicle at Gunpoint, Handcuffed Him, and Locked Him Up in a Patrol Car**

There is no genuine issue of material fact as to McCampbell and McDowell's liability for additional excessive force and unlawful seizure as to Mr. Powell for their actions in Stage Three.

It is well-settled that "simply handcuffing a person and detaining [that person] in handcuffs . . . absent justifiable circumstances, will result in a Fourth Amendment violation." *Meredith v. Erath*, 756 F.3d 1154, 1163 (9th Cir. 2014); *see also Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1165-66 (9th Cir. 2014) (handcuffing compliant persons not suspected of any crime, removing them from their residence, and detaining them, or alternatively, causing excessive pain while handcuffing, constituted excessive force). *Meredith* thus reaffirmed that, in addition to gun pointing, simple handcuffing "substantially aggravates the intrusiveness of a detention," and that the use of handcuffs must be "justified by the totality of the circumstances." *Id*. at 342 F.3d at 1062-63 (internal citations omitted); *see also Washington*, 98 F.3d at 1188 ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop.") (quoting *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982)). "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Green*, 751 F.3d at 1050. Similar to the drawing of weapons, this holds especially true in cases involving investigatory or *Terry* stops, as the Ninth Circuit has "consistently applied the principle that drawing weapons and using handcuffs or other restraints is unreasonable in many situations." *Robinson*, 278 F.3d at 1015-16.

Here, as shown above in section II, *supra* pp.6-7, the facts are undisputed that McCampbell and McDowell acted in concert to order Mr. Powell out of his vehicle, forced him at gunpoint to walk backwards with his hands behind his head, handcuffed him, and confined him in the back of a patrol car. It is also undisputed that neither deputy was able to articulate any facts justifying the deprivation of Mr. Powell's Fourth Amendment rights based on probable cause or reasonable suspicion that Mr. Powell

committed a crime, was committing a crime, was about to commit a crime, or was a credible danger to them. *Id.* On the contrary, they admitted that Mr. Powell was compliant and polite, and that they had no objective and particularized basis to believe he had weapons, drugs, or contraband. *Id.* It is also beyond dispute that Mr. Powell was seized for 45 minutes, far in excess of the time it should have taken to conclude the traffic stop for which Plaintiffs were seized. *Rodriguez*, 575 U.S. at 350-51, 355.

Defendants contend Mr. Powell's seizure was a "detention" and not an arrest but this distinction makes little difference. Even brief detention requires "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). That is, the officer "must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.* (quoting *Terry*, 392 U.S. at 27)). Here, the Deputies could provide no particularized facts concerning Mr. Powell. In fact, as McCampbell was locking up Mr. Powell in the patrol car, he admitted that Mr. Powell was being locked up because *Ms. Porter* allegedly "fought two deputies." *Supra* § II, p.7. This admission by itself puts the issue beyond dispute, because "[o]fficers *must* articulate reasonable suspicion with particularity *as to each individual they detain*." *Gutierrez v. City of Sacramento*, No. 2:22-cv-00802-KJM-JDP, 2023 U.S. Dist. LEXIS 73567, at *16 (E.D. Cal. Apr. 26, 2023) (citing *Sialoi v. City of San Diego*, 823 F.3d 1223, 1235 (9th Cir. 2016)).

As a matter of technicality, however, Mr. Powell's 45-minute seizure, most of it in handcuffs in a patrol car, after being forced out of his car at gunpoint, was far more egregious than a brief detention and was an arrest, as a matter of law. Generally, an arrest occurs when "a reasonable innocent person in [the same] circumstances would not have felt free to leave*." Johnson*, 724 F.3d at 1176. Whether an investigatory stop has risen to the level of an arrest is ascertained considering the totality of the circumstances. *Green*, 751 F.3d at 1047 (9th Cir. 2014). "Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment." *Washington*, 98 F.3d at 1187. The Ninth Circuit's decision in *Del Vizo* is instructive and squarely on point. The court there held that the removal of the suspect from the vehicle at gunpoint and his subsequent handcuffing after he had been compliant and presented no credible threat amounted to an *arrest*. *United States v. Del Vizo*, 918 F.2d 821, 825 (9th Cir. 1990); *see also Green*, 751 F.3d at 1047 (handcuffing a compliant suspect and placing her in a patrol car

constituted an unnecessarily restrictive arrest).

