Yasin M. Almadani (Cal. Bar No. 242798)
ALMADANI LAW
4695 MacArthur Ct., Suite 1100
Newport Beach, CA 92660
(949) 877-7177 | YMA@LawAlm.com

Ahmed Ibrahim (Cal. Bar No. 238739)
AI LAW, PLC
4695 MacArthur Ct., Suite 1100
Newport Beach, CA 92660
Tel: (949) 266-1240
Fax: (949) 266-1280
aibrahim@ailawfirm.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

|  |  |
|---|---|
| NAKIA V. PORTER, an individual on her own behalf and on behalf of her minor children, L.P. and A.P; JOE BERRY POWELL, JR., an individual; and CLIFTON POWELL, on behalf of his minor child, O.P., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF SOLANO; SOLANO COUNTY SHERIFF'S OFFICE; SHERIFF THOMAS A. FERRARA, in his official capacity as Sheriff of Solano County; DEPUTY DALTON MCCAMPBELL, an individual; DEPUTY LISA MCDOWELL, an individual; SERGEANT ROY STOCKTON, an individual; DEPUTY CONNOR HAMILTON, an individual; DEPUTY CHRIS CARTER, an individual; CITY OF DIXON; DIXON POLICE DEPARTMENT; DIXON POLICE CHIEF ROBERT THOMPSON, in his official capacity as Dixon Chief of Police; OFFICER GABRIEL HOLLINGSHEAD, an individual, OFFICER AARON WILLIAMS, an individual, and DOES 1 to 10, inclusive, <br><br> Defendants. | Case No. 2:21-CV-01473-KJM-JDP <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' [EXCEPT ROY STOCKTON] MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hon. Kimberly J. Mueller <br> United States District Judge <br><br> <u>**Hearing Information:**</u> <br> Date:          December 12, 2024 <br> Time:          10:00 a.m. <br> Judge:         Hon. Kimberly J. Mueller <br> Courtroom:  3, 15th Floor |

# TABLE OF CONTENTS

II.    **FACTUAL BACKGROUND**........................................................................................

III.   **LEGAL STANDARD** ...............................................................................................

IV.   **ANALYSIS** ..............................................................................................................

  A.   DEFENDANTS ENGAGED IN UNREASONABLE SEIZURE, FORCE, AND SEARCH, AND VIOLATIONS OF RELATED STATE LAW CLAIMS (CLAIMS 1, 2, 3, 7, 10, AND 11) ................................................

    1.   *McCampbell and McDowell's Unreasonable Seizure and Excessive Force* ..............................

    2.   *Carter and Hamilton Were Integral Participants in an Unreasonable Seizure*........................

    3.   *Defendants' Unreasonable Search of Plaintiffs' Vehicle (Claim 3)* .........................................

    4.   *The Motion Is Improper as to Related State Law Claims (Claims 7, 10, and 11)*...................

  B.   DEFENDANTS MCDOWELL AND MCCAMPBELL MADE FALSE STATEMENTS AND FABRICATED EVIDENCE IN DEPRIVATION OF MS. PORTER'S LIBERTY (CLAIM FOUR) .....................................................

    1.   *First Element: Defendants Deliberately Falsified Evidence Against Ms. Porter* .....................

    2.   *Second Element: Ms. Porter Suffered Deprivation of Liberty*...................................................

  C.   VIOLATIONS OF THE EQUAL PROTECTION CLAUSE & RALPH ACT (CLAIMS 5, 6, AND 8)........................

    1.   *Deputy McCampbell Made Racially Tinged Remarks Toward Mr. Powell*...............................

    2.   *The SCSO Bears More Heavily on Minorities and People of Color*............................................

    3.   *The Sheriff Himself Ratified a Culture of Extremism and Racism at the SCSO*........................

  D.   THE ENTITY DEFENDANTS ALSO BEAR *MONELL* LIABILITY ON EXCESSIVE FORCE (CLAIM SIX) ...............

    1.   *The SCSO Ratified the Unconstitutional Conduct in This Case*................................................

  E.   DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY ...............................................................

  F.   REMAINING STATE LAW CLAIMS.........................................................................................................

    1.   *Violation of Gov. Code § 815.6 (Claim 9)*.............................................................................

    2.   *Intentional Infliction of Emotional Distress (IIED) (Claim 12)* ...............................................

    3.   *Negligence and Negligence Per Se (Claims 13 and 14)*...........................................................

  G.   SOLANO IS NOT ENTITLED TO IMMUNITY UNDER STATE STATUTES ........................................................

1      1.    Government Code § 821.6 Is Inapplicable..........................................................

2      2.    The Entity Defendants Are Vicariously Liable......................................................

3  **V.    CONCLUSION** ........................................................................................................

# **TABLE OF AUTHORITIES**

**CASES**

*Austin B. v. Escondido Union Sch. Dist.*,
149 Cal. App. 4th 860 (2007) ........................................................................... 15

*Ballou v. McElvain*,
29 F.4th 413 (9th Cir. 2022) ....................................................................... 14, 15

*Blankenhorn v. City of Orange*,
485 F.3d 463, n.12 (9th Cir. 2007) .............................................................. 9, 30

*Boyd v. Benton Cty.*,
374 F.3d 773 (9th Cir. 2004) ....................................................................... 9, 27

*Brent v. City of Cumberland Police Dep't*,
2023 U.S. Dist. LEXIS 41614 (D. Md. Mar. 10, 2023) ..................................... 14

*Brown v. City of Stockton*,
2020 WL 4043017 (E.D. Cal. July 17, 2020) .............................................. 24, 25

*Brown v. Schnoor*,
2015 WL 2062604 (W.D. Wash. Mar. 16, 2015) ......................................... 14, 15

*Brown v. Texas*,
443 U.S. 47 (1979) ............................................................................................. 6

*Caldwell v. San Francisco*,
889 F.3d 1105 (9th Cir. 2018) ..................................................................... 10, 13

*Christie v. Iopa*,
176 F.3d 1231–39 (9th Cir. 1999) ..................................................................... 20

*Comm. Concerning Cmty. Improvement v. City of Modesto*,
583 F.3d 690 (9th Cir. 2009) ............................................................................ 15

*Costanich v. Dep't of Soc. & Health Servs.*,
627 F.3d 1101 (9th Cir. 2009) ........................................................................... 13

*Devereaux v. Abbey*,
263 F.3d 1070 (9th Cir. 2001) ........................................................................... 27

*Dorger v. City of Napa*,
2012 WL 3791447 (N.D. Cal. Aug. 31, 2012) .................................................... 19

*Dougherty v. City of Covina*,
654 F.3d 892 (9th Cir. 2011) ............................................................................ 19

*ECF 150-1 at 39,*
    637 F. Supp. 2d 731 (E.D. Cal. 2008) ................................................................ 30

*Ex. 450. United States v. Esquivel,*
    88 F.3d 722 (9th Cir. 1996) ................................................................................ 16

*Fontana v. Haskin,*
    262 F.3d 871 (9th Cir. 2001) ................................................................................ 7

*Fourth Amendment." Green v. City & County of S.F.,*
    751 F.3d 1039 (9th Cir. 2014) .............................................................................. 7

*Giebel v. Sylvester,*
    244 F.3d 1182 (9th Cir. 2001) ............................................................................ 27

*Gilead Cmty. Servs. v. Town of Cromwell,*
    432 F. Supp. 3d 46 (D. Conn. 2019) .................................................................. 14

*Gillette v. Delmore,*
    979 F.2d 1342 (9th Cir. 1992) ............................................................................ 19

*Gomez v. County of Los Angeles, No. CV 09-02457 MMM*
    (CWx), 2009 WL 10699670 (C.D. Cal. Aug. 17, 2009) .................................... 29

*Gomez v. Vernon,*
    255 F.3d 1118 (9th Cir. 2001) ............................................................................ 20

*Haley v. City of Boston,*
    657 F.3d 39 (1st Cir. 2011) ................................................................................ 27

*Harvey v. Waldron,*
    210 F.3d 1008 (9th Cir. 2000) ............................................................................ 10

*Hayes v. County of San Diego,*
    57 Cal. 4th 622 (2013) ........................................................................................ 29

*Hughes v. Pair,*
    46 Cal. 4th 1035–51 (2009) ................................................................................ 29

*Hunt Valley Baptist Church,*
    2020 U.S. Dist. LEXIS 22054 (D. Md. Feb. 10, 2020) ...................................... 14

*Hunter v. County of Sacramento,*
    652 F.3d 1225 (9th Cir. 2011) ............................................................................ 25

*Johnson v. Bay Area Rapid Transit Dist.,*
    724 F.3d 1159 (9th Cir. 2013) .............................................................................. 7

*Larez v. City of Los Angeles,*
    946 F.2d 630 (9th Cir. 1991) .............................................................................. 19

*Lassiter v. City of Bremerton*,
  556 F.3d 1049 (9th Cir. 2009) ................................................................................. 19

*Lobato v. Las Vegas Metro. Police Dep't*,
  No. 22-16440, 2023 WL 6620306 (9th Cir. Oct. 11, 2023) ....................................... 13

*Lolli v. County of Orange*,
  351 F.3d 410 (9th Cir. 2003) ................................................................................... 7

*McRorie v. Shimoda*,
  795 F.2d 780 (9th Cir. 1986) ................................................................................... 20

*Mendiola-Martinez v. Arpaio*,
  836 F.3d 1239 (9th Cir. 2016) ........................................................................... 15, 16

*Peck v. Montoya*,
  51 F.4th 877 (9th Cir. 2022) ................................................................................... 9

*Puckett v. County of Sacramento*,
  2023 WL 2432919 (E.D. Cal. Mar. 9, 2023) ............................................................ 19

*Robinson v. Solano County*,
  278 F.3d 1007 (9th Cir. 2002) (en banc) ................................................................ 7

*Rodriguez v. County of Los Angeles*,
  891 F.3d 776 (9th Cir. 2018) ........................................................................... 25, 27

*Rodriguez v. United States*,
  575 U.S. 348 (2015) ........................................................................................... 7, 8

*Rosales v. City of Chico*,
  2015 WL 6167740 (E.D. Cal. Oct. 20, 2015) .......................................................... 20

*S.R. Nehad v. Browder*,
  929 F.3d 1125 (9th Cir. 2019) ................................................................................. 25

*Scott v. Harris*,
  550 U.S. 372 (2007) ........................................................................................... 2, 3

*Serrano v. Francis*,
  345 F.3d 1071 (9th Cir. 2003) ................................................................................. 14

*Serrano*,
  345 F.3d ............................................................................................................ 14