Here, as demonstrated above in section II, *supra* pp.6-7, Mr. Powell had just witnessed his daughter beaten unconscious, and then was ordered out of his car at gunpoint by the same Deputies, having to leave his granddaughters all alone at night. He was then placed in handcuffs and put in the back of a patrol car with a cage. No person in Mr. Powell's position would have felt free to leave. He was also compliant and polite throughout the encounter, and the Deputies had no particularized basis to believe he was armed or dangerous. It is beyond dispute that Mr. Powell was arrested, not just detained.

<u>For these reasons, the Court should find as a matter of law that McCampbell and McDowell engaged in unreasonable seizure and excessive force against Mr. Powell.</u>

**G.    During Stage Four, McCampbell and McDowell Engaged in Excessive Force and Unreasonable Seizure Against the Children When They Approached the Children (Ages 3 to 6) with a Gun Pointed and Unnecessarily Isolated Them from Their Caretakers for 45 Minutes During a Traffic Stop Violated**

Next, based on the facts set forth in section II, *supra* p.8, the Court should grant partial summary judgment in favor of L.P. and A.P. against McCampbell and McDowell for their section 1983 claims for excessive force and unreasonable seizure. It is undisputed that, after arresting Mr. Powell, the Deputies confirmed with him that only children ages 3, 4, and 6 remained in Plaintiffs' vehicle. *Id.* Having no reason to believe otherwise, indeed, having seen two of the children themselves, the Deputies nevertheless approached the vehicle at gunpoint. The Ninth Circuit has held that training a weapon on a child "falls outside the Fourth Amendment's objective reasonableness standard" and thus constitutes excessive force. *Motley*, 432 F.3d at 1089, *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc); *see also Robinson*, 278 F.3d at 1015; *Tekle*, 511 F.3d at 845; *Espinosa*, 598 F.3d at 537. Thus, there is no dispute of material fact that McCampbell and McDowell engaged in excessive force against the Children.

There is also no dispute that McCampbell and McDowell seized the Children because "stopping an automobile and detaining its occupants constitute[s] a seizure [and thus implicates the Fourth Amendment]" even if "the purpose of the stop is limited and the resulting detention quite brief." *United States v. Choudhry*, 461 F.3d 1097, 1100–01 (9th Cir. 2006). There is also no dispute that the seizure of the Children lasted approximately 45 minutes, most of which was spent in the dark isolated from their

caretakers while strangers searched through the vehicle. <u>For the same reasons as discussed for Mr. Powell, *see supra* § IV.G, this too was an unreasonable seizure, and the Court should so find as a matter of law.</u>

### H. Stage Five Includes the Unconstitutionally Prolonged Seizure of Mr. Powell and the Children by Stockton, Carter, and Hamilton After They Arrived on Scene

The Court must also grant partial summary judgment in favor of Mr. Powell, L.P., and A.P. on their section 1983 claims for unlawful seizure against Defendants Stockton, Carter, and Hamilton for their active participation in the continued seizure of Mr. Powell and the Children, based on the undisputed facts discussed above in section II, *supra* pp.9-10. Liability against Stockton, Carter, and Hamilton is warranted as a matter of law under the integral participation doctrine. Separately, supervisor liability must be imposed on Stockton as a matter of law.

#### 1. Stockton, Carter, and Hamilton are Liable as Integral Participants for the Prolonged Seizure of Mr. Powell, and Minors L.P. and A.P.

"[M]any factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage and in such a case each may be a proximate cause." *Jones v. Williams*, 297 F.3d 930, 937 n.6 (9th Cir. 2002).