*Spencer v. Peters*,
  857 F.3d 789 (9th Cir. 2017) ........................................................................... 10, 13

*Stout v. Jefferson Cty. Bd. of Educ.*,
  882 F.3d 988 (11th Cir. 2018) ................................................................................. 14

*Thomas v. Cannon,*
   2017 WL 2289081 (W.D. Wash. May 25, 2017) ................................................ 20

*Thomas v. County of Riverside,*
   763 F.3d 1167 (9th Cir. 2014) ....................................................................... 25

*Thompson v. Rahr,*
   885 F.3d 582 (9th Cir. 2018) ........................................................................... 8

*United States v. Cervantes,*
   678 F.3d 798 (9th Cir. 2012) ....................................................................... 8, 9

*United States v. Mota,*
   982 F.2d 1384 (9th Cir. 1993) ................................................................... 8, 28

*Velazquez v. City of Long Beach,*
   793 F.3d 1010 (9th Cir. 2015) ............................................................. 24, 25, 27

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ......................................................... 14, 15, 16, 17

*Wallis ex rel. Wallis v. Spencer,*
   202 F.3d 1126 (9th Cir. 1999) ....................................................................... 30

*Washington v. Davis,*
   426 U.S. 229 (1976) ................................................................................. 15, 16

*Washington v. Lambert,*
   98 F.3d 1181 (9th Cir. 1996) ........................................................................... 7

*Weiland v. Palm Beach County Sheriff's Office,*
   792 F.3d 1313 (11th Cir. 2015) ..................................................................... 13

**FEDERAL AND STATE STATUTES**

42 U.S.C. § 1983 .................................................................................... *passim*

Civ. Code § 51.7 ............................................................................................. 15

Civ. Code § 52.1 ............................................................................................... 3

Gov. Code § 815.2 ........................................................................................... 30

Gov. Code § 815.6 ............................................................................... 28, 29, 30

Gov. Code § 821.6 ................................................................................... 29, 30

Gov. Code § 945.3 ................................................................................... 10, 12

Pen. Code § 69 ................................................................................................ 13

Pen. Code § 118.1 ........................................................................................... 28

Pen. Code § 148 ................................................................................................................ 24, 28, 29

Pen. Code § 853.5 ................................................................................................................... *passim*

Vehicle Code § 5200 .................................................................................................................. 28

**FEDERAL RULES**

Fed. R. Civ. P. 11 ........................................................................................................................ 8

Fed. R. Civ. P. 30(b)(6) ....................................................................................................... 16, 23

Fed. R. Evid. 1006 ............................................................................................................... 16, 26

## I.      INTRODUCTION

Defendants' Motion for Summary Judgment ("DMSJ") (ECF 150)[1] must be denied because it ignores the wealth of evidence against Defendants and is based largely on perjurious declarations. These declarations are so misrepresentative of the record that *Plaintiffs* are actually entitled to summary adjudication on liability on Claims One (Unreasonable Seizure), Two (Excessive Force), Three (Unreasonable Search), Seven (Bane Act), Ten (False Imprisonment), and Eleven (Assault & Battery), as explained in Plaintiffs' Motion for Summary Adjudication ("PMSA") (ECF 153). *Infra* § IV.A

As to the remaining claims, the DMSJ must be denied to the following reasons:

Claim Four (False Statements and Fabrication of Evidence) survives because the record evidence is overwhelming that McCampbell and McDowell lied about Ms. Porter to arrest her and have her submitted for felony prosecution in deprivation of her liberty.  *Infra* § IV.B.

Claims Five and Eights (Equal Protection and Ralph Act) survive on three independent bases: (i) McCampbell was making racially tinged remarks while he and McDowell violated Plaintiffs' constitutional rights; (ii) excessive force by Solano County Sheriff's Office ("SCSO") deputies bears more heavily on people of color, especially Black people; and (iii) the SCSO has a pervasive custom and practice and culture of extremism and racism that the Sheriff himself condones and protects. These latter two bases also confer *Monell* liability on equal protection (Claim Six). *Infra* § IV.C.

Claim Six (*Monell* Liability) additionally survives because SCSO policymakers ratified the conduct in this case, as they had done previously with McCampbell in a prior, similar case; and because the SCSO has a custom and practice of ignoring their deputies' excessive force and paying out victims rather than addressing the unconstitutional policing, which caused Plaintiffs injury. The *Infra* § IV.D.

The remaining state law claims—Claims Nine (Gov. Code § 815.6), Twelve (Intentional Infliction of Emotional Distress ("IIED"), and Thirteen and Fourteen (Negligence and Negligence *per se*)—are closely related to the foregoing claims and survive for the reasons explained *infra* § IV.F.

Defendants are not entitled to qualified immunity on the federal claims because the claims are based on clearly established caselaw or state immunity because it simply does not apply.

---

[1] "ECF" refers to Electronic Case File followed by a docket control number associated with the cited document. Any citation to pages refers to the pagination in the blue PACER header of the document.

## II.    FACTUAL BACKGROUND

The facts recited in the PMSA are relevant to this Opposition. To avoid burdening the Court with redundancy, Plaintiffs incorporate herein the full Statement of Facts in their PMSA (ECF 153 at 12-20), along with the full contents of Plaintiffs' Statement of Undisputed Facts (ECF 153-1 ("PSUF")). Concerning unreasonable seizure and search and excessive force (and related state law claims), Plaintiffs have provided detailed facts in the PMSA and PSUF. Plaintiffs will thus be terse and targeted in the recitation of facts concerning these issues, providing summaries and highlighting instances where Defendants have been less than forthcoming.

However, regarding fabrication/false statements, violations of the Equal Protection Clause, and *Monell* liability (along with any associated state law claims), Plaintiffs will provide more a more fulsome factual recitation in the concurrently filed Plaintiffs' Omnibus Statement of Additional Material Facts in Support of Oppositions to Defendants' Motions for Summary Judgment ("PAMF"). For brevity, the facts are interwoven with the analysis and discussed in their respective sections below.

## III.    LEGAL STANDARD

Incorporating by reference the summary judgment standard in the PMSA (ECF 153 at 20-21), Plaintiffs stress that, "when opposing parties tell different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## IV.    ANALYSIS

### A.    Defendants Engaged in Unreasonable Seizure, Force, and Search, and Violations of Related State Law Claims (Claims 1, 2, 3, 7, 10, and 11)

In their motion for summary adjudication of liability on unreasonable seizure and search and excessive force, Plaintiffs explained at length why they should win as a matter of law on the following issues: **(1)** McCampbell and McDowell engaged in excessive force and unreasonable seizure by pointing a gun at Ms. Porter and Mr. Powell, and handcuffing and dragging Ms. Porter away from her vehicle while she was having a polite conversation and trying to be compliant (ECF 153 at 21-27); **(2)** Ms. Porter had the right to question and reasonably resist the excessive force being used against her (*id.* at 27-29); **(3)** McCampbell engaged in additional excessive force and unreasonable seizure when he slammed Ms.

Porter to the asphalt by her head, beat her unconscious, and locked her up in a patrol car as McDowell assisted (*id.* at 29-32); **(4)** McCampbell and McDowell engaged in additional excessive force and unreasonable seizure when they forced Mr. Powell out of his vehicle at gunpoint, handcuffed him, and locked him up in a patrol car (*id.* at 32-34); **(5)** McCampbell and McDowell engaged in excessive force and unreasonable seizure against the children when they approached the Children (ages 3 to 6) with a gun pointed and unnecessarily separated them from their parents for 45 minutes (*id.* at 34-35); **(6)** the encounter included the unconstitutionally prolonged seizure of Mr. Powell and the Children by Deputies Carter and Hamilton after they arrived on scene (*id.* at 35-36); **(7)** Defendants conducted a warrantless and unconstitutional search of Plaintiffs' vehicle with no cognizable exception to the warrant requirement (*id.* at 37-39); and **(8)** Plaintiffs have also established liability as a matter of law on the related state law claims of false imprisonment, assault and battery, and Civ. Code § 52.1 (Bane Act) (*id.* at 39-40).  To avoid redundancy, Plaintiffs hereby incorporate by reference and rely upon the entirety of the eight arguments in their own motion (ECF 153 at 11-40) to oppose Defendants' motion here.

### 1.    *McCampbell and McDowell's Unreasonable Seizure and Excessive Force*

To justify their actions, Defendants highlight they were on a call for a "suspicious vehicle." But they <u>omit</u> that this vehicle was a Ford truck that was "unrelated" to Plaintiffs' Toyota and "bore no resemblance to [it]." ECF 153 at 12; PSUF 9-11. They also <u>omit</u> that the truck was unoccupied, and *prior to Plaintiffs' arrival*, Defendants had already determined that the unoccupied truck had *not* been reported stolen; they were waiting for dispatch to contact the registered owner. ECF 153 at 12-13; PSUF 12. In other words, Defendants' feigned concern over the "suspicious vehicle" is irrelevant and misleading.

Defendants concede that a mismatched license plate is merely a vehicle code infraction. ECF 150-1 at 11; PSUF 19. And while they suggest that it "can be a sign of a stolen vehicle," (ECF 150-1 at 11), they ignore that the same can be said for many traffic infractions such as not fully stopping at a stop sign and even having an expired tag. *See* ECF 153 at 26. Defendants cite no other reason or objective basis to suspect Plaintiffs' vehicle was stolen. *See* ECF 150-1 at 11. Importantly, Defendants <u>omit</u> that they knew Pen. Code § 853.5(a) prohibits peace officers from taking a person into custody for a traffic infraction unless that person refuses to present and identification or sign a ticket. ECF 153 at 13; PSUF 20.