Consistent with this principle, a defendant may be deemed to have caused a section 1983 violation under the "integral-participant doctrine," if the defendant "knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022); *Blankenhorn*, 485 F.3d at 481 n.12. "'[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation," *Boyd*, 374 F.3d at 780, "[b]ut it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn*, 485 F.3d at 481, n.12. For example, an officer may be liable for providing armed backup or participating without objection in a police action with knowledge that a particular form of force would be used. *Boyd*, 374 F.3d at 780 (citing *James*, 909 F.2d at 837 and *Melear*, 862 F.2d at 1186). Or, an officer who stands at the door of a dwelling, armed with his gun, while other officers conduct the search, can nevertheless be a "full, active participant" in the search. *Id*. On the other hand, "[b]eing a mere bystander [is] insufficient." *Chuman*, 76 F.3d at 294–95; ECF 51 (Court Order) at 8-9).

Here, the undisputed facts in Section II, *supra* pp. __, compel partial summary judgment on

liability. It is undisputed that when Stockton, Carter, and Hamilton arrived on the scene around 9:30 p.m., they began assisting McCampbell and McDowell with the investigation, including by gathering evidence, maintaining custody of the Children, and later maintaining custody of Ms. Porter at the hospital. At 9:26 p.m., minutes before arriving, Stockton, Carter, and Hamilton each heard over the dispatch radio, under the Code 33 that was in effect at the time, that Ms. Porter was the registered owner of the vehicle, clear and current. They therefore knew that the family's vehicle had not been stolen. In addition, none of them was able to articulate any facts concerning any criminal activity of Mr. Powell or the Children that justified their continued seizure. Despite this, Stockton did not remove Mr. Powell's handcuffs until 9:52 p.m. And Mr. Powell and the Children continued to be seized until approximately 9:58 p.m., over 20 minutes after Stockton, Carter, and Hamilton arrived on the scene. It is fundamental that "participation in an ongoing seizure after any probable cause had dissipated violates the Fourth Amendment." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019). Stockton, Carter, and Hamilton are liable as a matter of law for their continued integral participation in Mr. Powell, L.P., and A.P.'s seizure.

### 2.   Liability of Sergeant Stockton as the Supervising Sergeant on Scene

"A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (*quoting Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). For liability to attach, supervisors must have actual supervisory authority over the government actor who committed the alleged violations. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018). A supervisor can be held liable in his or her individual capacity if he or she "knew of the violations and failed to act to prevent them." *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013); see also 9th Cir. Mod. Civ. Jury Ins. No. 9.4 (failure to act when a supervisor knew or should have known of the constitutional deprivation or his callous disregard for constitutional rights creates liability). Here, based on the undisputed facts in section II, supra pp. __, the requirements for supervisor liability are met as a matter of law.

There is no dispute Stockton was acting under color of law as he was the supervising sergeant on scene who had the authority to terminate constitutional violations. There is also no dispute that Stockton's subordinates, McCampbell and McDowell, were clearly violating Mr. Powell and the Children's right to

be free from unreasonable seizure as they continued to hold them even after learning at 9:26 p.m. that the car was duly registered to Ms. Porter, an announcement broadcast over dispatch radio under Code 33 and heard by all units, including Stockton.

Thus, there is no dispute that, from the time Stockton arrived on the scene around 9:30 p.m., he knew or should have known that there was no basis at all to hold Mr. Powell and the Children, and he showed a reckless or callous indifference to the deprivation of their right to be free from unreasonable seizure when he allowed it to continue for over 20 minutes more. *Robinson*, 278 F.3d at 1014 (a 15- to 30-minute detention of an innocent person was actionable).

For these reasons, Mr. Powell, L.P., and A.P. are entitled to partial summary judgment as to Stockton's supervisory liability under Section 1983 for unlawful seizure.

## I.   The Search of Plaintiffs' Vehicle Violated Their Constitutional and State Law Rights to Be Free from Unreasonable Search

The Court must grant partial summary judgment on liability for Plaintiffs' claim against McCampbell and McDowell for the unreasonable search of Plaintiffs vehicle. As demonstrated above in section II, *supra* p.10, there is no dispute that McCampbell searched Plaintiffs' vehicle and caused other officers to do that same. *Id.* There is also no dispute that the search was warrantless. *See id.* There is also no dispute that McDowell was an integral participant. *See id.*

The law here is clear. "Warrantless searches by law enforcement officers [including those of vehicles] 'are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.'" *Cervantes*, 678 F.3d at 802 (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967). Thus, the vehicle search was *per se* unreasonable, and the Court must assess whether an exception to the warrant requirement applies. As a matter of law, none does.