Defendants highlight that Ms. Porter exited her vehicle, yet they <u>omit</u> that both McDowell and

McCampbell testified that there was nothing unlawful about Ms. Porter being out of her vehicle at the time Defendants approached her. ECF 153 at 13; PSUF 23; PAMF 1. Defendants claim that Ms. Porter was not being compliant with McDowell's command to get back in the car. This is belied by dashcam and bodycam footage (Ex. 101, 103), as well as deposition testimony. McDowell testified that Ms. Porter had a *polite* conversation with McDowell, and McDowell said "okay," when Ms. Porter explained that they were switching seats. ECF 153 at 13; PSUF 21-22. McDowell further testified that it was *reasonable* for a person in Ms. Porter's position to believe she had permission to proceed to the passenger side. ECF 153 at 13-14; PSUF 21-24. Defendants omit that McDowell did not object to Ms. Porter switching seats or order her back to the driver side *for the next five seconds*, bearing in mind that the entire encounter before the Deputies decided to handcuff Ms. Porter was about 25 seconds. ECF 153 at 14; PSUF at 27-28. Defendants also omit that, prior to Defendants handcuffing Ms. Porter, she was polite the entire time, did not appear to have any weapons, was not making any threatening movements, and both her hands were visible, all confirmed by video. ECF 153 at 13-14; PSUF 21-32, 35. Defendants further omit that, the very first time it was made clear to Ms. Porter to return to the driver's side, she "immediately" complied, "walking back to the driver side," after which Defendants handcuffed her anyway. ECF 153 at 14; PSUF 30-32. McCampbell testified that, when the Deputies decided to handcuff Ms. Porter, she had "not taken any aggressive stance," and it appeared that she "was simply walking around to the driver's side," consistent with McDowell's direction to do so. *Id.*

Defendants further omit that, at the time McCampbell appeared *with his firearm drawn*, Ms. Porter had been courteous, had not acted in any threatening way, and tried to comply when the Deputies motioned her back to the driver side. ECF 153 at 14-15; PSUF 35. McDowell admitted that officers have a legal duty to intervene to prevent escalation, but she did not tell Deputy McCampbell to holster his firearm and prevent escalation. ECF 153 at 15; PSUF 36. Instead, the Deputies handcuffed Ms. Porter in front of her small children and forcibly dragged her away out of the view of the Dashcam, as she explained that she was not resisting arrest, pleaded for an explanation and for her rights to be respected, and prayed in fear. ECF 153 at 15; PSUF 36-43. While Defendants characterize this as "resistance," (ECF 150-1 at 12-13), they omit that the purported reason they gave for assaulting and handcuffing Ms. Porter was, "You have two different plates on your vehicle," which, as shown above, is undisputedly a traffic

infraction for which Pen. Code § 853(a) prohibits taking a person into custody. ECF 153 at 15; PSUF 42. Defendants also <u>omit</u> that McDowell testified excessive force by police triggers a legally recognized right of a person to reasonably resist such unlawful force. ECF 153 at 15; PSUF 39.

Despite the undisputed admissions and video evidence, Defendants state that, "Due to her *noncompliance*, and the circumstances described above,[2] McCampbell directed McDowell to detain Ms. Porter." ECF 150 at 12 (emphasis added).

Defendants also claim that Ms. Porter broke free of her handcuffs and struck McCampbell in the head and neck, which prompted him to slam her to the ground by her head and beat her unconscious. ECF 150 at 13. But Defendants again <u>omit</u> key facts showing this to be a lie. ECF 153 at 30-31; PSUF 56-61. On McCampbell's bodycam, both of Ms. Porter's hands are observed in handcuffs just before the takedown and beating begin. *Id*. Later when Ms. Porter is already on the ground in a fetal position, the video reveals that the left arm (the one McCampbell was holding) still has the handcuff on it; and it is the right arm (the one McDowell was holding) that has come out of the handcuff. *Id*. Importantly, McDowell (the deputy holding the right hand) testified, she did not see when the handcuff came off Ms. Porter's right arm. SUF 58. **Very importantly, McDowell further testified, "I had lost, you know, my grip on Ms. Porter's arm, <u>*because [Ms. Porter] was being taken down*</u>"** by McCampbell. *Id*. (emphasis added). To cement the issue, McDowell also testified she did not see "any punch delivered by [Ms. Porter] to anyone." *Id*. But she did see McCampbell striking Ms. Porter while she was on the ground. *Id*. Consistent with the overwhelming evidence, Ms. Porter denies striking anyone. *Id*. Ms. Porter's account is further corroborated by Plaintiffs' expert Jason Fries, who provides a slow-motion breakdown of McCampbell's bodycam footage further confirming that Ms. Porter did not punch McCampbell prior to him slamming her to the ground by the head to beating her unconscious. ECF 153 at 31; PSUF 62.

Defendants state McCampbell "was initially concerned [Ms. Porter] *may have* lost consciousness." ECF 150-1 at 13 (emphasis added). A citation to the record is conspicuously missing from this assertion. This is because Defendants again <u>omit</u> undisputed material facts. In sum, video and

---

[2] These "circumstances described above" include: (i) not being able to see Ms. Porter's hands (a lie, according to video and deposition testimony); (ii) Ms. Porter being outside her vehicle (which deputies admitted was not unlawful); and (iii) it being nighttime in a rural area (which is not a basis to suspect a crime, *infra* n.3). Given the rest of the admissions, there was no justification for the Deputies' assault on Ms. Porter.

testimony confirm that McCampbell slammed Ms. Porter to the pavement by the head and beat her _unconscious_. ECF 153 at 15; PSUF 44-47, 51-52. As Ms. Porter struggled for her life, praying, "God, bless me. Bless me," McCampbell beat her with punches while McDowell assisted. _Id_. As Ms. Porter lay unconscious on the pavement, McCampbell sat mounted on her for nearly a minute catching his breath. _Id_. He acknowledged multiple times that she was unconscious, saying, for example, "I believe she's unconscious," and, "I think she's out," and, "She went unconscious," to state a few. _Id_.

Concerning Mr. Powell, Defendants tell this Court that he "was seen leaning down, out of sight, and reaching down towards the floor of the passenger seat of the vehicle, which prompted officer safety concerns," and that "McCampbell observed Mr. Powell reach over towards the driver's seat and continued to reach around." (ECF 150-1 at 12 and 13). But they omit that McCampbell admitted he saw "[Mr. Powell] reaching towards the _cell phone_ on the ground," as Mr. Powell reaffirmed, "We were about to switch drivers," and got back in the car per the officers' requested. ECF 153 at 14 (citing PSUF 34) (emphasis added). Defendants emphasize that Mr. Powell was "initially non-compliant," but again they mislead the Court. ECF 150-1 at 14. Defendants omit that McCampbell was referring to Mr. Powell as "young man" (despite him being a grandfather in his 60s); they also omit Mr. Powell fully complied after confirming that McCampbell's instructions to come out of the car were for him. ECF 153 at 16; PSUF 67-68. They omit testifying that Mr. Powell was compliant with their commands and was polite the entire time, and there were no facts to believe he was armed. ECF 153 at 17; PSUF 74-75. Defendants were unable to articulate any particularized facts to justify handcuffing and locking up Mr. Powell. ECF 153 at 17; PSUF 70-73. Even in their motion, all they could point to was: (i) the alleged "suspicious vehicle" (i.e., the unrelated, irrelevant Ford truck (_supra_, p.1)); (ii) in a "rural area" (driving through a rural area is not indicative of a crime in any fashion);[3] and (iii) "mismatching license plates" (a traffic infraction that could have been resolved in minutes, if not seconds, (_infra_, p.5)). _See_ ECF 150-1 at 14.

Defendants also state that McCampbell observed "_additional occupants_ in the back seat of the

---

[3] Defendants here cannot even claim that it was a "high crime" area, which by itself would _not_ have been sufficient even for a _Terry_ stop. _Brown v. Texas_, 443 U.S. 47, 52 (1979) (The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood.").

---

vehicle, who were moving around," and the Deputies were "outnumbered" by these "unknown occupants." ECF 150 at 12. But Defendants again mislead the Court by omitting material information, to wit, that the Deputies had observed these "additional occupants" were all small children *at the time they were arresting Ms. Porter*, as evidenced by their statements on camera *before and during* Mr. Powell's arrest. ECF 153 at 17-18 citing PSUF 76-77. Disturbingly, Defendants omit that, after arresting Mr. Powell and isolating the small Children, Defendants approached the Children in the car at gunpoint, knowing they were ages three (3), four (4), and (6), and kept them isolated from their parents for nearly 40 minutes while they searched the car. ECF 153 at 18; PSUF 81-83. Defendants were unable to articulate any particularized basis to seize and isolate the Children for that long. ECF 153 at 18; PSUF 84-86.

Defendants admit that Ms. Porter agreed to provide her identification (ECF 150-1 at14) but omit that McCampbell asked for the identification only after beating Ms. Porter unconscious. ECF 153 at 16; PSUF 63. They omit that, within 25 seconds of obtaining Ms. Porter's identification, Defendants learned that she was the current registered owner of the vehicle (at 9:26 p.m.). ECF 153 at 16; PSUF 64.

Prolonging a stop beyond what is necessary to address the subject traffic infraction is unlawful "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015). "[W]hen the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints *will* violate the Fourth Amendment." *Green v. City & County of S.F.*, 751 F.3d 1039, 1050 (9th Cir. 2014); *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) (drawing weapons and handcuffing "*greatly* increases the seriousness of the stop") (emphases added); *Robinson v. Solano County*, 278 F.3d 1007, 1015-16 (9th Cir. 2002) (*en banc*) (pointing a gun at an apparently unarmed misdemeanor subject was excessive force in violation of the Fourth Amendment even though that subject had previously been armed with a shotgun that he used to shoot a neighbor's dog but was not armed at the time of detention). Indeed, "[w]here there is no need for force, *any* force used is constitutionally unreasonable." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001); *Lolli v. County of Orange*, 351 F.3d 410, 417 (9th Cir. 2003) (any force beyond that which is necessary is unconstitutional). Seizing an individual without probable cause, even a suspected misdemeanant, violates the Constitution where there is an insufficient basis to conclude likelihood of ongoing danger. *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1175 (9th Cir. 2013); *Robinson*,

278 F.3d at 1014 (a 15 to 30-minute detention of an innocent person was actionable). For traffic stops, the seizure *cannot* go beyond what is necessary to address the subject traffic infraction. *Rodriguez*, 575 U.S. at 350-51, 355. Statutory law adds an additional bar specifically for infractions such as here. Penal Code section 853.5 limits "the authority [of peace officers] to execute custodial arrests for . . . infractions" by allowing an officer to take an arrestee into custody "'*[o]nly if* the arrestee refuses to present written identification or to sign the written promise to appear.'" *United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993) (quoting Cal. Pen. Code § 853.5) (emphasis added); ECF 51 (Court Order) at 18-19.

Here, the Deputies were dealing with a non-moving infraction and had not developed sufficiently "*particularized*" reasonable suspicion or probable cause for any felony or misdemeanor. Hence, as a matter of law, they were prohibited from seizing Plaintiffs and using force in the manner they did.

To save themselves from this obvious conclusion, Defendants argue that they wished to investigate whether Plaintiffs' car was "stolen" because the vehicle had mismatched license plates. But this argument is debunked above and in the PMSA. ECF 153 at 25-27. Indeed, "a conclusory allegation by law-enforcement that a particular house was a suspected narcotics stash house, [i] entitled to little (if any) weight." *United States v. Cervantes*, 678 F.3d 798, 803 (9th Cir. 2012)).