### 1.   The Automobile Exception Does Not Apply

Under the automobile exception "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Cervantes*, 678 F.3d at 802 (quoting *California v. Acevedo*, 500 U.S. 565, 580 (1991)). "An officer will have probable cause to search if 'there is a fair probability that contraband or evidence of a crime will be found in a particular place, 'based on the totality of circumstances.'" *Id.* (quoting *Dawson v. City of Seattle*, 435 F.3d 1054,

1062 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983))). Mere suspicion or conclusory statements without supporting foundational facts are entitled little to no weight and will not suffice. *Id*.

In the present case, as a matter of law, Deputies McCampbell and McDowell cannot avail the automobile exception because they were unable to articulate any objective facts to demonstrate that contraband would be found in Plaintiffs' vehicle. The vehicle did not match any description of a suspicious vehicle, and, prior to the search, the officers knew they had stopped a family, including a mother, her elderly father, and three very small children. They had no evidence of criminal activity or any particularized reason to believe that contraband would be found in Plaintiffs' vehicle.

Moreover, the initial reason for the traffic stop was a mismatched license plate, a minor traffic infraction. Evidence of this infraction was visible outside the vehicle, and a search of the passenger compartment of the vehicle was not needed to confirm this minor infraction. The automobile exception to the warrant requirement has no evidentiary support and is simply not available as a matter of law.

### 2.    *The Search Incident to Lawful Arrest Exception Does Not Apply*

Defendants may attempt to avail the search incident to arrest exception. It is also not available to them as a matter of law because they cannot satisfy the requirements of the exception. Under this exception, when police make a *lawful* arrest of a recent occupant of a vehicle, officers may search the passenger compartment of the vehicle in *only* two specific circumstances: (1) "when it is reasonable to believe that evidence *of the offense of arrest* might be found in the vehicle," or (2) "when the arrestee is unsecured and *within reaching distance of the passenger compartment at the time of search*." *Arizona v. Gant*, 556 U.S. 332, 335, 338, 343 (2009) (emphases added).

"In many cases, *as when a recent occupant is arrested for a traffic violation*, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Id*. at 343 (emphasis added). Furthermore, *if an arrestee is secured away from the passenger compartment* of a vehicle such that they cannot access items or evidence within the vehicle, the justifications for the search incident to arrest exception—officer safety and destruction of evidence—are absent and the exception does not apply. *Id*. at 343-44; *United States v. Ruckes*, 586 F.3d 713, 718 (9th Cir. 2009) (search incident to arrest did not apply because arrestee was "beyond lunging distance of the handgun [in the vehicle] at the time [the officer] conducted the automobile search" and "there was no likelihood that [the officer] might have

discovered evidence of [the arrestee's] driving offense within the vehicle.").

Here, the undisputed facts in section II, *supra* pp.2-7, show that neither Ms. Porter nor Mr. Powell's seizures and arrests were lawful thus ending the inquiry, which requires *lawful* arrest.

Furthermore, even if the Court were to find an open question of fact concerning the validity of Ms. Porter's arrest (which the Court should not for the reasons discussed above, *supra* pp.11-22), the search incident to arrest exception still would not apply because the *Gant* requisites were not met. First, at the time of the search, Ms. Porter was secured in the back of a patrol car, handcuffed the entire time, and unconscious for a portion of it. Thus, officer safety with respect to Ms. Porter's ability to reach within the vehicle was not a concern under *Gant* and *Ruckes*. Second, because Ms. Porter was arrested for allegedly "resisting" a peace officer, evidence of *this alleged offense* would not be found in the vehicle. Indeed, the alleged "resistance" had no connection to any item in the vehicle, thus rendering the exception wholly unavailable as a matter of law under *Gant*.