Defendants also misrepresent the law. For example, they cite *Thompson v. Rahr*, 885 F.3d 582, 588 (9th Cir. 2018), for the proposition that "pointing a gun did not constitute excessive force." ECF 150 at 24. To the contrary, the Ninth Circuit held that pointing a gun at the unarmed felony suspect *did* constitute excessive force. *Thompson*, 885 F.3d at 587. However, the officer was let off on *qualified immunity*, because he "was conducting a felony arrest at night of a suspect who was not handcuffed, stood six feet tall and weighed two hundred and sixty-five pounds, was taller and heavier than [the officer], and had a prior felony conviction for unlawfully possessing a firearm," and there was a loaded gun in his car the officer knew about. *Id*. at 588. In Plaintiffs' case here, the situation is much tamer. And it was Defendants who escalated the situation against a petite, unthreatening woman stopped for an infraction.[4]

### 2.   *Carter and Hamilton Were Integral Participants in an Unreasonable Seizure*

A defendant may be deemed to have caused a section 1983 violation under the "integral-

---

[4] Defendants' untruthful accounts and misleading characterizations of the law violate not only the perjury laws but also Fed. R. Civ. P. 11 ("Rule 11") and are especially troubling coming from sworn officers.

participant doctrine," if the defendant "knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation." *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022). "[I]ntegral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation," *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004), "[b]ut it does require some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481, n.12 (9th Cir. 2007). Indeed, an officer may be liable for providing armed backup or participating without objection in a police action knowing that a particular form of force would be used. *Boyd*, 374 F.3d at 780 (internal citations omitted).

Defendants' arguments about Deputies Carter and Hamilton are focused on Ms. Porter. ECF 150-1 at 15. But the claim of unreasonable seizure against them is brought by Mr. Powell and the Children. The following undisputed facts show that Carter and Hamilton's were integral participants: Carter and Hamilton arrived together at the scene of the incident at approximately 9:31 p.m.; they *joined* the investigation and were there *to assist McCampbell and McDowell*. PSUF 90-91. At the time, the SCSO had broadcast to all deputies that Ms. Porter was the clear and current registered owner of Plaintiffs' vehicle. PSUF 97-98. Carter and Hamilton were unable to identify any reasonable justification for the continued seizure of Mr. Powell or the Children, which was a total of 45 minutes, 30 minutes of which was under Carter and Hamilton's watch and participation. PSUF 90-102.

### 3.    *Defendants' Unreasonable Search of Plaintiffs' Vehicle (Claim 3)*

There is no dispute that McCampbell himself searched the passenger compartment of the vehicle twice and caused other officers to do the same, and McDowell was a direct and integral participant. PSUF 103-107. Here, Defendants' reliance on the automobile exception is misplaced, because they were not able to articulate any particularized basis for "probable cause to believe contraband or evidence [of a crime]" would be found in Plaintiffs' vehicle—a condition of the exception. *Cervantes*, 678 F.3d at 802. For the reasons explained in Plaintiffs' motion (ECF 153 at 37-39), incorporated herein, Defendants' warrantless search of Plaintiffs' vehicle was indisputably unconstitutional. Conspicuously, Defendants also omit that they did not find any contraband or firearm. PSUF 87. Defendants' motion must be denied.

### 4.    *The Motion Is Improper as to Related State Law Claims (Claims 7, 10, and 11)*

For the reasons articulated in PMSA (ECF 153 at 39-40), incorporated and relied upon herein,

Claims Seven (Bane Act), Ten (False Imprisonment), and Eleven (Assault & Battery) are closely related to Plaintiffs' section 1983 Claims One through Three, discussed above, and must proceed.

**B.  Defendants McDowell and McCampbell Made False Statements and Fabricated Evidence in Deprivation of Ms. Porter's Liberty (Claim Four)**

"To prevail on a section 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). "A plaintiff can prove deliberate fabrication in several ways. Most basically, a plaintiff can produce direct evidence of deliberate fabrication." *Caldwell v. San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018). "Alternatively, a plaintiff can produce circumstantial evidence related to a defendant's motive." *Id.* "[E]vidence that officials continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent can raise the inference that the investigator has an unlawful motivation to frame an innocent person." *Spencer,* 857 F.3d at 793. "Or deliberate fabrication can be shown by direct evidence," such as deliberate mischaracterizations in an investigative report.'" *Id.* (internal citations omitted).

### 1.  First Element: Defendants Deliberately Falsified Evidence Against Ms. Porter

#### a.  The Deputies Lied About Ms. Porter's Alleged "Non-Compliance" in Order to Jail and Submit Her for Felony Prosecution

It cannot be lost that a pending criminal prosecution bars litigation on civil rights claims related to that prosecution. *Harvey v. Waldron*, 210 F.3d 1008, 1014 (9th Cir. 2000); Cal. Gov. Code § 945.3.

After grossly violating Plaintiffs' constitutional rights, McCampbell and McDowell lied that Ms. Porter was non-compliant both on the scene and in their police reports to arrest and submit her for felony prosecution. PFMF 2-3 McCampbell's bodycam shows his lies on the scene, where he says Ms. Porter was "non-compliant," "refused to get back in the car," "tried to walk away," and "actually started fighting McDowell," which prompted the officers to go "hands on." PAMF 4. Defendants doubled down on these lies in their police reports. Specifically, McDowell wrote that Ms. Porter "did not comply" and "was not complying" with her commands to get back into her vehicle. PAMF 5. McCampbell wrote that Ms. Porter "refused" to comply with McDowell's commands to return to the vehicle, and that due in part to "Porter's preexisting noncompliance," he felt it was "unsafe for Porter to be allowed to return to the driver's seat of the vehicle." PAMF 6. These statements are clear lies based on the dashcam and bodycam videos and

deposition testimony, which show that Ms. Porter was polite, compliant, and non-threatening when the Deputies became aggressive and unlawfully assaulted her. ECF 153 at 13-14; PSUF 21-33; PAMF 7-26.

> **b.** **McCampbell Falsely Stated in His Police Report That Ms. Porter Refused His Command to Put Her Hands on the Back of Her Head _Before_ He Directed McDowell to Detain Her**

McCampbell stated in his police report that: "I gave Porter a command to show me her hands. Porter did not show me her hands but continued walking to the rear of the vehicle. I gave Porter a command to put her hands on the back of her head to which she refused by not placing her hands on her head and continued walking towards the driver side of the vehicle. Due to her noncompliance and the aforementioned circumstances, I told Deputy McDowell to detain Porter." PAMF 31.

McCampbell's bodycam shows these are plain fabrications. As Ms. Porter was complying with the command to return to the driver's side, McCampbell told McDowell, "You know what, detain her." PAMF 32; PSUF 30-31. And it is only _after_ McCampbell gave this unlawful command to McDowell that he gave Ms. Porter the command, "put your hands on the back of your head." PAMF 33. Thus, contrary to the police report, Ms. Porter was being polite and compliant _prior to_ the unconstitutional command to detain her in handcuffs. PSUF 21, 25, 27, 74; PAMF 7, 10, 12, 20, 26. In addition, both of Ms. Porter's hands were clearly visible to McCampbell. PAMF 14, 26, 34; PSUF 29. The police report is misleading.

> **c.** **The Police Reports Are Misleading Because the Deputies Knew the "Unknown" Potentially Dangerous "Occupants" Were Small Children**

McDowell and McDowell also justified illegally seizing Ms. Porter and Mr. Powell on their alleged belief that they did not know at the time that the other passengers in the car were small children. PAMF 35. As written in her police report, McDowell justified her actions, in part, on the contention that there were an "unknown number of additional occupants" other than Mr. Powell inside the vehicle. PAMF 36. Similarly, McCampbell stated in his police report that before handcuffing Ms. Porter, he could see "additional occupants" within the vehicle, but he was "unsure of the number of additional occupants due to the darkness of the vehicle," and due in part to this belief, he "felt it was unsafe for Porter to be allowed to return to the driver's seat of the vehicle." PAMF 37. McCampbell and McDowell's police reports give the impression that they did not know there were small children inside the vehicle until after putting Mr. Powell was in custody. PAMF 38 (quoting misleading parts of police reports).

But these statements are misleading because the Deputies had observed these "additional occupants" were small children *at the time they were arresting Ms. Porter*, as evidenced by their statements on camera *before and during* Mr. Powell's arrest: "There are kids in the car, so I can't use my dog," and "Did you see how many kids were back there? I saw two." ECF 153 at 17-18; PSUF 76-77.

#### d.   McDowell and McCampbell Lied in Their Police Reports that Ms. Porter Slipped Out of Her Handcuffs and Punched McCampbell

McCampbell stated in his police report that "Porter managed to slip one hand out of one of the handcuffs and spun away breaking my grip of Porter." PAMF 27. McCampbell continued: "Porter then struck me in the mouth with one of her fists and scratched the left side of my throat." *Id.* He also told other officers on the scene that Ms. Porter "slipped the cuff and punched me in the face." PAMF 28. Similarly, McDowell stated in her police report that "Ms. Porter was able to free her right hand from the handcuffs and strike Deputy McCampbell in the face." PAMF 30.

But these are unsupported lies. Contrary to her police report, McDowell admitted in deposition that she did not see Ms. Porter slip out of the handcuffs or hit anyone. PSUF 58-60. Further, as seen on McCampbell's bodycam, both of Ms. Porter's hands were in handcuffs just before he took her down to beat her unconscious. PSUF 56. The evidence simply does not support the Deputies' lies, as explained in the PMSA and incorporated herein by reference. ECF 153 at 29-32; PSUF 56-62. McCampbell's statement to the paramedics that "she did this to herself" (PAMF 29) is also false. His almost immediate reflex to begin lying about the incident reflects his consciousness of guilt and consequence avoidance.

#### e.   Misimpression About the Manner of the Stop

McCampbell and McDowell made other false statements on the scene and in their police reports and to their fellow Solano County deputies. For example, both characterized the encounter with Ms. Porter as a "traffic enforcement stop," giving the impression that Ms. Porter had been pulled over while driving. PAMF 39. In reality, Ms. Porter's vehicle had already stopped and was in "park" mode before McDowell's vehicle pulled up to Ms. Porter's vehicle. PAMF 40. McCampbell and McDowell both admitted that Ms. Porter had already stopped before McDowell turned on her overhead lights, meaning Ms. Porter had not been pulled over while driving. PAMF 41.