Therefore, because there is no dispute that the Deputies' search of Plaintiffs' vehicle was warrantless and without any valid exception, the Court must find that Deputies McCampbell and McDowell deprived Plaintiffs of their constitutional right to be free from unreasonable search.

## J. State Law Claims

### 1. Claim Ten (False Imprisonment)

"A police officer who makes an arrest without a warrant and without justification may be held civilly liable for false arrest and imprisonment." *Dragna v. White*, 45 Cal. 2d 469, 471 (1955). Thus, for the same reasons the Court finds unreasonable seizure as a matter of law, the Court, too, should find that McCampbell and McDowell falsely arrested Ms. Porter and Mr. Powell.

### 2. Claim Eleven (Assault & Battery)

"The essential elements of a cause of action for battery are: (1) defendant touched plaintiff, or caused plaintiff to be touched, with the intent to harm or offend plaintiff; (2) plaintiff did not consent to the touching; (3) plaintiff was harmed or offended by defendant's conduct; and (4) a reasonable person in plaintiff's position would have been offended by the touching;" assault is essentially threatened battery. *So v. Shin*, 212 Cal.App.4th 652, 668-669 (2013). Thus, for the same reasons the Court finds excessive force as a matter of law, the Court must also find that McCampbell and McDowell committed assault and

battery against Ms. Porter and Mr. Powell.

### 3. Claim Seven (Civ Code § 52.1)

A Bane Act claims is made for interference with an person's constitutional rights "by threat, intimidation, or coercion[.]" Cal. Civ. Code § 52.1(b). "[T]he Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (internal citations omitted). But it does require "a specific intent to violate the arrestee's right to freedom from unreasonable seizure." *Id*. Other than specific intent, "the elements of the excessive force claim under § 52.1 are the same as under § 1983[.]" *Id*. at 1044. "[A] *reckless disregard for a person's constitutional rights* is evidence of a specific intent to deprive that person of those rights." *Id*. at 1046 (emphasis added).

As demonstrated above, the excessive force and unreasonable seizure violations here are beyond dispute, and the only question that remains is whether Defendants showed specific intent, i.e., "a reckless disregard for [Plaintiffs'] constitutional rights." *Id*. There is no dispute they did. Here, the undisputed facts supporting an utterly unreasonable seizure and a high degree excessive force against a polite, law-abiding *family* are so clear, there can be no dispute that Defendants recklessly disregarded Plaintiffs' constitutional rights, if not showed outright, egregious disdain for them. *Id*. at 1043 ("[p]roperly read, the statutory phrase 'threat, intimidation or coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is *sufficiently egregious* to warrant enhanced statutory remedies, beyond tort relief." (emphasis added).). Here, the Deputies knew what the law was, and they recklessly disregarded it. *Supra* section II, pp.3-6. <u>This is precisely the type of egregious conduct the Bane Act was enacted to curtail, and no reasonable jury can find otherwise. The Court must find liability.</u>

### K. Affirmative Defense No. 8 for Comparative Fault or Apportionment of Fault and No. 30 for Assumption of Risk Must Be Dismissed as to the Federal Claims

To the extent that Defendants seek to assert an affirmative defense for comparative fault, contribution, indemnification, or assumption of risk as concerning the section 1983 claims, they are precluded from doing so. *L.F. by & through Brown v. City of Stockton*, No. 2:17-CV-01648-KJM-DB, 2018 WL 3817558, at *6, 8 (E.D. Cal. Aug. 10, 2018) (striking assumption of risk, and contributory and comparative negligence affirmative defenses as to the plaintiffs' federal claims).

**V.    CONCLUSION**

For the reasons stated above, Plaintiffs request that summary adjudication be granted on the issues requested.

Dated: July 3, 2024                              ALMADANI LAW


                                                 */s/ Yasin M. Almadani*
                                                 Yasin M. Almadani, Esq.


                                                 AI LAW, PLC


                                                 */s/ Ahmed Ibrahim*
                                                 Ahmed Ibrahim, Esq.

                                                 *Attorneys for Plaintiffs*