Misrepresenting facts in police reports is a textbook factual basis for an actionable constitutional

---

violation for a false statements and fabrication claim. In *Spencer*, for example, the Court reversed the district court's order granting judgment as a matter of law to the defendants in a case where the jury found the County sheriff's office deliberately mischaracterized witness' statements in her investigative reports. 857 F.3d at 793. In *Costanich v. Health Servs.*, 627 F.3d 1101, 1111-12 (9th Cir. 2009), the Court held that false statements in an investigative report and declaration precluded summary judgment. In *Caldwell*, the Court held there were triable issues of fact where the defendant officer fabricated a statement from the plaintiff by falsifying notes. 889 F.3d at 1112-13; *see also Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *1 (9th Cir. Oct. 11, 2023) ("[V]iewing the facts in the light most favorable to Lobato, there is a genuine dispute whether the Detectives' inaccurate recounting of Lobato's statements in their reports amounts to deliberate fabrication or carelessness."); *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015) (that police officers lies in reports caused the plaintiff's incarceration, is sufficient to state a § 1983 claim).

### 2.   *Second Element: Ms. Porter Suffered Deprivation of Liberty*

The second element of this claim requires that "the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer*, 857 F.3d at 798. McCampbell and McDowell's fabrications on the scene and in the police reports certainly deprived Ms. Porter of her liberty. She was taken to jail that night and booked on felony violation of Pen. Code § 69. PAMF 47. Ms. Porter spent the night in jail and was released the next morning, but only on $25,000 bail for which she had to pay $2,500 as a bail bond fee, naturally depriving her of the ability to use that money for herself and her family. PAMF 48. Ms. Porter was also restricted from travel, confined to the state of California as a condition of bail in further deprivation of her liberty. PAMF 49. This restriction persisted until the Solano County District Attorney deferred prosecution on September 28, 2020, citing "PRE-FILING DEFERRAL" as the reason for filing the Notice of Intent Not to Prosecute in the matter of "*People of the State of California v. Nakia Victoria Porter*." PAMF 50. But because this was a *deferral* and not a dismissal, Ms. Porter remained under threat and in fear of false felony prosecution until August 6, 2023, when the three-year statute of limitations on that felony offense expired. In further deprivation of her liberty, Ms. Porter was required to show up for a criminal hearing in early October 2020, where she received the pre-filing deferral. PAMF 51. Fortunately, the felony case was never again revived, but Ms. Porter's liberty was certainly deprived in

many respects, and suffered anxiety, depression, paranoia, loss of sleep, nightmares, and a host of other trauma and injury. PAMF 52. Based on the foregoing factual issues, summary judgment must be denied.

### C.   Violations of the Equal Protection Clause & Ralph Act (Claims 5, 6, and 8)

"To state a claim for violation of the Equal Protection Clause, a plaintiff must show that the defendant acted with an intent or purpose to discriminate against him based upon his membership in a protected class," which includes race. *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003). A plaintiff is not required "to prove that the challenged action rested solely on [a] racially discriminatory purpose," *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Plaintiff must show that "defendant acted at least in part because of a plaintiff's protected status." *Serrano*, 345 F.3d at 1082.

"A plaintiff may establish discriminatory purpose by 'produc[ing] direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated' the defendant, and that the defendant's actions adversely affected the plaintiff in some way." *Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) (quoting *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 504 (9th Cir. 2016). For example, if a government official makes "racially tinged remarks," that is sufficient to raise an inference of improper racial motivation. *Serrano*, 345 F.3d at 1083. In *Brown v. Schnoor*, 2015 WL 2062604, at *4 (W.D. Wash. Mar. 16, 2015), the court permitted the equal protection claim on plaintiff's evidence that a correctional officer called him "boy" when violating his constitutional rights; *see also Brent v. City of Cumberland Police Dep't*, No. JKB-22-1349, 2023 U.S. Dist. LEXIS 41614, at *19 (D. Md. Mar. 10, 2023) (permitting an equal protection claim on allegations that the subject officers "ha[d] personal ties to the[] [offending] neighbors," who "were motivated by racial animus"); *Hunt Valley Baptist Church, Inc. v. Balt. Cty.*, No. SAG-17-0804, 2020 U.S. Dist. LEXIS 22054, at *44 (D. Md. Feb. 10, 2020) (allowing discrimination claim finding that social media accounts and posts evidenced discriminatory intent); *Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988, 1008 (11th Cir. 2018) (holding that comments on social media accounts shed light on the motivations of discriminatory action and were properly admitted); *Gilead Cmty. Servs. v. Town of Cromwell*, 432 F. Supp. 3d 46, 74 (D. Conn. 2019) (public facing statements may be used to evidence discriminatory intent).

"[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [government action] bears more heavily on one race than

another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). "In determining whether a discriminatory intent or purpose exists, [courts] may consider direct evidence of discrimination, statistical evidence showing a discriminatory impact, or other factors that could reveal a discriminatory purpose, like the historical background of the policy." *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1261 (9th Cir. 2016). "[P]roof of disproportionate impact on an identifiable group, such as evidence of gross statistical disparities, can satisfy the intent requirement where it tends to show that some invidious or discriminatory purpose underlies the policy." *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009); *Mendiola-Martinez*, 836 F.3d at 1261 (same); *Arlington Heights*, 429 U.S. at 266, 97 ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action[.]"). But "[t]he existence of a comparator is not a prerequisite to stating a Fourteenth Amendment equal protection claim." *Ballou*, 29 F.4th at 426.

The Ralph Act, codified in Civ. Code § 51.7, is a state statutory equal protection analog that makes it unlawful to commit violence or intimidation based on race, among other things. *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 880 (2007).

### 1.    *Deputy McCampbell Made Racially Tinged Remarks Toward Mr. Powell*

In Plaintiffs' case, SCSO deputies criminally brutalized a polite, unassuming Black family—a mother, grandfather, and three small children—without any cause or justification. During the encounter, Deputy McCampbell kept referring to Mr. Powell as "young man," akin to the racial slur "boy," even though Mr. Powell was in his sixties (decades older than McCampbell), and McCampbell had observed Mr. Powell was an old man when pointing a gun at him and arresting him. PAMF 53. When questioned about this, McCampbell testified that he was calling Mr. Powell "young man" out of "respect" to "bring down . . . the intensity" of the situation. PAMF 54. But the video evidence does not bear out this explanation. As to intensity, the video shows that the very person who had unnecessarily raised the "intensity" and was remaining "intense" was McCampbell himself. PAMF 55. Moreover, at the time McCampbell was allegedly showing "respect" to Mr. Powell, he either had Mr. Powell at gunpoint or locked up in a patrol car for no reasonable purpose, separating him from his small granddaughters. PAMF 56. Mr. Powell certainly felt that McCampbell was calling him "young man" to demean him akin to the racial slur "boy." PAMF 57; *see Brown*, 2015 WL 2062604, at *4. McDowell was present when

McCampbell was referring to Mr. Powell in a racially insensitive manner and did nothing to stop it. PAMF 58. She rather participated in the constitutional violations. *See supra.* §§ IV.A and B.

### 2. The SCSO Bears More Heavily on Minorities and People of Color

Statistical evidence showing a discriminatory impact of excessive force against the Black community also supports denial. *Supra* pp.14-15. In discovery, Defendants produced complaints of use-of-force and violence by the SCSO. PAMF 59. Plaintiffs analyzed these complaints from May 2016 to the present, deposed the County's Rule 30(b)(6) witness (Cap. Elbert) about them, and compiled a chart based on the review and deposition and notations Elbert relied upon in a binder he had created for the deposition. PAMF 60. The chart is presented here as Exhibit 300 under Fed. R. Evid. 1006. *Id.* The chart depicts 47 complaints of force and violence by SCSO deputies from May 24, 2016, through December 19, 2023, for which sufficient data exists.[5] PAMF 61. Of these 47 complaints, a whopping 34 are made by minorities who are people of color with 23 of those 34 being made by Black individuals. Of the remaining 13, seven (7) are made by non-minorities, and the last six (6) are unknown. PAMF 62. This means that 72% of the complaints of excessive force by SCSO deputies come from people of color, and 49% of the complaints come from the Black community. *Id.* This unmistakable disparity in excessive force against people of color, especially Black people, becomes even more pronounced when examined vis-à-vis the 2020 Decennial Census Bureau Profile showing that in 2020, only 10% of the Solano County population was Black.[6] PAMF 63. To have half of the complaints of excessive force come from 10% of the population demonstrates an invidious discriminatory impact. *See Washington*, 426 U.S. at 242; *Mendiola-Martinez*, 836 F.3d at 1261; *Arlington Heights*, 429 U.S. at 266.

### 3. The Sheriff Himself Ratified a Culture of Extremism and Racism at the SCSO

The evidence of racism and extremism at the SCSO is far deeper and more pervasive than even the evidence above shows. It permeates through SCSO, and the Sheriff himself condones and protects it.

On September 16, 2020—within a month of the attack on the Porter family, which had not yet gone public—the Tri-City NAACP sent Sheriff Ferrara an email objecting to one of *his* social media

---

[5] There are 51 complaints documented on the chart, but because there is insufficient information for 4 of the complaints, these 4 complaints have been excluded from the data reported herein. Almadani Decl., ¶ 37.
[6] Government census data is appropriate for judicial notice in the Ninth Circuit, and thus Plaintiffs move the Court to take judicial notice of Ex. 450. *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996).

posts. PAMF 64. In response to a song by Alicia Keys played during an NFL game—which called attention to police violence against the Black community and encouraged peace and equality—Ferrara commented, "My family will no longer watch any sports entity that promotes this abomination." *Id*.

Consistent with the Sheriff's sentiments, public social media posts by SCSO deputies, including Sergeant Stockton (a Defendant in this case), posted from approximately 2016 through mid-2021 show alarmingly extremist and racially discriminatory content. PAMF 65. Professor Peter Simi, Plaintiffs' expert on far-right extremism and white supremacy movements, will testify about these social media posts. PAMF 66. Professor Simi will explain the SCSO Deputies' support for the Three Percenter ideology, as well as well as imagery posted by them depicting white supremacy. *Id*. The Three Percenters are a far-right militia group sparked by the election of Barack Obama, the first Black president. PAMF 67. The group has been involved in multiple domestic terror plots and other criminal acts, including the January 6 insurrection on the U.S. Capitol. PAMF 68. Among other things, Professor Simi will explain that several social media posts by Stockton show that he uses the Gadsden snake in a manner associated with extremist and white supremacist ideology. PAMF 69. For example, Stockton not only depicted the Gadsden snake wrapped around the Three Percenter symbol, but he also depicted the Gadsden snake through what has been classified as a symbol of hate depicting "white power." *Id.* Stockton also promoted the hashtag and phrase "Red-Blooded-American," displayed in numerous posts, which was popularized by white supremacist senator Theodore G. Bilbo and holds a specialized, racist meaning in far-right extremist culture. PAMF 70. Stockton displayed the Gadsden snake on the Punisher skull, which has been appropriated by extremist groups such as the Three Percenters and used by extremist law enforcement officers to dispense justice without the hindrance of the justice system, taking example from the Punisher comic character. PAMF 71. Stockton displayed these extremist symbols alongside his SCSO uniform and patch. PAMF 72. Stockton had countless such images on his social media accounts. PAMF 73.

Solano County Sheriff's Sergeant Cully Pratt had similar extremist posts on his social media accounts. PAMF 74. So too did Solano County Sheriff's Deputy Dale Matsuoka. PAMF 75. On his accounts, Matsuoka had photos of Solano County Sheriff's deputies dressed in official uniforms alongside a Three Percenter symbol. *Id*. There is also other extremist and racist imagery, including, for example, "White Lives Matter" imagery, a man with a Gadsden snake tattoo throwing up a white-power

symbol, the Punisher skull, and "I hate [LGBTQ] PEOPLE" imagery. *Id.*

These extremist and racist social media posts sparked a public outcry in Solano County, and the Sheriff himself was made aware of these issues through an article and emails by Scott Morris in February 2021 (within months of the SCSO's attack on the Porter family). PAMF 76.

Sheriff Ferrara testified that in response to the articles published in 2021 concerning Solano Sheriff's deputies' ties to far-right extremism (Exs. 180, 181, and 191), Ferrara talked to the FBI and allegedly asked his command staff to make sure that any of the content posted on Solano deputies' social media—essentially the posts in Appendices A-C of the Morris declaration and Simi Report—"did not violate law or policy." PAMF 77. Ferrara further testified that his Undersheriff (DeWall) and Captains allegedly looked through the deputies' social media posts to investigate these issues and found no violation of law or Solano County policy. PAMF 78. But contrary to Ferrara's testimony, Undersheriff DeWall, testified that Ferrara himself *shut down* any internal affairs investigation into these issues:

| Counsel: | Okay. My question is: As a result of the steps that you took, did you make a determination that there were any violations of Solano County Sheriff's Office policies by any of the deputies or sergeants named in this email? |
| DeWall: | Yeah. In my conversation with the sheriff, he explained that we were *not* going to be conducting an internal affairs investigation. |
| Counsel: | Do you remember him telling you why not? |
| DeWall: | No. It was that simple. |

PAMF 79.

On or about February 16, 2021, Benicia Black Lives Matter sent a letter to the Solano County Board and Sheriff Ferrara expressing grave concerns of extremism and white supremacist ideology within the SCSO, but the Sheriff took no steps in response to this letter. PAMF 80. On or about March 9, 2021, Morris published another article expressing concerns about the Sheriff's refusal to appropriately investigate these issues, but the Sheriff took no steps in response. PAMF 81. Sometime after March 19, 2021, Progressive Democrats of Benicia wrote a letter to the Sheriff requesting that he condemn white supremacist ideology within the SCSO, but again the request fell on deaf ears. PAMF 82. On April 16, 2021, another article was published calling for additional investigation into these issues, but the Sheriff again did nothing in response. PAMF 83. On June 4, 2021, the Tri-City NAACP sent a letter calling for further investigation into the extremism and racism, but the Sheriff again ignored the request. PAMF 84.

Sheriff Ferrara testified that these actions of his were consistent with SCSO policy. PAMF 85.

Based on the foregoing evidence, a reasonable jury can conclude that the SCSO's constitutional violations here were racially motivated, in violation of the Equal Protection Clause (Claim Five) and the Ralph Act (Claim Eight), and that a culture of racism within the SCSO was ratified by the Sheriff himself protecting a pervasive practice of discriminatory policing, sufficient for *Monell* liability (Claim Six). *See Puckett v. County of Sacramento*, No. 2:22-CV-00350-KJM-DB, 2023 WL 2432919, at *7 (E.D. Cal. Mar. 9, 2023) (quoting *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019)).

### D.     The Entity Defendants Also Bear *Monell* Liability on Excessive Force (Claim Six)

To impose municipality *Monell* liability, a plaintiff must prove that: (1) she had a constitutional right of which she was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) "the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). "The Ninth Circuit recognizes four theories establishing municipal liability under *Monell*: '(1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker [also known as 'ratification'].'" *Puckett*, 2023 WL 2432919, at *7.

#### 1.     The SCSO Ratified the Unconstitutional Conduct in This Case

To prove *Monell* liability under a ratification theory, a plaintiff must show that "a policymaker approve[d] a subordinate's decision *and the basis for it*[.]" *Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992) (emphasis in original). "A single decision by a municipal policymaker 'may be sufficient to trigger Section 1983 liability under *Monell*, even though the decision is not intended to govern future situations,' but the plaintiff must show that the triggering decision was the product of a 'conscious, affirmative choice' to ratify the conduct in question." *Lassiter v. City of Bremerton*, 556 F.3d 1049, 1055 (9th Cir. 2009) (quoting *Gillette*, 979 F.2d at 1347); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) ("[O]fficial liability may also be imposed where a first-time decision to adopt a particular course of action is directed by a governmentally authorized decisionmaker.")

"[R]atification of conduct, and thus the existence of a *de facto* policy or custom, can be shown by a municipality's post-event conduct, including its conduct in an investigation of the incident." *Dorger v. City of Napa*, No. 12-CV-440 YGR, 2012 WL 3791447, at *5 (N.D. Cal. Aug. 31, 2012). "Policy or

1    custom may be inferred if, after the [incident] . . . officials took no steps to reprimand or discharge the

2    [officers], or if they otherwise failed to admit the [officers'] conduct was in error." *McRorie v. Shimoda*,

3    795 F.2d 780, 784 (9th Cir. 1986). In addition, a policymaker's pronouncement that a defendant officer's

4    alleged use of force was "in compliance with Department policy" may give rise to a *Monell* claim and is

5    sufficient to raise a genuine issue of material fact—even where the finding was made after the incident

6    at issue. *See Rosales v. City of Chico*, Civ. No. 2:14-02152 WBS, 2015 WL 6167740, at *7 (E.D. Cal.

7    Oct. 20, 2015). Such an act is "tantamount to the announcement or confirmation of a policy for purposes

8    of *Monell*." *Id.* (quoting *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003), *overruled on other*

9    *grounds by*, 543 U.S. 194 (2004)); *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001) ("[A] policy-

10   maker's pronouncement that he has not or will not discipline officers that retaliated against prison

11   litigators is sufficient evidence of a policy or custom: those statements can 'be[ ] considered to represent

12   [the prison's] policy or custom of condonation of, and acquiescence in, [retaliation] by its offic[ials].'")

13   (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991)); *Thomas v. Cannon*, No. 3:15-

14   05346 BJR, 2017 WL 2289081, at *13 (W.D. Wash. May 25, 2017) ("A rational jury could find that [the

15   officer's] decision to shoot was not constitutionally justified, and that [the official policymaker] ratified

16   that unconstitutional decision by determining it was lawful and within policy."). "Ordinarily, ratification

17   is a question for the jury." *Christie v. Iopa*, 176 F.3d 1231, 1238–39 (9th Cir. 1999).

18        Here, as detailed below, the SCSO ratified McCampbell and McDowell's unconstitutional

19   conduct against the Porter family. Contrary to SCSO's own policy, McCampbell and McDowell were

20   never subjected to any formal review of their use of force, and they were never investigated, let alone

21   disciplined. To the contrary, the SCSO issued an official press release and statement in support of

22   McCampbell and McDowell's unconstitutional acts, fully endorsing a false narrative of the incident

23   knowing that it contradicted the evidence. *See, e.g.*, ECF 153 at 12-20, 21-39.

### a.    The Use of Force Review Board

25        The SCSO has an internal review process for reviewing incidents in which force has been used

26   called a "Use-of-Force Review Board" (hereafter, the "Review Board"). PAMF 86. The purported

27   purpose of the Review Board is to ensure compliance with SCSO policies and training. PAMF 87. The

28   Review Board is composed of the Undersheriff, Compliance Division Commander (or his designee), an

---

*Plaintiffs' Opposition to Defendants' Summary Judgment Motion*            *2:21-CV-01473-KJM-JDP*

outside civilian member, and the Captain of the division being analyzed, all of whom are "voting members," and possibly a subject matter expert deputy, who is a non-voting member. PAMF 88.

Importantly, according to the SCSO's policy, a Review Board must be convened within 30 days of when the use of force results in "great bodily injury." PAMF 89. "Great bodily injury" includes instances where the force results in, for example, unconsciousness, abrasions, lacerations, fractures, and sutures, meaning that in such cases, a Review Board must be convened within 30 days. PAMF 90.

The Review Board's function is to capture in writing whether the officers' actions are deemed to be within SCSO policy, or whether the actions need to be investigated further by the SCSO's Internal Affairs division to consider discipline. PAMF 91. The decision made by the Review Board is final with no appeals, and is the official decision of the SCSO. PAMF 92.

There is no genuine dispute here that use of force against Ms. Porter resulted in loss of consciousness, bruising, abrasions, and significant loss of hair to the point that Ms. Porter had to cut off the braids she had grown and groomed for years. PAMF 93. The purported Review Board should unquestionably have been convened. But the SCSO top brass intervened and ratified the conduct.

### b.   SCSO Policymakers Ratified the Deputies' Excessive Force

**Ratification No. 1 (Undersheriff Cursory Review).** On the night of the incident in the early morning hours on August 7, 2020, Sergeant Stockton prepared a formal "Solano County Sheriff's Office Use-of-Force Report" of the incident to have Review Board review the incident. PAMF 94. This triggered a "Blue Team" notification on August 7, 2021, emailed to the Compliance Division to review the force for compliance with SCSO policy. PAMF 95. Though the incident fell within policy parameters requiring a review by the Review Board within 30 days, the SCSO did not convene the Review Board. PAMF 96.

Instead, close in time after the incident, Undersheriff DeWall (the second highest-ranking officer and part of the command staff at the SCSO, a policymaker) conducted his own personal "review" of the incident by reviewing the body camera and dash camera footage. PAMF 97. DeWall then ratified the unconstitutional conduct, concluding that there was no policy violation, and that neither McCampbell nor McDowell should be referred to Internal Affairs. PAMF 98. DeWall neither generated a report nor convened a Review Board to review the incident. PAMF 99-100.

**Ratification No. 2 (Compliance Commander Cursory Review).** Shortly after August 7, 2020,

the SCSO Compliance Commander at the time, who was responsible for issuing and implementing the policies and procedures of the SCSO, conducted a second "review" of the incident. PAMF 100. He and his team reviewed the evidence, including body camera and dash camera videos. PAMF 101. Similar to DeWall, the Compliance Commander neither generated a report nor convened a Review Board.  PAMF 102-103. Moreover, even after Plaintiffs filed their government tort claims on January 13, 2021, no Review Board was convened, and no investigation of the offending officers was undertaken. PAMF 104.

**Ratification No. 3 (Command Staff and County Counsel's Review Followed by Press Release).** The lawsuit in this matter was filed on August 18, 2021. PAMF 105. Shortly thereafter, on or about August 24, 2021, the SCSO issued an official press release, regarding the attack on the Porter family on August 6, 2020. PAMF 106. The press release was distributed to all Sheriff media contacts and was described to them as a "response to the federal lawsuit that was recently filed." PAMF 107. In these public statements, the SCSO made an official public pronouncement that neither McCampbell nor McDowell had engaged in any wrongdoing. PAMF 108. Instead, the SCSO laid the blame for the incident on Ms. Porter due to her purported "refus[al]" to follow the deputies' commands, her purported "resist[ance]" of the deputies, her purported act of "slipp[ing] her right hand out of her handcuffs," and her purported act of "str[iking] a deputy in the face." PAMF 109. As summarized above in §§ IV.B.1, *supra*, based on the videos and the deputies' own testimony, each of these assertions, which the SCSO adopted as their own in the press releases, were factually untrue belied by the evidence that SCSO policymakers admittedly reviewed. That is, before issuing the press releases, Undersheriff DeWall, along with County Counsel, the Public Safety Commission Commander, the Compliance Division Commander, and possibly the Sheriff, together conducted another review of the incident, including the body camera and dash camera video footage. PAMF 110. All of these top-level decisionmakers were involved in drafting and issuing the press release. PAMF 111. Sheriff Ferrara himself confirmed that he personally reviewed the press release, looked at video evidence, and authorized the press release. PAMF 112.

This is all consistent with the normal process of the SCSO in issuing press releases, namely, that they must be vetted by the individuals identified above before they can be approved for publication and dissemination, and reflect the official position of the SCSO. PAMF 113.

As with the other "reviews," there was no Review Board convened after this review in connection

---

with the press releases. PAMF 114. Sheriff Ferrara testified that the incident was "low level" despite top-level decisionmakers huddling in a room to issue a press release  PAMF 115.

**Ratification No. 4 (Cursory Review By Compliance Commander).** Around August 30, 2021, the SCSO top brass conducted a fourth "review" of the incident. PAMF 116. Sergeant Chad Sayre within the SCSO Compliance Division prepared a presentation for Captain Denton Autry, Division Commander of the Compliance and Professional Standards Division at the time and thus responsible for SCSO policymaking and compliance.  PAMF 117. Captain Autry reviewed the presentation and the evidence in the case, including the body camera and dash camera footage. PAMF 118. Notably, this review was conducted solely by an SCSO policymaker, excluding a voting citizen on a Review Board. PAMF 119.

After multiple reviews of the incident by top brass policymakers, and despite video evidence of obvious unconstitutional conduct, the SCSO determined that McCampbell and McDowell (and Sergeant Stockton, who deliberately approved falsified reports to submit Ms. Porter for felony prosecution) should not be investigated by internal affairs or disciplined because their use of force against the Porter family was within SCSO policy. PAMF 120. Rather, these  deputies were rewarded, as McDowell was promoted to Sergeant, McCampbell was made a Field Training Officer, and Stockton remained a Sergeant with no consequences. PAMF 121. There was, of course, no change in SCSO policy. PAMF 122.

### c.    The SCSO Had Previously Ratified Similar Force by McCampbell

The County and SCSO also separately ratified McCampbell's violent conduct by failing to take any action to investigate or discipline McCampbell despite the existence of a *strikingly similar* use of excessive force by him in 2018 for which he was sued, and the County paid out money to the claimant. PAMF 126-128. The claimant, Stephen Talamantes, first filed a government tort claim on May 18, 2018, alleging that on November 23, 2017, McCampbell and another deputy used excessive force and attacked Mr. Talamantes,[7] causing him serious injuries. PAMF 123. No Review Board was convened, and no internal investigation was done against McCampbell. PAMF 124. The SCSO determined the force used

---

[7] Although Captain Elbert, the County's Rule 30(b)(6) witness, testified Mr. Talamantes was "white" based on what his documents reflect, he also agreed that Mr. Talamantes' name made him believe he may be Hispanic or Latino and acknowledged that although Latinos and Hispanics may mark "white" for race, they would mark Latino or Hispanic for "ethnicity." PAMF 131. Here, however, the County's forms do not have a place for the claimant to select ethnicity and that he is therefore not personally aware of Mr. Talamantes' race. *Id.*

was within policy and rejected the claim. PAMF 125.

On December 11, 2018, Mr. Talamantes filed a lawsuit in this Court for excessive force and other claims against McCampbell and the SCSO. PAMF 126. In the lawsuit, Mr. Talamantes alleged, in part, that "McCampbell caught up with Talamantes and immediately physically attacked Talamantes, forcing him to the ground. Talamantes' *head hit the ground during the takedown*, and he immediately began to profusely bleed from above his left eyebrow. Once on the ground, *McCampbell struck Talamantes multiple times with closed fist strikes. Another deputy, Aaron Watts, then arrived and assisted McCampbell with placing Talamantes in handcuffs.*" PAMF 127. Mr. Talamantes further alleged, "T*o cover up his completely unnecessary and excessive use of force, McCampbell arrested Talamantes for resisting, delaying or obstructing a peace officer under California Penal Code Section 148(a)(1).*" PAMF 128. The District Attorney initially filed a single charge for resisting a peace officer, but later dismissed the charge. *Id*. There was a payout to Mr. Talamantes per a settlement with the County. PAMF 129. Despite the lawsuit and the payout, however, no Review Board was convened to investigate McCampbell, there was no internal affairs investigation, no discipline to McCampbell, and no change to SCSO policy, even though the Compliance Commander was aware of the complaint and lawsuit. PAMF 130.

On September 28, 2021, Sheriff Ferrara and Undersheriff DeWall were made aware of this lawsuit against McCampbell by a local reporter. PAMF 132. Although the reporter informed Ferrara that McCampbell was alleged to have previously used very similar excessive force, and the SCSO had settled the lawsuit, Ferrara took no action to look further into Ms. Porter's incident. PAMF 133. And even though DeWall was aware of McCampbell being involved in both the Talamantes and Porter excessive force incidents, he did not further investigate McCampbell or train McCampbell. PAMF 134.

"Evidence of 'identical incident[s]' to that alleged by the plaintiff may establish that a municipality was put on notice of its agents' unconstitutional actions[.]" *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1027 (9th Cir. 2015). Here, even though the SCSO was on notice, and then again put on notice after Ms. Porter filed her case, they did nothing but run cover for McCampbell and made him a *field training* officer. Indeed, by repeatedly refusing to review, investigate or discipline McCampbell and McDowell, the County engaged in "a 'pattern' of ratification" amounting to "a practice or custom[.]" *L.F. by & through Brown v. City of Stockton*, No. 2:17-CV-01648-KJM-DB, 2020 WL 4043017, at \*22

(E.D. Cal. July 17, 2020) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)).

### d. The SCSO Has a Custom and Practice of Rejecting Government Claims Regardless of the Merits and of Tolerating Excessive Force Incidents

In addition to ratification, *Monell* liability may also be imposed on a public entity for a "longstanding practice or custom." *Thomas v. County of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). The plaintiff "need not show evidence of a policy or deficient training; evidence of an informal practice or custom will suffice." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1141 (9th Cir. 2019).

"*[E]vidence* of inaction—specifically, failure to investigate and discipline employees in the face of widespread constitutional violations—can support an inference that an unconstitutional custom or practice has been unofficially adopted by a municipality." *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011) (emphasis in original). "It is sufficient under [the] case law to prove a 'custom' of encouraging excessive force to provide evidence that personnel have been permitted to use force with impunity." *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018). Stated another way, "general evidence of departmental treatment of complaints and of the use of force can 'support[ ] the [plaintiff's] theory that . . . disciplinary and complaint processes . . . contributed to the police excesses complained of because the procedures made clear to [the] officer that . . . [he] could get away with anything." *Velazquez*, 793 F.3d at 1027 (internal citations omitted). A *Monell* claim may be sustained on "a failure-to-discipline *Monell* theory" based on evidence "that the City had a policy or custom of failing to investigate and discipline officers who had allegedly committed prior instances of excessive force." *Velazquez*, 793 F.3d at 1027–28; *Hunter*, 652 F.3d at 1234 (reversing on failure to permit evidence on a similar theory); *L.F. by & through Brown v. City of Stockton*, No. 2:17-CV-01648-KJM-DB, 2020 WL 4043017, at *20-21 (E.D. Cal. July 17, 2020) (denying summary judgment on *Monell* claim because defendants' review of Officer-Involved-Shootings remained unresolved for several years and that, despite numerous incidents of alleged excessive force, no officer had ever been terminated).

The discovery in this case revealed that the way the SCSO treated the excessive force applied by its deputies to Ms. Porter, namely, by failing to investigate the matter or discipline the deputies involved, was not a "one-off" scenario. Rather, it has been SCSO custom and practice from at least 2016 to the present. Discovery also revealed that the County's custom and practice is to summarily reject government

tort claims filed for excessive force without conducting any review or investigation regardless of the merits of the claim, and to thus force victims to find an attorney and bring a lawsuit to obtain justice.

As described above, Plaintiffs have compiled a chart under Fed. R. Evid. 1006 (Ex. 300) depicting the use-of-force complaints against the SCSO provided by Defendants. *Supra* § IV.C.2. The chart depicts 47 complaints[8] of force and violence by SCSO deputies from May 2016 through December 2023. Ex. 300. Most, if not all, describe severe injuries allegedly caused by the use of force. PAMF 135.

But the SCSO had only *one* confirmed case of discipline imposed on the deputy accused of excessive force,[9] which is disturbingly probative of the SCSO's custom and practice of doing virtually nothing to address excessive force by its deputies. PAMF 136. Also of great concern is that, although there were eight (8) government tort claims filed (where no lawsuit was filed), there was no discipline of the officers involved, and no compensation of the alleged victim in the absence of a lawsuit. PAMF 137. This woeful disciplinary record is even more problematic when considering that the County has a payout rate to claimants of over 70% in concluded excessive force lawsuits, but insufficient investigation into the unconstitutional conduct of the offending deputies and almost never a consequence to them. PAMF 138. In other words, the County would rather pay money to claimants—but only after putting them through the paces of a lawsuit, as reflected by the 100% rejection rate of government tort claims—than to be proactive by appropriately reviewing and disciplining unconstitutional officer conduct. *See* Ex. 300.

Furthermore, the SCSO convened force Review Boards for only 13% of the complaints (6 out of 47). PAMF 139. These numbers are staggeringly low because SCSO's purported policy is to convene a force Review Board within 30 days of when the use of force by an officer results in "great bodily injury." PAMF 140. Indeed, per the actual SCSO practice and custom, Ms. Porter's case also did not get a Review Board. PAMF 96. As expected, none of the complaints resulted in any SCSO policy change. PAMF 141.

These practices are unmistakably linked to the harm Ms. Porter has suffered. The County's failure to adequately investigate excessive force being used within their ranks created a custom of condoning excessive force, particularly against the Black community, sending a clear message to deputies that they

---

[8] As noted, the chart documents 51 complaints, but sufficient information existed for only 47 complaints.
[9] There was one case (Exhibit 205) where the County did not know whether discipline was actually imposed and two others where the deputy was under review by Internal Affairs (Exhibits 292 and 293). Almadani Decl., ¶__, Ex. 300. In the remaining 44 cases (94%), the deputies accused of excessive force received no discipline. *Id.*

---

*Plaintiffs' Opposition to Defendants' Summary Judgment Motion*          2:21-CV-01473-KJM-JDP

would be "permitted to use force with impunity." *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018). The Court can readily see this blasé and callous treatment of excessive force with how Defendants discuss the incredibly egregious acts committed here by McCampbell and McDowell, trying at every turn in the testimony and in their sham declarations to persuade the Court to disbelieve what the eyes can plainly see in the bodycam and dashcam videos. Despite the evidence, the deputies received no scrutiny and instead received supporting press releases and promotions. The Ninth Circuit said it best in *Velazquez*: the County's "departmental treatment of complaints and of the use of force" in this case "contributed to the police excesses complained of because" it made clear to the officers that they "***could get away with anything***." 793 F.3d at 1027 (emphasis added). So too is the case here.

Plaintiffs' highly qualified and experienced expert on police practices and training, Roger Clark, a 27-year veteran (15 years as Lieutenant) of the Los Angeles County Sheriff's Department, reviewed all the evidence summarized above and concluded that, based on his experience and training, the SCSO directly ratified the unconstitutional policing here and ran cover for the Defendant Deputies. PAMF 142.

On this record, summary judgment on *Monell* liability must be denied.

### E.    Defendants Are Not Entitled to Qualified Immunity

"Qualified immunity is a judge-made doctrine designed to 'balance[] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011) (alterations in original) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The Ninth Circuit requires a two-step process. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001). "At the first step, the inquiry is whether the facts alleged constitute a violation of the plaintiff's rights." *Id*. (citing *Saucier v. Katz*, 121 S. Ct. 2151 (2001)). If they do, the second step is to determine whether the right was clearly established. *Id*. While a right may be clearly established by decisional law, it can also be self-evident in light of pre-existing law. *Id*. "Precedent directly on point is not necessary to demonstrate that a right is clearly established. Rather, if the unlawfulness is apparent in light of preexisting law, then the standard is met." *Devereaux*, 263 F.3d at 1074; *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir. 2001); *Boyd*, 374 F.3d at 781 (a victim's constitutional rights may be clearly established even in the absence of a case on all fours prohibiting the

particular manifestation of unconstitutional conduct at issue).

Based on the caselaw cited in the preceding sections, there can be no doubt that, as of August 6, 2020, the constitutional violations of which Plaintiffs complain were clearly established in decisional and statutory law. There is no serious argument for qualified immunity here.

**F.    Remaining State Law Claims**

**1.    *Violation of Gov. Code § 815.6 (Claim 9)***

"Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." Cal. Gov. Code § 815.6. Plaintiffs pursue this claim against the County for its officers' violation of California Penal Code sections 853.5(a) and 149.[10] Section 853.5(a) curtails "the authority [of officers] to execute custodial arrests for offenses so minor that they are designated as infractions." *United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993). Here, mismatched license plates between the front and rear of Ms. Porter's vehicle was the *only* objective basis for the deputies to conduct a traffic stop and, in fact, was the reason the deputies pulled up to Ms. Porter and Mr. Powell as they exited the vehicle—there is no other reasonable justification. In fact, when putting Ms. Porter in handcuffs, McDowell cited the mismatched plates as the reason. PAMF 143; PSUF 42. Mismatched plates, however, is an infraction under Vehicle Code § 5200, which the deputies admitted and noted in their police reports. PAMF 144. However, as shown in the videos, McCampbell and McDowell did not request evidence of Ms. Porter's and Mr. Powell's identities before taking them into custody. PAMF 145.

In addition, Penal Code section 149 makes it a crime for a peace officer to "assault[ ] or beat[ ] any person" "under color of authority" "without lawful necessity." The statute is clearly designed to protect the public from being assaulted by peace officers without lawful necessity. Here, based on the evidence presented in support of their excessive force claims (PSUF 15-80), genuine disputes of material facts exist with regards to Ms. Porter and Mr. Powell's section 815.6 claim predicated on violation of

---

[10] Plaintiffs have elected not to pursue a section 815.6 claim based on violation of Penal Code section 118.1.

Penal Code section 149. *See Gomez v. County of Los Angeles*, No. CV 09-02457 MMM (CWx), 2009 WL 10699670, at *12–14 (C.D. Cal. Aug. 17, 2009) (denying motion to dismiss section 815.6 claim because the plaintiff adequately alleged claims for assault and battery against officers).

On the record here, a jury can find that SCSO decisionmakers saw the video evidence where the Defendant Deputies clearly violated Pen. Code §§ 853.5(a) and 149, and yet fully endorsed the unlawful conduct, giving rise to entity liability under Gov. Code § 815.6. The motion must be denied.

### 2.   *Intentional Infliction of Emotional Distress (IIED) (Claim 12)*

"A cause of action for intentional infliction of emotional distress [IIED] exists when there is (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (2009) (internal quotation marks omitted). The basis for Plaintiffs' IIED claims is self-evident. Contrary to Defendants' arguments, the arrest and beating of Ms. Porter were not reasonable or justified. PSUF 15-64. Nor was Mr. Powell's seizure in handcuffs in the back of a police car, or for their small Children to be separated from their mother and grandfather during this horrific incident. PSUF 65-88. With respect to Carter and Hamilton, the facts presented demonstrate they were integral participants in Mr. Powell and the Children's seizure. PSUF 90-91, 97-99, 102. *Cf.* ECF 51 at 22 (finding Plaintiffs stated a claim as to Dixon officers for aiding and abetting IIED). Hurting a person *and* their child indeed causes grave extreme distress. Plaintiffs have presented ample evidence to show Defendants' conduct was extreme and outrageous.[11]

### 3.   *Negligence and Negligence Per Se (Claims 13 and 14)*

Unless the law provides otherwise, public employees are liable to the same extent as private persons for negligence, and "public entities are generally liable for injuries caused by the negligence of their employees acting in the scope of their employment." *Hayes v. County of San Diego*, 57 Cal. 4th 622, 629 (2013). Here, with respect to Plaintiffs' negligence and negligence *per se* claims, Defendants argue only that they are immune under Government Code section 821.6 for Plaintiffs' claims premised

---

[11] This claim is not being pursued on the basis of falsification of the deputies' police reports and, therefore, Defendants' Government Code section 821.6 immunity arguments are moot.

1   on the deputies' falsification of police reports and that there is no violation of Penal Code section 853.5

2   and thus, no negligence *per se*. Because Plaintiffs do not pursue a negligence-based claim for Defendants'

3   fabrication of evidence, Defendants' immunity argument is moot. Further, as shown above with respect

4   to Plaintiffs' Government Code section 815.6 claim, Plaintiffs have presented ample evidence to create

5   genuine disputes of material fact precluding summary judgment. Defendants do not address the remaining

6   merits of the negligence-based claims, including, for example, Plaintiffs' contentions that the deputies'

7   use of excessive force and unjustified seizures also amount to negligent conduct. In addition to this failure

8   to present any argument, Defendants' motion as to the negligence-based claims should also be denied

9   because Plaintiffs have presented evidence to create genuine disputes of material fact. PSUF 15-80.

10   **G.      Solano Is Not Entitled to Immunity Under State Statutes**

11   ***1.      Government Code § 821.6 Is Inapplicable***

12   Gov. Code § 821.6 applies specifically to a *state* malicious prosecution claim—a claim Plaintiffs

13   have not brought. In their motion, Defendants focus on the conduct that supports the federal false

14   statements claim (Claim Four). But § 821.6 categorically does not apply to the federal claims as

15   "[i]mmunity under § 1983 is governed by federal law; state law cannot provide immunity from suit for

16   federal civil rights violations." *Wallis ex rel. Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir. 1999).

17   While Defendants concede that § 821.6 immunity does not apply to the state law assault and

18   battery false imprisonment claims, ECF 150-1 at 39, *Garcia v. City of Merced*, 637 F. Supp. 2d 731, 755

19   (E.D. Cal. 2008), they puzzlingly claim § 821.6 immunity on Bane Act, Ralph Act, Gov. Code § 815.6,

20   IIED, and negligence claims, when these claims are rooted in false imprisonment and assault and battery

21   that arose during the unconstitutional seizure and arrest. The Ninth Circuit is clear that that § 821.6

22   immunity does not apply to these claims because they are "based on acts that allegedly happened during

23   [Plaintiffs'] arrest, not pursuant to an investigation into [] guilt." *Blankenhorn*, 485 F.3d at 488.

24   ***2.      The Entity Defendants Are Vicariously Liable***

25   Defendants' vicarious liability argument must be rejected under Gov. Code § 815.2(a), which

26   provides that a public entity is liable for injuries caused by its employees if the act or omission would

27   have given rise to a cause of action against the employee. For the reasons explained above, the County

28   through its Sheriff's Office is vicariously liable for the state law violations Plaintiffs establish.

---

*Plaintiffs' Opposition to Defendants' Summary Judgment Motion*          *2:21-CV-01473-KJM-JDP*

1

## V.     CONCLUSION

2          For the reasons stated above, Plaintiffs request that summary adjudication be granted on the issues

3  requested.

4  Dated: October 18, 2024                          ALMADANI LAW

5

6                                                   _/s/ Yasin M. Almadani_____
                                                    Yasin M. Almadani, Esq.
7

8                                                   AI LAW, PLC

9

10                                                  _/s/ Ahmed Ibrahim_____
                                                    Ahmed Ibrahim, Esq.
11
                                                    *Attorneys for Plaintiffs*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28