1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    Nakia Porter et al.,                          No. 2:21-cv-01473-KJM-JDP

12                      Plaintiffs,                  ORDER

13           v.

14    County of Solano et al.,

15                      Defendants.

16

17          In this action arising from an encounter between Solano police officers and plaintiffs that

18    went awry, the parties have filed cross motions for summary judgment.  When parties move for

19    summary judgment, the court considers whether it can resolve claims by applying the law to

20    material facts that are undisputed.  If the court grants summary judgment, there is then no need

21    for a factfinder—a citizen jury or, if the parties waive a jury, a neutral judge—to resolve disputed

22    facts before applying the law.  In this case, the court grants summary judgment to the plaintiffs on

23    their claims of unlawful search in violation of the Fourth Amendment against McCampbell.  The

24    court also grants summary judgment to defendant Stockton on plaintiffs' claims of deliberate

25    falsification, equal protection, and those claims arising under California's Ralph Act.  The court

26    grants summary judgment to Solano defendants on plaintiffs' claims against Carter and Hamilton.

27    The court grants summary judgment to Solano defendants on plaintiffs' claim of deliberate

1

1  falsification to the extent the claim relies on deputies' written reports.  The court also grants

2  summary judgment to Solano defendants on plaintiffs' equal protection claims against McDowell.

3         With respect to a number of the other claims, the undisputed facts present a very close

4  case.  Even though plaintiffs present strong arguments for granting summary judgment with

5  respect to certain of their claims, given that the plaintiffs and the defendants provide different

6  descriptions of what happened on the night of the underlying incident and those descriptions are

7  supported by sworn testimony at deposition, the law calls for a factfinder to decide what the facts

8  are and any questions regarding the credibility of the witnesses in the process.  The court explains

9  in full below why it **grants** plaintiffs' motion **in part**, **grants** defendant Roy Stockton's motion

10  **in part**, and **grants** Solano defendants' motion **in part**.  To the extent the court does not grant a

11  party's motion, the party's case will go to trial and the court sets a final pretrial conference to

12  schedule and plan for trial.

13  **I.      BACKGROUND**

14         Plaintiffs bring this case against the County of Solano and its affiliates, including Sheriff's

15  Deputies Dalton McCampbell, Lisa McDowell, Chris Carter and Connor Hamilton (together

16  Solano defendants) and Sergeant Roy Stockton.  Fourth Am. Compl. (FAC) at 2, ECF No. 144.[1]

17  Solano defendants and Stockton move separately for summary judgment but move jointly in

18  opposing plaintiffs' cross motion for summary judgment as well.  *See* Defs.' Mem. P. & A.

19  (Solano Defs.' Mot.), ECF No. 150-1; Def. Roy Stockton Mem. P. & A. (Stockton Mot.), ECF

20  No. 152-6; Opp'n (Defs.' Joint Opp'n), ECF No. 164.  The court has compared the parties'

21  respective statements of fact and the underlying record, *see* Pls.' Resp. to Solano Defs.' Statement

22  of Undis. Facts (Pls.' Resp. to Solano UMF), ECF No. 161-1; Solano Defs.' Resp. to Pls.'

23  Statement of Undis. Mater. Facts (Solano Defs.' Resp. to UMF), ECF No. 164-1; Pls.' Resp. to

24  Stockton Def.'s Statement of Undis. Mater. Facts (Pls.' Resp. to Stockton UMF), ECF No. 169,

25  and also reviewed the relevant deposition transcripts and available body and dashboard camera

26  footage provided by the parties and lodged with the court in USB format, *see* Notice of Lodging,

---

[1] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

1    ECF No. 151.[2]  Based on a review of the record, the court finds the following facts are undisputed

2    unless otherwise stated.

3        **A.    Factual Background**

4        On August 6, 2020, Nakia Porter and her father Joe Berry Powell were driving home to

5    Sacramento from Oakland in Porter's Toyota Highlander.  FAC ¶¶ 1, 36.  Porter's two daughters,

6    L.P. (age six) and A.P. (age four), and her niece, O.P. (age three), were in the back of the car.  *Id.*

7    About an hour into the approximately two-hour trip, Porter asked Powell to drive so she was not

8    driving while fatigued.  *Id.* ¶ 38.  It was approximately 9:12 p.m. when she pulled over onto a

9    dead-end road in Dixon, California and initiated a U-turn.  *Id.* (stating the time was

10   "approximately 9:13 p.m."; Solano Defs.' Resp. to UMF No. 8 (not disputing the time as

11   "approximately 9:12 p.m.").

12       Solano County Sheriff's Office (SCSO) Deputies McCampbell and McDowell were

13   parked on the same dead-end road where Porter pulled over.  McDowell Dep. Vol. 1A at 99,

14   Notice of Lodging Ex. 509, ECF No. 151; McCampbell Dep. at 123, Notice of Lodging Ex. 511,

15   ECF No. 151.[3]  The deputies were in the area because of a suspicious vehicle call related to an

16   abandoned Ford truck.  McDowell Dep. Vol. 1A at 99; McCampbell Dep. at 123; Solano Defs.'

17   Resp. to UMF No. 10.  By the time Porter pulled onto the dead-end road, deputies had determined

18   the truck was not reported stolen and were waiting for dispatch to contact the owner of the

19   vehicle.  McDowell Dep. Vol. 1A at 98–100; Solano Defs.' Resp. to UMF No. 11.  As Porter

20   conducted the U-turn, deputies observed two different license plates on the front and back of the

21   vehicle: one from California and another from Maryland.  McDowell Dep. Vol. 1A at 99, 124–

22   126; McCampbell Dep. at 99–100.  California Vehicle Code section 5200(a) requires both vehicle

23   plates to match, and the deputies knew they could cite having mismatched plates as a traffic

---

[2] Parties lodged copies of the full deposition transcripts with the court under this district's Local Rules.  E.D. Cal. L.R. 133(j).

[3] When citing exhibits lodged with the court and not bearing automatic pagination generated by the CM/ECF system, including full transcripts of depositions, the court uses the pagination appearing on the cited document.

1    violation.  McDowell Dep. Vol. 1A at 99–100; McCampbell Dep. at 118, 124; Cal. Veh. Code

2    § 5200(a).[4]

3      Porter completed her U-turn, stopped her vehicle and shifted the vehicle into park at

4    which point McDowell activated the overhead emergency lights on her marked patrol vehicle and

5    drove towards Porter.  McDowell Dep. Vol. 1A at 104; Dashboard Camera Footage, Ex. 500 at

6    0:53–1:00 (Dash Cam.), ECF No. 151.  Powell and Porter then opened their respective doors and

7    exited their vehicle.  Dash Cam. at 1:00–1:03.  As Porter began walking around the vehicle,

8    McDowell approached Porter, greeted her and asked her to "get back in the car, please."  *Id.* at

9    1:05–1:15.  Porter, having reached the rear of the vehicle, explained they were switching drivers

10   and proceeded to the passenger-side of the vehicle.  *Id.*  McDowell responded, "okay, but get

11   back in the car."  *Id.*  Porter's hands remained visible to McDowell during their conversation, and

12   McDowell testified Porter did not appear to have any weapons, did not speak in an aggressive

13   tone or make any threatening movements.  *Id.*; McDowell Dep. Vol. 1B at 203–04, Notice of

14   Lodging Ex. 509, ECF No. 151.  As McDowell spoke with Porter, McCampbell approached

15   Porter's vehicle with his gun drawn and yelled at Porter to "get back in the car, now."  Dash Cam.

16   at 1:15–1:30; McCampbell Body Camera Footage, Ex. 504 at 0:24–0:35 (McCampbell Body

17   Cam.), ECF No. 151.  As Porter began returning to the driver side, McCampbell walked up

18   behind McDowell and said, "you know what, detain her—detain her."  McCampbell Body Cam.

19   at 0:24–0:35.  McCampbell walked behind McDowell, lowered his firearm and then raised it

20   again as he approached Powell, who had remained on the passenger-side of the vehicle.  *Id.*;

21   McCampbell Decl. ¶¶ 20, 22, 25, ECF No. 150-3.  Powell reached to pick up his cell phone,

22   which had fallen to the ground, though video footage shows his hands and cell phone remained

23   visible.  McCampbell Body Cam. at 0:27–0:39.

24     McDowell approached Porter—who had now returned to the driver's side—and used her

25   right hand to grasp Porter's right wrist.  Dash Cam. at 1:35–1:38.  McCampbell approached the

---

   [4] California Vehicle Code section 5200(a) applies "[w]hen two license plates are issued by the department for use upon a vehicle" and requires that "they shall be attached to the vehicle for which they were issued, one in the front and the other in the rear."

4

1   driver's side of the vehicle and assisted McDowell in handcuffing Porter. *Id.* at 1:38–1:45;

2   McCampbell Body Cam. at 0:43–0:46.  As McCampbell approached, Porter asked McDowell,

3   "can you read me my rights?"  McCampbell Body Cam. at 0:43–0:48.  Deputies pushed Porter

4   against the car as she explained, "I am not resisting arrest" and McDowell responded, "you have

5   two different plates on your vehicle." *Id.* at 0:51–1:15.  Once they had her handcuffed, deputies

6   led Porter to the patrol car. *Id.* at 1:15–1:26.

7         Defendants allege at this point Porter attempted to break free from McCampbell and

8   McDowell and was able to slip one hand out of the handcuffs.  Plaintiffs dispute this and no video

9   offers clear footage of this portion of the incident. *Id.* at 1:22–1:50; Solano Defs.' Mot. at 12–13,

10  23; Opp'n to Solano Defs' Mot. at 13, ECF No. 173.  McCampbell then performed a hair pull

11  takedown,[5] bringing Porter to the pavement where she curled into the fetal position.  Solano

12  Defs.' Mot. at 12–13; McCampbell Body Cam. at 1:25–1:39.  McCampbell delivered several

13  punches to Porter as she lay on the ground, including one punch to her head and another to her

14  abdomen. *Id.* at 1:35–1:50; McCampbell Dep. at 236–37.  Defendants say Porter struck

15  McCampbell in the face and neck area during the takedown; plaintiffs dispute this and maintain

16  Porter at no point resisted arrest or struck McCampbell.  Solano Defs.' Resp. to UMF Nos. 55,

17  62.  Deputies rolled Porter into a prone position; McCampbell sat atop Porter for at least a full

18  minute as he called for an ambulance, radioing dispatch to say "I believe she's unconscious," and

19  saying to McDowell, "I think she's out."  McCampbell Body Cam. at 1:50–2:53.  After catching

20  his breath, McCampbell then lifted Porter, who is approximately five feet, two inches tall and

21  weighed between 125 and 135 pounds, into the back of the patrol car.  McCampbell Body Cam.

22  at 2:55–3:30; McDowell Dep. Vol. 1B at 282; FAC ¶ 14.

23        The deputies returned to their patrol vehicle at about 9:18 p.m. and used the patrol car's

24  amplifier to order Powell out of the vehicle.  McCampbell Body Cam. at 3:45–4:55.  McDowell

---

[5] During a so-called "hair pull takedown," officers use one hand to secure the individual and use their "other hand to grab a portion or a piece of hair that's attached to the person's head, and pull[] downwards to the ground."  The method is meant "to offset the spine," thereby displacing the individual's body weight to eventually bring the individual to the ground. McCampbell Dep. at 235–36.

had her firearm drawn while McCampbell ordered Powell to exit the vehicle with his hands raised, calling him "young man." *Id.* at 4:20–4:25, 5:04.  While McCampbell used the amplifier, McDowell also yelled at Powell to exit the vehicle. *Id.* at 4:50–4:59.  In between the commands to exit the vehicle, McCampbell informed McDowell twice that he had seen at least two children in the car, and McDowell confirmed she had seen the children. *Id.* at 4:04–4:08; 4:47–4:55.  Ninety seconds after being ordered out of the vehicle, at approximately 9:20 p.m., Powell opened the passenger door slowly as the deputies repeated their instructions and conveyed a radio transmission to dispatch calling Powell a "noncompliant" passenger. *Id.* at 4:55–6:50.  McDowell continued to point her firearm at Powell even as he complied with orders to walk backwards toward the deputies. *Id.*  When Powell reached the deputies, McCampbell handcuffed him and told Powell he was not under arrest but being detained *Id.* at 6:45–7:20.  Powell asked why he was being handcuffed and McCampbell responded, "well considering she just fought two deputies, that's why you're being detained." *Id.*  Powell then informed the deputies three children, ages three to six, remained in the vehicle unattended. *Id.*  By the time Powell was handcuffed at approximately 9:22 p.m., two Dixon City police officers, Gabriel Hollingshead and Aaron Williams (Dixon police), arrived on the scene and McCampbell placed Powell in the rear seat of their Dixon City patrol car. *Id.* at 7:15–7:30.

McCampbell then instructed the Dixon police officers to approach Porter's vehicle and instructed McDowell to also approach the vehicle, but with her gun raised.  He told fellow officers they were to confirm there were children in the car and that no child had access to weapons. *Id.* at 8:20–8:55.  Maintaining her firearm in the ready position, McDowell approached the vehicle with McCampbell and the Dixon police behind her. *Id.*; Dash Cam. at 9:35–9:54.  Upon reaching the vehicle, McDowell opened the rear passenger door, holstered her gun and used her flashlight to illuminate the rear seat of the vehicle where the children sat.  McCampbell Body Cam. at 8:20–8:55; Dash Cam. at 9:50–9:54.  McDowell also walked to the back of the vehicle and looked at the trunk through the vehicle's rear windshield.  Dash Cam. at 10:15–10:25.  Simultaneously, McCampbell proceeded to the front of the vehicle.  McCampbell spoke to the children through the passenger side door that Powell had left open when exiting the vehicle.

6

1   McCampbell Body Cam. at 8:50–8:55.  Using his flashlight, McCampbell illuminated the

2   passenger well and center compartment, and eventually removed the keys from the ignition.  *Id.*

3   at 8:50–9:01.  McCampbell then walked to the driver's side, opened the driver's side door and

4   again used his flashlight to illuminate the driver well.  Dash Cam. at 9:55–10:30; McCampbell

5   Body Cam. at 9:01–9:21.  McCampbell returned to the front of the vehicle and told the other

6   deputies, "Yeah, there's a Maryland plate up here and a California one in the back."  McCampbell

7   Body Cam. at 9:21–9:28.

8          McCampbell walked back to the patrol car and told McDowell that Porter "clocked [him]

9   in the face," but that he was "fine."  *Id.* at 9:38–9:42.  By 9:24 p.m., McCampbell returned to the

10  patrol car where Porter was being held and at that point responsive, addressed her as "young

11  lady" and obtained Porter's identification by searching the cross-body purse on her person.  *Id.* at

12  9:51–11:33.  Porter informed McCampbell she was experiencing pain in her face, back and

13  stomach, and that she had lost consciousness.  *Id.*  McCampbell told Porter an ambulance was on

14  its way and closed the patrol car door.  *Id.*  Turning to a Dixon police officer, McCampbell

15  explained Porter "went unconscious" and asked the officer to watch the children.  *Id.* at 11:40–

16  11:55.  McCampbell then called dispatch and confirmed at approximately 9:26 p.m. that Porter

17  was the vehicle's registered owner.  *Id.* at 11:55–12:25.  Seconds after McCampbell confirmed

18  the registration was current with no restrictions, emergency medical responders arrived on the

19  scene.  McCampbell stated to the emergency responders that he was involved in "a scuffle" with

20  Porter, who "went unconscious" due to being "struck in the face."  *Id.* at 12:25–13:00.  He also

21  informed emergency responders that Porter was complaining about pain in her face, back and

22  stomach.  *Id.*  McCampbell then reported to emergency responders he "got hit in the face" but did

23  not require immediate medical attention.  *Id.*  A few seconds later, McCampbell asked medical

24  personnel, "actually, can you tell me if I got—if I got like a cut on my lip or anything, man?"  *Id.*

25  at 13:10–13:16.  Medical personnel briefly inspected McCampbell's face by shining a flashlight

26  on him and explained there was no cut on his face but "a little bit of a scratch on [his] neck" that

27  looked like he "got caught with a fingernail."  *Id.* at 13:16–13:31.  Emergency responders asked

1  McCampbell if he needed medical attention in a joking tone. *Id.* at 13:31–13:36. McCampbell

2  declined. *Id.* at 13:36–13:39.

3      After speaking to emergency responders, at approximately 9:28 p.m. McCampbell

4  returned to Porter's vehicle, confirmed with Dixon police the children were attended to and again

5  opened the driver's side door. *Id.* at 14:15–14:28. As he walked to the vehicle, McCampbell

6  sorted through the cards in Porter's wallet. *Id.* Approximately one minute later, after walking

7  around the scene and again returning to Porter's vehicle, McCampbell opened the passenger side

8  door and searched the passenger well, opened the glove compartment and searched through

9  multiple documents before closing the compartment. *Id.* at 15:15–16:00. After this search,

10  McCampbell returned to the patrol car to speak to Powell, who McCampbell again addressed as

11  "young man." *Id.* at 16:25–16:30; Pls.' Mot. at 16, ECF No. 153. McCampbell asked Powell if

12  he had a valid driver's license, and Powell confirmed he did. McCampbell Body Cam. at 16:25–

13  16:30. McCampbell told Powell the children were safe, closed the car door and joined McDowell

14  who was speaking with emergency responders. *Id.* at 16:30–16:40. McCampbell confirmed

15  McDowell's description to emergency responders that Porter had become unconscious during the

16  altercation. *Id.* at 16:44–17:33. Porter told medical responders that she had lost consciousness

17  during the altercation. Porter Dep. at 159, Notice of Lodging Ex. 514, ECF No. 151. Medical

18  personnel told deputies Porter's own description of her symptoms, including seeing "stars" and

19  being "startled" when her face hit the ground, did not "sound like a loss of consciousness," but

20  that Porter requested she be transported to the hospital. *Id.*

21      Shortly thereafter, at approximately 9:31 p.m., Deputies Chris Carter and Connor

22  Hamilton of SCSO arrived together at the scene of the incident. Solano Defs.' Resp. to UMF

23  No. 90. McCampbell reported to Carter and Hamilton that Porter "instantly popped out of the car

24  as soon as McDowell turned her lights on" and that the "vehicle had mismatching plates."

25  McCampbell Body Cam. at 17:50–18:25. Seconds later, as McCampbell described the events to

26  Carter and Hamilton, Sergeant Stockton arrived and became the highest-ranking officer at the

27  scene. *Id.*; Solano Defs.' Resp. to UMF No. 93. McCampbell told Carter, Hamilton and

28  Stockton that Porter "started fighting McDowell" at which point deputies "went hands on."

1    McCampbell Body Cam. at 18:15–18:40.  McCampbell said Porter "punched [him] in the face"

2    and he then followed medical personnel into an ambulance to "get [his] hand washed."  *Id.*

3          At Stockton's directions, Carter and Hamilton took photographs to assist in the

4    investigation and attended to the children.  Hamilton Dep. at 54, Notice of Lodging Ex. 512, ECF

5    No. 151.  As the supervising officer, Stockton spoke with McCampbell and McDowell, checked

6    the status of the children himself and spoke with Powell.  Stockton Decl. ¶¶ 20–24, ECF No. 152-

7    5.  Stockton instructed McDowell, Carter and Hamilton to transport Porter to a local hospital.  *Id.*;

8    Hamilton Dep. at 157.  Stockton confirmed Powell as a licensed driver, removed his handcuffs

9    and permitted him to leave the scene with the three children by 9:58 p.m., approximately thirty

10   minutes after Stockton arrived and approximately thirty-six minutes after McCampbell

11   handcuffed Powell.  *Id.*

12         McDowell, Carter and Hamilton transported Porter to the North Bay Medical Center.

13   Stockton Dep. at 112, Notice of Lodging Ex. 513, ECF No. 151; Hamilton Dep. at 157.  After

14   Porter was medically cleared, deputies transported her to Solano County Jail, where she spent the

15   night.  Porter Decl. Support Pls.' Opp'n (Porter Decl. Opp'n) ¶ 2, ECF No. 161-2; Dalton

16   McCampbell Police Report (McCampbell Report), Almadani Decl. Ex. 11, ECF No. 162.  The

17   booking report shows she was booked into the County Jail in the early morning hours of

18   August 7, 2020.  *See* Booking Report at 1, Almadani Decl. Ex. 12, ECF No. 162.  Porter secured

19   her release after paying a $2,500 bail bond fee on her $25,000 bail.  Porter Decl. Opp'n ¶ 2.  As a

20   condition of bail, Porter was restricted from travelling outside of California until September 28,

21   2020, the date on which Solano County District Attorney filed a pre-filing deferral of prosecution

22   of Porter.  *Id.* ¶ 3.  The District Attorney never revived the felony criminal charges and notified

23   Porter of that office's intent to not prosecute the case in early October at a criminal hearing.  *Id.* ¶¶

24   3–5.  The cited reason for not prosecuting was "Prosecutor Pre-Filing Deferral."  Notice of Intent

25   Not to Prosecute, Porter Decl. Opp'n Ex. 88, ECF No. 161-2.

26         The day following the incident, August 7, 2020, Stockton reviewed the written reports the

27   deputies submitted and the available video footage.  Stockton Dep. at 26–27, 42, 44.  After his

28   review, Stockton approved McCampbell's and McDowell's written reports.  *Id.* at 26–27.

1    Because the deputies had used force during the incident, Stockton prepared a Significant Event

2    Entry and "Use of Force Report" and submitted the reports through SCSO's internal reporting

3    systems. *Id.* at 66–67, 77–79, 87, 98.  Then-Sergeant Ronald C. Sayre and then-Captain Denton

4    Autry reviewed the Use of Force Report and determined the Use of Force Review Board would

5    not be convened to review the incident.  Elbert Decl. ¶¶ 3–4, Solano Defs.' Mot., ECF No. 150-7.

6    The County Undersheriff, Brad DeWall, also reviewed the reports and body camera videos and

7    determined there was no violation of County policy and therefore no need for disciplinary action

8    against the involved deputies.  *See* DeWall 30(b)(6) Dep. at 28–29, Almadani Decl. Ex. 312, ECF

9    No. 162; DeWall Dep. at 34–35, 38–39, Almadani Decl. Ex. 311, ECF No. 162.

10        Plaintiffs allege that for many years prior to this incident, "multiple officers at the SCSO"

11    including Stockton posted extremist and racist content online, indicating a widespread culture

12    within SCSO of "turn[ing] a blind eye to" racist policing culture.  FAC ¶¶ 93, 100–103.  In early

13    2021, SCSO Sheriff Thomas A. Ferrara and DeWall became aware of allegations that at least

14    three SCSO personnel posted content on their public social media accounts allegedly supporting

15    far right and extremist positions.  DeWall 30(b)(6) Dep. at 101–02; Ferrara Dep. at 37–43,

16    Almadani Decl. Ex. 310, ECF No. 162.  After contacting the Federal Bureau of Investigation and

17    the Central California Intelligence Center, Ferrara and DeWall determined this off-duty conduct

18    did not violate SCSO policy or state or federal law because no members of SCSO had criminal

19    ties to extremist groups and no internal complaint was filed with respect to officers' social media

20    posts.  Stockton Dep. at 42; Solano Defs.' Mot. at 30–31.

21        Approximately one year after the incident in August 2020, and following the initial

22    department review, on August 18, 2021, Porter and Powell filed the original complaint in the

23    instant matter.  Compl., ECF No. 1.  After plaintiffs filed their complaint, SCSO conducted a

24    further review of the incident in August 2021, including of the available video footage.  *See*

25    DeWall 30(b)(6) Dep. at 20–25, 34, 45.  SCSO Sheriff, Thomas A. Ferrara, watched the videos of

26    the arrest and approved a press release that had been drafted, as is normally required by the

27    Sheriff Office's policy.  Ferrara Dep. at 64–65; Elbert 30(b)(6) Dep. at 86–87, Almadani Decl.

28    Ex. 307, ECF No. 162.  The Sheriff's Office then published a Facebook post and issued the

1    approved press release about Porter's and Powell's allegations.  *See* Almadani Decl. Exs. 189–

2    190, ECF No. 162.  The post and press release claimed Porter had "refused" to get back in her

3    car, "resisted the deputies, slipped her right hand out of her handcuffs, and struck a deputy in the

4    face." *Id.*

5         **B.**    **Procedural Background**

6         Porter, individually and on behalf of her minor children L.P. and A.P.,[6] together with

7    Powell, filed the operative fourth amended complaint on August 14, 2024.  *See generally* FAC.

8    Plaintiffs bring claims against the County of Solano,[7] Ferrara in his official capacity as SCSO

9    Sheriff, and McCampbell, McDowell, Carter, Hamilton and Stockton in their individual

10    capacities.[8]  The amended lawsuit brings fourteen claims as follows:

11      1) Unlawful seizure:

12         a. Porter brings her claim of unlawful seizure against McCampbell, McDowell and

13           the County.

14         b. Powell, L.P. and A.P. bring unlawful seizure claims against all defendants.

15      2) Excessive force against McCampbell, McDowell and the County brought by all plaintiffs.

16      3) Unlawful search against McCampbell, McDowell and the County brought by all plaintiffs.

17      4) False statements and fabrication of evidence against McCampbell, McDowell, Stockton

18         and the County brought by Porter.

19      5) Equal Protection violations against McCampbell, McDowell, Stockton and the County

20         brought by all plaintiffs.

21      6) *Monell* violations against the County brought by all plaintiffs.  436 U.S. 658, 690 (1978).

---

[6] At hearing, counsel indicated the third minor child present during the incident, O.P. is no longer a party to the case.  *See* Mins. Hr'g, ECF No. 185.  The clerk of court is directed to correct the caption of the case and terminate O.P. as a party to the case.

[7] Counsel also indicated at hearing that the Solano County Sheriff's Office was erroneously sued, and the correct entity party is the County of Solano.  *Id.*  The clerk of court is directed to correct the caption of the case and terminate the Solano County Sheriff's Office as a party to the case.

[8] Prior to amending their complaint, plaintiffs settled their claims against the City of Dixon and its individual officers, and the court dismissed the Dixon defendants with prejudice. *See* Min. Order, ECF No. 99.

7)  Violations of the Tom Bane Civil Rights Act (Cal. Civ. Code § 52.1):

    a.  Porter brings her claim for violations of section 52.1 against McCampbell, McDowell and the County.

    b.  Powell brings his claim for violations of section 52.1 against all defendants.

8)  Violations of the Ralph Civil Rights Act (Cal. Civ. Code § 51.7):

    a.  Porter brings her claim for violations of section 51.7 against McCampbell, McDowell and the County.

    b.  Powell brings his claim for violations of section 51.7 against all defendants.

9)  Liability under California Government Code section 815.6 against the County brought by Porter and Powell.

10) False imprisonment against all defendants:

    a.  Porter brings her claim of false imprisonment against McCampbell, McDowell and the County.

    b.  Powell brings his claim of false imprisonment against all defendants.

11) Assault and battery against McCampbell, McDowell and the County brought by Porter and Powell.

12) Intentional infliction of emotional distress (IIED):

    a.  Porter brings her claim of IIED against McCampbell, McDowell and the County.

    b.  Powell brings his claim of IIED against all defendants.

13) Negligence *per se*:

    a.  Porter brings her claim of negligence *per se* against McCampbell, McDowell and the County.

    b.  Porter brings his claim of negligence *per se* against all defendants.

14) Negligence:

    a.  Porter brings her claim of negligence against McCampbell, McDowell and the County.

    b.  Powell brings his claim of negligence against all defendants.

FAC ¶¶ 133–254; Joint Statement Pending Claims (Joint Statement), ECF No. 186.

As noted above, the parties filed cross motions for summary judgment. Solano defendants move for summary judgment on all claims against them. Solano Defs.' Mot. Stockton also moves for summary judgment on all claims against him. Stockton Mot. The defendants' motions for summary judgment are fully briefed. Opp'n to Stockton Mot., ECF No. 165; Opp'n to Solano Defs.' Mot.; Stockton Reply, ECF No. 177; Solano Defs.' Reply, ECF No. 178.

Plaintiffs move for partial summary judgment on claims 1, 2, 3, 7, 10 and 11. Pls.' Mot. The motion is fully briefed. Defs.' Joint Opp'n; Pls.' Reply, ECF No. 179. The court heard oral argument on both motions on December 11, 2024. Mins. Mot. Hr'g, ECF No. 185. Ahmed Ibrahim and Yasin Almadani appeared for plaintiffs, Danielle K. Lewis appeared for Solano defendants and Gregory M. Fox appeared for defendant Roy Stockton. *Id.* After hearing and on the court's order, parties filed a joint statement clarifying the pending claims and the foregoing summary reflects the information in that statement. *See* Joint Statement.

## II.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The party moving for summary judgment must first carry its initial burden of production. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz*

1  *Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party would not have the burden

2  to prove the disputed claims at trial, then it must carry its initial burden of production at summary

3  judgment in one of two ways: "either produce evidence negating an essential element of the

4  nonmoving party's claim or defense or show that the nonmoving party does not have enough

5  evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire*,

6  210 F.3d at 1102.  Then, to carry its burden of persuasion on the motion, the moving party must

7  "persuade the court that there is no genuine issue of material fact." *Id.*

8          In the case of the defendants' affirmative qualified immunity and California Government

9  Code section 821.6 immunity defenses, because they would bear the burden of proving their

10  disputed defenses at trial, they must cite portions of the record to show "no reasonable jury" could

11  find in favor of the nonmoving party in order to prevail.  *Snell v. Bell Helicopter Textron, Inc.*,

12  107 F.3d 744, 746 (9th Cir. 1997).  The defendants must "establish beyond controversy every

13  essential element" of their immunity defenses.  *S. California Gas Co. v. City of Santa Ana*,

14  336 F.3d 885, 888 (9th Cir. 2003) (per curiam) (internal quotations and citations omitted).  "If the

15  nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the

16  moving party wins the motion for summary judgment.  But if the nonmoving party produces

17  enough evidence to create a genuine issue of material fact, the nonmoving party defeats the

18  motion." *Nissan Fire*, 210 F.3d at 1103 (citing *Celotex*, 477 U.S. at 322).

19          A cross motion for summary adjudication is evaluated under the same standard, "giving the

20  nonmoving party in each instance the benefit of all reasonable inferences." *Am. Civil Liberties*

21  *Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).  For plaintiffs to prevail

22  on their motion they must cite portions of the record to show "no reasonable jury" could find in

23  favor of the nonmoving party.  *Snell*, 107 F.3d at 746.  When, as here, the "parties submit cross-

24  motions for summary judgment, each motion must be considered on its own merits." *Fair Hous.*

25  *Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations

26  and alterations omitted).  In the following discussion, the court considers the merits of all three of

27  the parties' pending motions given their overlap.

1   **III.   ANALYSIS**

2       **A.     Scope of Federal Constitutional Claims**

3          **1.     Section 1983 14th Amendment Due Process Claims**

4        Section 1983 provides a cause of action for individuals who believe their federal rights

5   have been violated by someone acting under color of law. *Gomez v. Toledo*, 446 U.S. 635, 639

6   (1980) (citing 42 U.S.C. § 1983). "Where a particular Amendment provides an explicit textual

7   source of constitutional protection against a particular sort of government behavior, that

8   Amendment, not the more generalized notion of substantive due process, must be the guide for

9   analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (internal quotations

10   omitted) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Though plaintiffs bring their

11   § 1983 claims for unlawful search and seizure and excessive force under both the Fourth and

12   Fourteenth Amendments, the court analyzes the claims under the Fourth Amendment alone. *See,*

13   *e.g.*, *Graham*, 490 U.S. at 395.

14        To the extent plaintiffs plead their § 1983 claims for unlawful search, seizure and

15   excessive force in violation of the Fourteenth Amendment due process clause, they are dismissed.

16          **2.     Section 1983 Aiding and Abetting Claims**

17        Similarly, plaintiffs' claims of aiding and abetting under § 1983 are not colorable as pled.

18   "[W]hen Congress enacts a statute under which a person may sue and recover damages from a

19   private defendant for the defendant's violation of some statutory norm, there is no general

20   presumption that the plaintiff may also sue aiders and abettors." *Centr. Bank of Denver, N.A. v.*

21   *First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). Because the text of § 1983

22   contains no language authorizing liability for aiding and abetting, courts have concluded that

23   § 1983 cannot support an "aiding and abetting" theory of liability. *See Est. of Mann v. County of*

24   *Stanislaus*, No. 21-1098, 2023 WL 1110372 at *9–10 (E.D. Cal. Jan. 30, 2023) (collecting cases).

25   While § 1983 does not support claims of aiding and abetting, defendants may be liable under

26   theories of integral participation or supervisor liability. *See, e.g.*, *Johnson v. Duffy*, 588 F.2d 740,

27   743 (9th Cir. 1978) ("Anyone who 'causes' any citizen to be subjected to a constitutional

1   deprivation is also liable."); *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) ("A defendant

2   may be held liable as a supervisor under § 1983 . . . .").

3       To the extent plaintiffs seek to plead aiding and ability liability under their § 1983 claims,

4   the claims are dismissed.

5       **B.    Fourth Amendment Unlawful Seizure (Claim One)**

6       Having addressed the scope of § 1983 as applicable here, the court proceeds to address the

7   plaintiffs' claims in the same order as alleged in the fourth amended complaint.  Porter first brings

8   a claim for unlawful seizure in violation of the Fourth Amendment against McCampbell,

9   McDowell and the County.[9]  FAC ¶¶ 133–140; Joint Statement at 2.  Powell, L.P. and A.P. bring

10  this claim against all defendants.  Plaintiffs also countermove for summary judgment on these

11  grounds.  FAC ¶¶ 133–140; Joint Statement at 2.

12      When determining whether someone's Fourth Amendment right against unlawful seizure

13  have been violated, "the ultimate touchstone . . . is 'reasonableness.'"  *United States v. Odom*,

14  588 F. Supp. 3d 1032, 1037 (N.D. Cal. 2022) (quoting *Brigham City, Utah v. Stuart*, 547 U.S.

15  398, 403 (2006)).  "A seizure conducted without a warrant is per se unreasonable under the Fourth

16  Amendment—subject only to a few specifically established and well delineated exceptions."

17  *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005) (quoting *United States v.*

18  *Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)).

19      The Fourth Amendment's "protections extend to brief investigatory stops of persons or

20  vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002)

21  (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)).  "[I]n such cases, the Fourth Amendment is satisfied

22  if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may

23  be afoot' . . . ."  *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  Courts "must look

24  at the totality of the circumstances of each case to see whether the detaining officer has a

25  particularized and objective basis for suspecting legal wrongdoing."  *Id.* (internal quotations and

---

[9] Parties clarified in their joint statement of pending claims that claims of relief against the "County" or "County Defendants" refers to the County of Solano and Sheriff Ferrara in his official capacity.  *See* Joint Statement at 2.  The court addresses *Monell* liability for the entity defendants separately, in sub-section III.H below.

1    citations omitted).  "An officer may make an investigatory stop if he is aware of specific,

2    articulable facts which, together with objective and reasonable inferences, form a basis for

3    suspecting that the particular person detained is engaged in criminal activity."  *United States v.*

4    *Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989); *cf. Duran v. City of Douglas, Ariz.*,

5    904 F.2d 1372, 1378 (9th Cir. 1990) ("If there is one irreducible minimum in our Fourth

6    Amendment jurisprudence, it is that a police officer may not detain an individual simply on the

7    basis of suspicion in the air."  *Id.*).

8         To decide whether a warrantless seizure was "reasonable" and therefore lawful, a court

9    "must balance the nature and quality of the intrusion on the individual's Fourth Amendment

10   interests against the importance of the governmental interests alleged to justify the intrusion."

11   *United States v. Place*, 462 U.S. 696, 703 (1983).  The parties agree that whether officers

12   indisputably had reasonable suspicion to detain plaintiffs, as a matter of law, is the dispositive

13   question to be answered in resolving plaintiffs' first claim.  *See* Solano Defs.' Mot. at 17–18;

14   Stockton Mot. at 20–22; Pl.'s Mot. at 21–22.

15                    **1.    Porter's Claim**

16        Defendants argue multiple circumstances support the conclusion McCampbell and

17   McDowell had reasonable suspicion for the initial stop and subsequent arrest of Porter:

18   • Police were at the scene based on a "suspicious vehicle" call in a rural area.

19   • Porter's vehicle bore two license plates from different states.

20   • Porter moved in ways that could jeopardize officer safety and violated state law

21     prohibiting resistance and obstruction.

22   Solano Defs.' Mot. at 18–19.

23        Porter does not dispute she violated California Vehicle Code section 5200(a), requiring

24   two matching, government-issued license plates be affixed to a vehicle.  Pls.' Resp. to Solano

25   UMF Nos. 8, 10.  "A traffic violation alone is sufficient to establish reasonable suspicion."

26   *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citing *Wren v. United States*,

27   517 U.S. 806, 810 (1996); *United States v. Willis*, 431 F.3d 709, 714–17 (9th Cir. 2005)).

28   However, "[a] seizure that is justified solely by the interest in issuing a warning ticket to the

1    driver can become unlawful if it is prolonged beyond the time reasonably required to complete

2    that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  McCampbell and McDowell had

3    reasonable suspicion to conduct the initial investigatory stop based on the perceived violation of

4    California Vehicle Code section 5200(a) for as long as needed to address the violation.  *See*

5    *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (reasonable

6    suspicion "not a particularly high threshold to reach").

7            Defendants also assert they justifiably prolonged the stop and lawfully arrested Porter

8    because she refused repeated orders and resisted arrest in violation of California Penal Code

9    sections 69 & 148(a)(1), which prohibit resistance and obstruction in response to the discharge of

10   an officer's duties.  Solano Defs.' Mot. at 18, 20.  It is disputed whether Porter complied with

11   deputies' instructions.  Plaintiffs assert Porter remained "polite," "immediately" complied and at

12   no point resisted arrest or struck McCampbell.  Opp'n to Solano Defs.' Mot. at 12–13.

13   Defendants disagree.  In evaluating Solano defendants' motion, the court finds a reasonable jury

14   could believe Porter was walking towards the driver-side of the car to follow deputies' orders

15   when they arrested her.  *See* McCampbell Body Cam. at 0:24–0:34.  With respect to Porter's

16   motion, a reasonable jury alternatively could find Porter was not "immediately" compliant as the

17   deputies repeated their orders to return to the vehicle multiple times.  Similarly, there are disputed

18   issues of material fact surrounding Porter's alleged resistance, and the available video footage and

19   testimony does not offer sufficient clarity to resolve this dispute at the summary judgment stage.

20   *See, e.g.*, *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) ("The mere

21   existence of video footage of the incident does not foreclose a genuine factual dispute as to the

22   reasonable inferences that can be drawn from that footage.").  Because a reasonable jury could

23   resolve these factual disputes in favor of either party, the court may not resolve Porter's claim of

24   unlawful seizure as a matter of law on summary judgment for either party.  *See Anderson*,

25   477 U.S. at 250.[10]

---

[10] Individual Solano defendants broadly assert qualified immunity "to all of [p]laintiffs'
federal claims."  Solano Defs.' Mot. at 33.  Stockton makes the same broad assertion.  Stockton
Mot. at 30 ("Stockton is entitled to qualified immunity from Plaintiffs' § 1983

1          **2.      Powell's Claim**

2          Defendants also assert the deputies' detention of Powell did not violate the Fourth

3   Amendment and move the court to grant summary judgment on these grounds.  Solano Defs.'

4   Mot. at 20, ECF No 150-1.  Defendants argue reasonable grounds for their seizure of Powell

5   existed because:

6   - Police were at the scene based on a "suspicious vehicle" call in a rural area.

7   - Porter's vehicle bore two license plates from different states.

8   - Porter was noncompliant and struck an officer in the head.

9   - Deputies observed additional passengers—at least two children—who "outnumbered"

10     them.

11   - Powell "initially did not comply with orders to exit the vehicle."

12   Solano Defs.' Mot. at 20, ECF No. 150-1.  Considered together, defendants assert the totality of

13   the circumstances reasonably justified the seizure of Powell.  *Id.*  Plaintiffs also move for

14   summary judgment of this claim.

15          As explained above, Porter's mismatching license plates offered sufficient reasonable

16   suspicion to justify an investigatory traffic stop.  While the parties dispute whether Porter stopped

17   her vehicle before McDowell turned on the patrol car lights to initiate a stop, *compare* Pls.' Mot.

18   at 22 *with* Solano Defs.' Mot. at 11, the parties nevertheless correctly agree the caselaw

19   surrounding traffic and investigatory stops applies.  *See, e.g.*, *United States v. Nault*, 41 F.4th

20   1073, 1080 (9th Cir. 2022) (when defendant was already stopped in idling car rather than stopped

21   while driving, the "analysis here is the same"); *compare* Pls.' Mot. at 12 (describing initial

22   interaction as a "routine traffic stop") *with* Solano Defs.' Mot. at 12 ("[I]t was a traffic stop ....").

23   Passengers in a stopped car, such as Powell, "are stopped by virtue of the stop of the vehicle" and

24   they may be ordered to exit the car "pending completion of the stop."  *Maryland v. Wilson*, 519

25   U.S. 408, 414 (1997).  This Circuit has extended *Wilson* in holding police may also order a

26   passenger to return to the car they had just exited.  *United States v. Williams*, 419 F.3d 1029, 1031

---

claims.").  Individual defendants' assertions of qualified immunity to each § 1983 claim is
addressed by the court below in sub-section III.G.

1    (9th Cir. 2005).  The Ninth Circuit explained its reasoning as reflecting the "need for officers to

2    exercise control over individuals" to reduce the risk of harm to police and vehicle occupants.  *Id.*

3    at 1034.

4          Here, McCampbell and McDowell's initial orders for Powell to return to the vehicle and

5    later exit the vehicle were not unreasonable.  "[I]t is well established that an officer effecting a

6    lawful traffic stop may order the driver and the passengers out of a vehicle," *Williams*, 419 F.3d

7    at 1030 (internal citations omitted), and the court acknowledges the "legitimate and weighty"

8    interests of protecting officer safety during traffic stops.  *See Pennsylvania v. Mimms*, 434 U.S.

9    106, 110–111 (1977).  But this reasoning does not extend so far as to allow police to detain and

10   handcuff a passenger who is not otherwise engaging in criminal activity.  Instead, officers must

11   articulate reasonable suspicion with particularity as to each individual they detain.  *Sialoi v. City*

12   *of San Diego*, 823 F.3d 1223, 1237 (9th Cir. 2016) (quoting *Liberal v. Estrada*, 632 F.3d 1064,

13   1077 (9th Cir. 2011)).  Moreover, Powell's association with Porter could not by itself create

14   reasonable suspicion of criminal activity.  *See United States v. Jones*, 101 F. Supp. 3d 1001, 1009

15   (D. Or. 2015) (officer's suspicions about an individual's association with known gang members

16   did not rise to reasonable suspicion because "[g]ang member status in and of itself is not criminal

17   activity").  Nevertheless, a reasonable jury could conclude, but would not have to, that officers

18   reasonably detained Powell considering the totality of the circumstances because he exited the

19   vehicle only after repeated instructions to do so and deputies had not yet confirmed the

20   passengers in the car were children.  *See* McCampbell Body Cam. at 4:55–6:55.  Because a

21   reasonable jury could resolve the factual disputes in favor of either party, the court denies

22   McCampbell's, McDowell's and Powell's motions for summary judgment on Powell's claims of

23   unlawful seizure.

24          Powell's claim further alleges Carter and Hamilton are liable as integral participants in his

25   unlawful seizure.  Solano defendants assert the claims against Carter and Hamilton must be

26   dismissed because the deputies' "only involvement with the investigation was to take

27   photographs" and otherwise did not include contact with Powell.  Solano Defs.' Mot. at 21.  A

28   state actor may be individually liable under § 1983 for "integral participation" in a constitutional

1   violation. *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007) (quoting

2   *Chuman v. Wright*, 76 F.3d 292, 294–95 (9th Cir. 1996)). "[I]ntegral participation does not

3   require that each officer's actions themselves rise to the level of a constitutional violation," *Boyd*

4   *v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004) (internal quotation marks omitted), "[b]ut it

5   does require some fundamental involvement in the conduct that allegedly caused the violation."

6   *Blankenhorn*, 485 F.3d at 481 n.12 (citing *id.*). Liability as an integral participant attaches "*only*

7   if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of

8   a common plan with those whose conduct constituted the violation, or (2) the defendant set in

9   motion a series of acts by others which the defendant knew or reasonably should have known

10  would cause others to inflict the constitutional injury." *Spencer v. Pew*, 117 F.4th 1130, 1145

11  (9th Cir. 2024) (quoting *Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022)).

12      While Carter and Hamilton cannot have participated in constitutional violations before

13  they arrived, "participation in an ongoing seizure after any probable cause had dissipated violates

14  the Fourth Amendment." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019).

15  Carter and Hamilton arrived during the ongoing detention of Powell at 9:31 p.m. Solano Defs.'

16  Resp. to UMF No. 90. Carter asserts he has no recollection of Powell's detention or any

17  knowledge of the reason deputies McCampbell and McDowell detained Powell. Carter Dep. at

18  58, Notice of Lodging Ex. 510, ECF No. 151. Hamilton similarly asserts he had no knowledge of

19  the circumstances surrounding Powell's detention or the reasons he was handcuffed. Hamilton

20  Dep. at 63–64. After arriving on the scene, Carter and Hamilton took photographs of the scene

21  and monitored the children before deputies Carter, Hamilton and McDowell left to transport

22  Porter to the hospital. *Id.* at 15. Carter and Hamilton made no direct contact with Powell during

23  their investigation. *Id.* at 54; Solano Defs.' Mot. at 21. No evidence supports a reasonable

24  factfinder's conclusion that their conduct on the scene rose to the level of integral participation in

25  the ongoing and allegedly unlawful seizure of Powell. Carter and Hamilton's motion for

26  summary judgment on Powell's first claim of unlawful seizure is, therefore, dismissed.

27      Powell also brings his unlawful seizure claim against Stockton as an integral participant

28  and under a theory of supervisor liability. FAC ¶ 133. The court begins by addressing the claim

1    of liability under a theory of integral participation.  Like Carter and Hamilton, Stockton asserts he

2    was not an integral participant because the allegedly unlawful detention occurred before Stockton

3    arrived on the scene and he played no fundamental role in Powell's detention and was unaware of

4    any plan to unconstitutionally detain Powell.  Stockton Mot. at 21.  While driving to the scene,

5    Stockton learned from dispatch radio transmissions that two suspects had been detained and that

6    the passenger—Powell—was identified as noncompliant by McDowell.  Stockton Dep. 220–25;

7    Stockton Decl. ¶¶ 4, 17.  After surveying the scene, Stockton spoke to McCampbell and

8    McDowell, confirmed Porter required medical attention and ensured deputies were watching the

9    children.  Stockton Mot. at 21–22.  Twenty minutes after arriving on the scene, Stockton spoke to

10   Powell for the first time, determined Powell should be released, unhandcuffed him and gave him

11   permission to leave the scene with the children.  *Id.* at 22.  Stockton argues that because Powell

12   was detained for approximately thirty minutes after Stockton arrived on the scene—from 9:31

13   p.m. to approximately 9:58 p.m., his role in Powell's detention  did not rise to the level of

14   "fundamental involvement" in the conduct causing the alleged constitutional violation of Powell's

15   rights.  *Id.*; *Hopkins*, 573 F.3d at 770.  Plaintiffs disagree and assert that because Stockton learned

16   while en route to the scene that the vehicle's registration was clear and current and that Powell

17   was still detained, Stockton should have immediately released Powell upon arriving at the scene.

18   Stockton Dep. at 39–41; Stockton Decl. ¶ 7; Opp'n to Stockton Mot. at 12.  Plaintiffs further

19   contend that Stockton could articulate no reasonable basis for prolonging Powell's seizure and

20   Stockton therefore integrally participated in prolonging the unconstitutional seizure.  Opp'n to

21   Stockton Mot. at 12.

22       Viewing the evidence in the light most favorable to plaintiffs, a reasonable jury could

23   conclude—but would not have to conclude—that Stockton directly and unreasonably prolonged

24   Powell's detention.  While Stockton cannot be liable for actions occurring before he arrived, a

25   jury could find Stockton's inability to articulate reasonable suspicion for Powell's detention for

26   almost thirty additional minutes constituted a constitutional violation.  *See, e.g.*, *Robinson v.*

27   *Solano County*, 278 F.3d 1007, 1014–15 (9th Cir. 2002) (en banc) (finding Fourth Amendment

28   violation for detentions between fifteen and thirty minutes); *see also Baker v. Monroe Township*,

1    50 F.3d 1186 (3d Cir. 1995) (finding a twenty-five minute detention actionable when considering

2    intrusiveness of incident in aggregate).  Nevertheless, reasonable jury could also find that

3    Stockton acted reasonably quickly in releasing Powell from custody.  Because material disputes

4    of fact exist, the court denies plaintiffs' and Stockton's motion for summary judgment on

5    Powell's claim of unlawful seizure against Stockton as an integral participant.

6          Similarly, Powell brings his claim against Stockton under a theory of supervisor liability.

7    FAC ¶ 133.  It is well established that "[a] supervisory official is liable under § 1983 so long as

8    'there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a

9    sufficient causal connection between the supervisor's wrongful conduct and the constitutional

10   violation.'" *Rodriguez v. County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (quoting

11   *Keates v. Koile*, 883 F.3d 1228, 1242–43 (9th Cir. 2018)).  Unlike integral participation where an

12   officer must play a fundamental role in the constitutional violation, a supervisor need not be

13   "physically present when the injury occurred." *Starr*, 652 F.3d at 1201.  Instead, the required

14   causal connection is established "by setting in motion a series of acts by others or by knowingly

15   refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably

16   should have known would cause others to inflict a constitutional injury." *Rodriguez*, 891 F.3d at

17   798  (alteration in original) (quoting *Starr*, 652 F.3d at 1207–08).  Therefore, "[a] supervisor can

18   be liable in his individual capacity for his own culpable action or inaction in the training,

19   supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation;

20   or for conduct that showed a reckless or callous indifference to the rights of others." *Starr*,

21   652 F.3d at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).  "A

22   supervisor is liable under § 1983 for a subordinate's constitutional violations 'if the supervisor

23   participated in or directed the violations or knew of the violations and failed to act to prevent

24   them.'" *Maxwell v. County of San Diego*, 708 F.3d 1075, 1086 (9th Cir. 2013) (quoting *Taylor v.

25   List*, 880 F.2d 1040, 1045 (9th Cir.1989)).  As explained above, material disputes of fact exist as

26   to whether Stockton unreasonably prolonged Powell's allegedly unconstitutional seizure.  The

27   court, therefore, denies summary judgment for both plaintiffs and Stockton on Powell's claim of

28   unlawful seizure against Stockton.

1                          **3.      L.P. and A.P.'s Claim**

2          Plaintiffs' first claim also asserts defendants unconstitutionally seized the three children in

3   the backseat of the car.  Plaintiffs bring this claim against all defendants and similarly assert

4   Carter, Hamilton and Stockton are liable under a theory of integral participation and that Stockton

5   is liable under a theory of § 1983 supervisory liability.  Plaintiffs say the children were separated

6   from their caregivers and left in isolation for an extended period in violation of their

7   constitutional rights.  Opp'n to Solano Defs.' Mot. at 15.  The uncontroverted video evidence

8   shows the children were left unsupervised by the deputies on scene multiple times during the

9   incident.  After Powell exited the vehicle at approximately 9:20 p.m., the children remained in the

10  vehicle unattended for approximately three minutes.  Dash Cam. at 6:50–9:50.  Once deputies

11  handcuffed Powell and placed him in a patrol car, they approached the vehicle with at least one

12  gun drawn, and made their first contact with the children.  *Id.*  From 9:23 p.m. until 9:58 p.m.,

13  video footage shows the children were attended to by officers who stood by the vehicle with the

14  passenger-side doors ajar.  *Id.* at 9:50–43:00.  But footage also shows at least three instances

15  when officers stepped away from the vehicle or closed the passenger doors, leaving the children

16  unattended, at one point for up to four minutes.  *Id.* at 27:30–29:00, 37:00–40:55, 42:00–43:00.

17  The end of the dashboard footage in particular memorializes the recording patrol car's driving

18  past Porter's vehicle and shows the rear-passenger doors ajar with the children unattended as

19  vehicles moved about the scene.  *Id.* at 42:00–43:00.  In total, the deputies seized the children for

20  approximately forty-five minutes; the children spent almost thirty minutes apart from a familial

21  caretaker and were left unattended for a total of approximately ten minutes.  *See generally id.*

22         Applying the legal standard explained above, when Porter's vehicle was stopped and she

23  and Powell were seized for a traffic infraction, so too were all other persons in the vehicle.

24  *Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021).  But a seizure alone is not by itself

25  unconstitutional; the seizure must also be unreasonable to be unconstitutional.  *Stuart*, 547 U.S. at

26  408; *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) (explaining seizure is not sufficient for

27  § 1983 liability; seizure must also be unreasonable).  Defendants' briefing cites little caselaw in

28  addressing the children's claim and depends instead on unsupported arguments evaluating the

                                                    24

1   deputies' "reasonableness."  Defendants argue in circular fashion that this seizure was

2   "reasonable" because there was "no reasonable alternative to the children remaining in the car."

3   Solano Defs.' Mot. at 21.  Plaintiffs point to the allegedly unreasonable precipitating factors—

4   including the arrest of Porter and detention of Powell—leading to the deputies' ultimate decision

5   to leave L.P. and A.P. "alone without Mr. Powell and in the custody of masked strangers,"

6   unconstitutionally.  Pls.' Reply at 15–16.  When caregivers are detained with children present,

7   those children can be left isolated, and some police departments outline guidelines and rules

8   regarding officers' roles in ensuring children are kept safe.

9        As explained above, a reasonable jury could conclude McCampbell and McDowell

10   unlawfully seized Porter and Powell.  If a jury finds that the seizure of the caregiving adults was

11   unreasonable, the jury could also conclude—but would not have to conclude—that McCampbell

12   and McDowell's seizure of the children was similarly unreasonable, and therefore unlawful.

13        While Carter and Hamilton arrived after the initial seizure of the children, Hamilton had

14   direct contact with the children and stood by Porter's vehicle for multiple minutes.  Hamilton

15   Dep. at 115, 123–27; Carter Dep. at 142–43.  Hamilton described his interaction with the children

16   as "[s]taying with the kids so they didn't feel alone."  Hamilton Dep. at 123.  Despite Hamilton's

17   contact with the children, plaintiffs do not produce sufficient facts to find as a matter of law that

18   either deputy "knew about and acquiesced in the constitutionally defective conduct as part of a

19   common plan with those whose conduct constituted the violation."  *Spencer*, 117 F.4th at 1145

20   (quoting *Peck*, 51 F.4th at 891 (9th Cir. 2022)).  Both deputies arrived at the scene and followed

21   instructions to assist in the investigation, and no evidence supports their involvement with a

22   common plan with other deputies to further an alleged constitutional violation.  Carter and

23   Hamilton's motion to dismiss is granted.

24        For the same reasons explained above with respect to Stockton's involvement in Powell's

25   detention, a reasonable jury could find Stockton was an integral participant and/or liable

26   supervisor in the alleged unconstitutional seizure of the children.  If a jury concludes Stockton

27   unreasonably prolonged the seizure of Powell, the jury could also conclude that this delay also

28   prolonged the unlawful seizure of the children.  It is for a jury to clarify the underlying material

facts surrounding the children's seizure and the court therefore denies summary judgment to plaintiffs and Stockton on L.P. and A.P.'s claims of unlawful seizure.

The court therefore grants in part and denies in part the individual deputies' motions and grants Stockton's motion with respect to plaintiffs' first claim:

- The court denies Stockton's motion for summary judgment of the plaintiffs' first claim. The court denies plaintiffs' motion in part as to the same claim.
- The court grants Carter and Hamilton's motion for summary judgment of the first claim. The court denies plaintiffs' motion in part as to the same claim.
- The court otherwise denies Solano defendants' motion for summary judgment of claim one.

Plaintiffs' motion for summary judgment of claim one is denied.

### C.    Fourth Amendment Excessive Force (Claim Two)

Plaintiffs' second claim alleges unconstitutional use of excessive force in violation of the Fourth Amendment. Plaintiffs argue McCampbell and McDowell engaged in excessive force by unreasonably pointing loaded firearms at them multiple times throughout the encounter, handcuffing and dragging Porter from the vehicle while she was compliant, beating her and locking her in a patrol car, handcuffing Powell and locking him in a patrol car, and isolating L.P. and A.P. from their caregivers. Plaintiffs, Solano defendants and Stockton cross move for summary judgment on this claim.

The "settled and exclusive" test for deciding whether an officer's force was excessive, and thus unlawful under the Fourth Amendment, is the "objective" standard described in *Graham*, 490 U.S. at 396, and *Tennessee v. Garner*, 471 U.S. 1 (1985). *See, e.g.*, *County of Los Angeles v. Mendez*, 581 U.S. 420, 420 (2017). In that test, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner*, 471 U.S. at 8 (quoting *United States v. Place*, 462 U.S. 969, 703 (1983)); *see also, e.g.*, *Graham*, 490 U.S. at 396; *Miller v. Clark County*, 340 F.3d 959, 964, 968 (9th Cir. 2003). This analysis involves three steps. First, the severity of the intrusion on the individual's Fourth Amendment rights is assessed by

1    evaluating the type and amount of force inflicted.  *Miller*, 340 F.3d at 964.  Second, the

2    government's interests are evaluated by assessing (1) the severity of the crime; (2) whether the

3    suspect posed an immediate threat to the officer's or public's safety; and (3) whether the suspect

4    was resisting arrest or attempting to escape.  *Id.* at 964–65.  Third, the gravity of the intrusion on

5    the individual is balanced against the government's need for that intrusion.  *Id.* at 965–66.

6        In some cases, very little force—or no force at all—might be the only objectively

7    reasonable amount of force an officer may use.  *See*, *Green v. City & County of San Francisco*,

8    751 F.3d 1039, 1049 (9th Cir. 2014); *Lolli v. Cnty. of Orange*, 351 F.3d 410, 417 (9th Cir. 2003).

9    In other cases, even deadly force might be deemed reasonable.  *See, e.g.*, *Scott*, 550 U.S. at 386.

10   But in every case, an officer's conduct "must be judged from the perspective of a reasonable

11   officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396

12   (citation omitted).  "[T]he calculus of reasonableness" must similarly take account of the fact that

13   officers "are often forced to make split-second judgments—in circumstances that are tense,

14   uncertain, and rapidly evolving—about the amount of force that is necessary in a particular

15   situation."  *Id.* at 396–97.

16       Because balancing these interests "nearly always requires a jury to sift through disputed

17   factual contentions, and to draw inferences therefrom, [this Circuit has] held on many occasions

18   that summary judgment or judgment as a matter of law in excessive force cases should be granted

19   sparingly."  *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir.

20   2003).  Nevertheless, when the evidence indisputably shows an excessive use of force a district

21   court may grant summary judgment to a plaintiff on the claims.  *Compare Thomas v. Dillard*, 818

22   F.3d 864 (9th Cir. 2016), *as amended* (May 5, 2016) (affirming district court's grant of plaintiff's

23   motion for summary judgment on claims of excessive force) *with Donovan v. Phillips*, 685 Fed.

24   Appx. 611 (9th Cir. 2017) (unpublished) (affirming district court's grant of summary judgment to

25   defendants after finding their use of force was reasonable as a matter of law).

26           **1.    Porter's Claim**

27       Quantifying the nature and severity of the force used often requires a court to consider

28   "specific factual circumstances surrounding the event."  *See Seidner v. de Vries*, 39 F.4th 591,

27

1   597 (9th Cir. 2022) (internal quotations and citations omitted). Here, the undisputed evidence

2   shows McCampbell approached Porter with his gun drawn after ordering her to return to the car.

3   Dash Cam. at 1:25–1:40; McCampbell Body Cam. at 0:19–0:35. The record also shows Porter

4   asked questions about what was going on but also told deputies she was "not resisting."

5   McCampbell Body Cam. at 0:43–1:15. It is undisputed McCampbell and McDowell grabbed

6   Porter and McCampbell performed a hair pull takedown and struck her in the head and abdomen

7   while she was on the ground. Solano Defs.' Resp. to UMF Nos. 44, 48. The undisputed evidence

8   also shows Porter suffered physical injury at the scene, and she later expressed her physical pain

9   and her belief that she had lost consciousness to officers and emergency responders.

10  McCampbell Body Cam. 10:05–10:30; Porter Dep. at 159. The nature of the intrusion against

11  Porter was severe, and no reasonable jury could find otherwise; therefore, the government's

12  interest in using such force must be justified. *See Espinosa v. City & Cnty. of San Francisco*,

13  598 F.3d 528, 537 (9th Cir. 2010) (pointing loaded gun at suspect alone can constitute "a high

14  level of force").

15       The government's interests are evaluated by assessing (1) the severity of the crime;

16  (2) whether the suspect posed an immediate threat to the officer's or public's safety; and

17  (3) whether the suspect was resisting arrest or attempting to escape. *Miller*, 340 F.3d at 964. Of

18  these factors, "the most important is whether the individual posed an immediate threat to officer

19  or public safety." *Young v. County of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (citation

20  omitted). When McCampbell and McDowell approached Porter, they had a reasonable basis to

21  believe she had committed a minor vehicle code violation, but no reason to believe she committed

22  or was about to commit any other crime. A minor vehicle code violation does not carry with it a

23  governmental interest in using force and this Circuit has "'consistently applied the principle that

24  drawing weapons and using handcuffs or other restraints is unreasonable in many situations'

25  involving investigatory or *Terry* stops." *Green*, 751 F.3d at 1050 (quoting *Robinson*, 278 F.3d at

26  1015); *see also Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) ("Under ordinary

27  circumstances, when the police have only reasonable suspicion to make an investigatory stop,

28  drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment.").

1   Before Porter allegedly resisted deputies' instructions, the government had no interest in using

2   force.

3       After they ordered Porter to get back into the car, defendants assert their use of force was

4   reasonable because she ignored deputies' orders, resisted arrest and then continued to resist when

5   being led to the patrol car.  Solano Defs.' Mot. at 22–23.  Defendants assert each of these actions

6   by Porter justified the respected use of force deputies used in response.  *Id.*  In evaluating use of

7   force against resistance, the Ninth Circuit has found resistance to "run[] the gamut from the

8   purely passive protestor who simply refuses to [obey], to the individual who is physically

9   assaulting the officer."  *Bryan v. MacPherson*, 630 F.3d 805, 830 (9th Cir. 2010).  "Even purely

10  passive resistance can support the use of some force, but the level of force an individual's

11  resistance will support is dependent on the factual circumstances underlying that resistance."  *Id.*

12  As explained above in the context of the alleged unlawful seizure, a reasonable juror could

13  disagree that Porter posed any risk of inflicting physical harm that would reasonably justify the

14  officers' use of any force at any time.

15      In assessing the government's interest in using force, courts also consider "whether proper

16  warnings were given and the availability of less intrusive alternatives to the force employed."

17  *Lowry v. City of San Diego*, 858 F.3d 1248 (9th Cir. 2017) (internal quotations omitted).  No

18  reasonable juror could find officers administered any warnings to Porter before pointing a gun at

19  her during the initial traffic stop.  *See, e.g.*, *Green*, 751 F.3d at 1050 (finding police could have

20  approached plaintiffs with their weapons at a low ready position in a traffic stop).  Similarly, it

21  cannot be disputed that deputies had a multitude of less intrusive alternatives to dragging Porter to

22  the ground and punching her repeatedly.  Jurors could disagree, however, about Porter's alleged

23  resistance to officers and whether this resistance—if any—justified the severe nature of the force

24  deputies used.  In the end, this factor may weigh against the government's interest in using force

25  both during the initial traffic stop and during the ultimate seizure and punching of Porter, but the

26  factual disputes are a question for the jury.

27      After determining the nature of the intrusion and the government's interests, the excessive

28  force inquiry then requires the court to "balance the gravity of the intrusion on [Porter's] Fourth

1    Amendment rights against the [government's] need for that intrusion." *Lowry*, 858 F.3d at 1260

2    (internal citations omitted).  As explained above, this step is often, but not always, reserved for

3    the jury due to the need for factual analysis and credibility findings.  The court cannot decide as a

4    matter of law if defendants used excessive force because there are material disputes about

5    Porter's level of resistance, if any.  Depending on how they resolve the question of Porter's

6    resistance, jurors might also disagree whether McCampbell and McDowell used excessive force

7    when they handcuffed Porter, dragged her to the ground and beat her unconscious.  Plaintiffs' and

8    Solano defendants' motions for summary judgment are denied.

9                        **2.       Powell's Claim**

10           Using the same balancing test set forth above, the court evaluates Powell's claim of

11   excessive force in violation of the Fourth Amendment.  Powell alleges McCampbell and

12   McDowell used excessive force when they approached him with a loaded weapon for a minor

13   vehicle code violation, and later pointed loaded weapons at him again as he was exiting the

14   vehicle, handcuffed him and then locked him in a patrol car.  Solano defendants and Powell cross

15   move for summary judgment on this claim.

16           While the court agrees with defendants that handcuffing during an ongoing investigation

17   is a "marginal intrusion," *see Muehler v. Mena*, 544 U.S. 93, 99 (2005), handcuffing was not the

18   only intrusion Powell suffered.  Instead, deputies pointed loaded weapons at him twice and then

19   handcuffed him after he had complied with their orders to exit the car and approach them slowly

20   with his hands raised.  A jury could find such an intrusion to be severe.  *See Espinosa*, 598 F.3d at

21   537 (finding officers used "a high level of force" when pointing guns at individual they knew had

22   not been accused of any crime).  An officer may violate the Fourth Amendment by pointing a gun

23   at a suspect when "[t]he crime under investigation was at most a misdemeanor; the suspect was

24   apparently unarmed and approaching the officers in a peaceful way[;] . . . [t]here were no

25   dangerous or exigent circumstances apparent at the time of the detention[;] and the officers

26   outnumbered the plaintiff." *Robinson*, 278 F.3d at 1014; *see also Tekle v. United States*, 511 F.3d

27   839, 845 (9th Cir. 2007) ("[T]he pointing of a gun at someone may constitute excessive force,

30

1    even if it does not cause physical injury."); *Espinosa*, 598 F.3d at 537 ("[P]ointing a loaded gun at

2    a suspect, employing the threat of deadly force, is use of a high level of force.").

3    　　　　Defendants assert Powell was initially noncompliant but do not produce evidence Powell

4    otherwise committed a crime.  Nevertheless, a jury could find deputies acted reasonably in

5    detaining Powell considering the "special and empirical dangers traffic stops pose to police

6    buttress[ing] the countervailing governmental interests." *Thomas v. Rahr*, 885 F.3d 582, 589–90

7    (9th Cir. 2018) (internal citations omitted).  Balancing these interests requires a factfinder to "sift

8    through disputed factual contentions, and to draw inferences therefrom." *Drummond*, 343 F.3d at

9    1056.  Both parties' motions for summary judgment are therefore denied.

10    　　　　　　　　**3.    L.P. and A.P.'s Claim**

11    　　　　Using the same test set forth above, the court evaluates L.P. and A.P.'s claim of excessive

12    force.  Plaintiffs assert McCampbell and McDowell used excessive force when they approached

13    the vehicle with their guns drawn, knowing there were children in the car, and then isolated the

14    children from their caregivers.  Opp'n to Solano Defs.' Mot. at 15.  After Powell was handcuffed,

15    he informed deputies three small children remained in the vehicle unattended.  McCampbell Body

16    Cam. at 6:45–7:20.  Defendants agree McCampbell and McDowell knew there were young

17    children in the vehicle but assert deputies "did not know whether other occupants were inside or

18    what other factors may have been present in the vehicle."  Joint Opp'n at 32.  Defendants further

19    assert "[a]t no point were any weapons drawn or pointed [at] the children." *Id.*  But the

20    uncontroverted evidence shows McDowell approached the vehicle with her weapon drawn.  Body

21    camera footage also shows McCampbell instructing McDowell to keep her weapon drawn while

22    he goes "hands free."  McCampbell Body Cam. at 8:30-8:55; Dash Cam. at 9:30–9:46.

23    McDowell lowered and holstered her firearm after she opened the rear-car door, where the

24    children were seated.  Dash Cam. at 9:46–9:54.

25    　　　　This Circuit has held that pointing a weapon at a child constitutes excessive force. *Motley*

26    *v. Parks*, 432 F.3d 1072, 1089 (9th Cir. 2005), *overruled on other grounds by United States v.*

27    *King*, 687 F.3d 1189 (9th Cir. 2012).  It is undisputed McDowell approached the vehicle with her

28    loaded gun pointed at the car at the instruction of McCampbell.  Even if the deputies believed

1  additional occupants other than the children or some danger presented itself in the vehicle, a

2  reasonable jury could disagree regarding what level of governmental interest existed in using this

3  level of force.  Similarly, a reasonable jury could find the deputies unconstitutionally trained a

4  weapon at the children, even if they did so through the vehicle's windows.  Balancing these fact-

5  specific interests requires a jury to weigh the facts and the credibility of the witnesses and "to

6  draw inferences therefrom."  *Drummond*, 343 F.3d at 1056.  The court denies summary judgment

7  for both parties with respect to L.P. and A.P.'s claims of excessive force.

8          Regarding the plaintiffs' second claim for excessive force in violation of the Fourth

9  Amendment, the court denies Solano defendants' motion and denies plaintiffs' motion.

10         **D.      Unlawful Search (Claim Three)**

11         Plaintiffs' third federal constitutional claim alleges unlawful search in violation of the

12  Fourth Amendment.  Porter brings this claim, individually and on behalf of L.P. and A.P., and

13  Powell brings the claim on his own behalf; both plaintiffs name individual defendants

14  McCampbell and McDowell.  FAC ¶ 148.  Plaintiffs assert McCampbell and McDowell

15  unreasonably searched their vehicle and their persons without probable cause.  *Id.* ¶¶ 148–51.

16  Plaintiffs' Like warrantless seizures, "[w]arrantless searches are presumptively unreasonable

17  under the Fourth Amendment, subject to certain exceptions."  *United States v. Taylor*, 60 F.4th

18  1233, 1242–43 (9th Cir. 2023) (quoting *Verdun v. City of San Diego*, 51 F.4th 1033, 1037–38

19  (9th Cir. 2022)).  The exceptions to this rule are "few" and "specifically established and well-

20  delineated."  *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (quoting *Katz v. United States*,

21  389 U.S. 347, 357 (1967)).  In evaluating the parties' cross motions for summary judgment of this

22  claim, the court begins with the presumption the search of the vehicle following the arrest of

23  Porter was unreasonable and assesses whether any exception existed.  Solano Defs.' Mot. at 25.[11]

---

[11] The defendants' assertion they are entitled to summary judgment on the claim of unlawful search because plaintiffs did not identify or allege "the specific officers" who conducted the search is without merit.  *See* Solano Defs.' Mot. at 26.  Plaintiffs' complaint sufficiently identifies McCampbell and McDowell as the specific officers conducting the search.  FAC ¶¶ 148–54; *see also* Joint Statement at 3.

1     Defendants assert the deputies' "cursory" searches were constitutionally valid under the

2  "automobile exception." *Id.* at 26.  Under the automobile exception, officers may search a

3  vehicle when they have probable cause to believe it contains contraband or evidence of illegal

4  activity. *Carroll v. United States*, 267 U.S. 132, 149 (1925); *see United States v. Brooks*,

5  610 F.3d 1186, 1193 (9th Cir. 2010) ("Under the automobile exception to the warrant requirement,

6  police may conduct a warrantless search of a vehicle if there is probable cause to believe that the

7  vehicle contains evidence of a crime.").  Probable cause is a "belief, reasonably arising out of

8  circumstances known to the seizing officer" that the vehicle contains evidence of illegal activity.

9  *Carroll*, 267 U.S. at 149.  The scope of a warrantless, probable cause-based search is the entire

10  area of the vehicle that might contain the object of the search.  *United States v. Ross*, 456 U.S. 798,

11  820–24 (1982) (scope of warrantless search "is defined by the object of the search and the places

12  in which there is probable cause to believe that it may be found").

13     Defendants also assert their "cursory" sweep ensured the children did not have access to

14  weapons, in line with their duties as "community caretakers."  Solano Defs.' Mot. at 26.  By

15  asserting their roles as community caretakers, defendants invoke the emergency exception to the

16  Fourth Amendment.  *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005) ("The

17  emergency doctrine is based on and justified by the fact that, in addition to their role as criminal

18  investigators and law enforcers, the police also function as community caretakers." (internal

19  citations omitted)).  It is well established police have the right to respond to emergency situations

20  and the Fourth Amendment does not bar warrantless entries and searches when there is a

21  reasonable belief a person is "in need of immediate aid."  *Mincey v. Arizona,* 437 U.S. 385, 392

22  (1978) ("We do not question the right of the police to respond to emergency situations.").

23     In their motion, defendants correctly assert shining "flashlight[s] to illuminate the interior

24  of a car, without probable cause" does not implicate the Fourth Amendment.  Solano Defs.' Mot.

25  at 26; *Texas v. Brown*, 460 U.S. 730, 739–40 (1983); *see also United States v. Dunn*, 480 U.S. 294,

26  305 (1987)).  But defendants' motion does not acknowledge that deputies' searches extended

27  beyond shining flashlights through closed windows, and included opening doors, compartments

28  and looking through personal belongings.  The characterization of the search as "cursory" is at odds

1   with the undisputed evidence in the record.  Camera footage shows McCampbell searched the front

2   of the vehicle, including the passenger well and glove compartment, on two separate occasions,

3   engaging in searches a reasonable jury could find went well beyond a cursory sweep of the area

4   accessible by the children.  McCampbell Body Cam. at 8:50–9:21, 15:20–15:58.  On his first search,

5   McCampbell searched the vehicle's driver's side and passenger well and on his second search

6   McCampbell searched the passenger well and glove compartment.  *Id.*; Dash Cam. at 10:10–10:42.

7   McDowell also searched the backseat of the vehicle while McCampbell simultaneously searched

8   the front of the vehicle.  Dash Cam. at 10:10–10:42.

9        In addition to mischaracterizing the scope of the McCampbell's search, defendants do not

10   assert any particularized reason to believe the vehicle contained weapons or other evidence of

11   illegal activity.  At hearing, counsel asserted deputies' search extended to the front of the vehicle

12   because the children, who had unbuckled their seatbelts, could have reached into the front of the

13   car.  Even with the small children unbuckled, no reasonable jury could agree with defendants that

14   the McCampbell's searches of the vehicle, including looking into the glove compartment and

15   shuffling through documents, was reasonably necessary as a matter of law to ensure the children's

16   and deputies' safety.  No reasonable doubt exists that McCampbell's actions violated plaintiffs'

17   constitutional rights to be free from unlawful search.  The court therefore grants plaintiffs' motion

18   for summary judgment to the extent the claim is brought against McCampbell.  Because no

19   reasonable jury could agree with McCampbell, his motion for summary judgment is denied.

20        While no reasonable jury could disagree McCampbell's search violated plaintiffs'

21   constitutional rights, the reasonability and scope of McDowell's search as a matter of law is

22   disputed.  A reasonable jury could conclude—but would not have to conclude—that McDowell

23   participated in the search either directly or as an integral participant when she stood by the

24   vehicle, armed and while McCampbell searched the front seat.  *See Boyd*, 374 F.3d at 780

25   (explaining "armed backup during an unconstitutional search [was] integral to that search, and

26   [those officers] were therefore participants rather than mere bystanders." (citing *Chuman*, 76 F.3d

27   at 294–95; *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir.1990)).  A reasonable jury

28   could also find that because McDowell only stood by the vehicle during the first search, her

1  participation did not amount to a direct constitutional violation and otherwise does not rise to the

2  level of integral participation.  Without a resolution regarding whether probable cause existed to

3  justify any search and whether McDowell participated in McCampbell's unconstitutional actions,

4  the court cannot grant summary judgment to either party on plaintiffs' claim of unlawful search

5  against McDowell.

6      The court grants summary judgment on plaintiffs' claim of unlawful search to the extent

7  the claim is brought against McCampbell.  Plaintiffs' motion for summary judgment of claim

8  three against McDowell is denied.  Solano defendants' motion for summary judgment of claim

9  three is denied.

10     **E.    False Statements & Fabrication of Evidence (Claim Four)**

11     Porter alleges in her fourth claim that she was subjected to "fabricated charges" based on

12 "false evidence" in violation of her due process rights.  FAC ¶¶ 155–57 (citing *Devereaux v.*

13 *Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc)).  She asserts this claim against

14 individual defendants McCampbell, McDowell and Stockton.  *Id.* ¶ 155.  McCampbell and

15 McDowell, she alleges, lied at the scene of her arrest and, later, in written reports they prepared.

16 *See id.* ¶ 157; Opp'n to Solano Defs.' Mot. at 18–21.  Stockton, in turn, approved McCampbell's

17 and McDowell's written reports, and Porter alleges Stockton made false statements in a "use of

18 force" report he later wrote as well.  *See* Opp'n to Stockton Mot. at 17–20.  Individual Solano

19 defendants McCampbell and McDowell, and Stockton move for summary judgment of this claim.

20     Porter asserts the officers' actions violated the Fourth, Fifth and Fourteenth Amendments.

21 *See* FAC ¶ 157.  The Fourth Amendment prohibits unreasonable searches and seizures but does

22 not prohibit the fabrication of evidence.  U.S. Const. amend. XIV.  The Fifth Amendment bars the

23 government from depriving any person of life, liberty, or property, without due process of law,

24 but it applies "only to actions of the federal government—not to those of state or local

25 governments." *Lee v. City of Los Angeles*, 250 F.3d 668, 687 (9th Cir. 2001) (citing *Schweiker v.*

26 *Wilson*, 450 U.S. 221, 227 (1981)).  Under the Fourteenth Amendment's Due Process Clause, by

27 contrast, which does apply to state and local governments, there is a "clearly established" rule that

28 evidence "deliberately fabricated by the government" cannot be the basis of a criminal charge.

1   *Caldwell v. City & Cnty of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018) (quoting

2   *Devereaux*, 263 F.3d at 1074–75).  The court, therefore, proceeds by analyzing plaintiffs' claim

3   under the Fourteenth Amendment.

4        To prove a violation of the Fourteenth Amendment at trial, a plaintiff must first show the

5   defendant deliberately fabricated evidence.  *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017)

6   (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)).  That is

7   possible both with direct evidence, such as a false police report, *see, e.g.*, *id.*, and with

8   circumstantial evidence, such as proof that officers continued investigating a suspect they knew to

9   be innocent, *see, e.g.*, *Caldwell*, 889 F.3d at 1112.  Plaintiffs must also show the fabrication

10  deprived them of a protected interest in "liberty" or "property."  *See Spencer*, 857 F.3d at 798

11  (liberty); *Costanich*, 627 F.3d at 1108 (property).  The fabrication must be both the "cause in

12  fact" of the deprivation and its "proximate" or "legal" cause.  *Spencer*, 857 F.3d at 798.  That is,

13  to prevail at trial, a plaintiff must show both that the deprivation would not have occurred if there

14  had been no fabrication, and that the specific deprivation is the type of injury "that a reasonable

15  person would see as a likely result of the conduct in question."  *Id.* (citing *Whitlock v.

16  Brueggemann*, 682 F.3d 567, 582–83 (7th Cir. 2012)).

17       The three individual defendants argue Porter cannot link any of the alleged fabrications to

18  specific deprivations of liberty or property.  *See* Solano Defs.' Mot. at 27–28; Stockton Mot.

19  at  27.  They point out, for example, that some alleged deprivations, including Porter's wrongful

20  incarceration, predate some alleged fabrications.  *See, e.g.*, Stockton Reply at 16.  The court

21  agrees with defendants that Porter has not pointed to evidence that could persuade a jury she can

22  establish the necessary link between many—but not all—of the alleged falsifications and a

23  protected liberty or property interest.

24       The court examines defendants' motion in the order the allegedly false statements and

25  fabrications were made beginning with the statements made at the scene then proceeding to the

26  written reports deputies prepared and Stockton approved.

1          **1.      Statements Made at the Scene**

2          Porter contends McCampbell and McDowell—but not Stockton—lied about what

3    happened on the scene of her arrest.  *See* Opp'n to Solano Defs.' Mot. at 18, 20.  McCampbell

4    and McDowell do not dispute that Porter might be able to prevail on her fourth claim by proving

5    they made false oral statements to other officers at the scene.  Nonetheless, the court reviews

6    Porter's assertions that  officers made three types of false statements on the scene because the

7    falsity or truth of those statements provides a foundation for the causation analysis below.

8          First, she cites McCampbell's statements to other officers that she "was noncompliant,"

9    "refused to get back in the car," and "tried to walk away."  Opp'n to Solano Defs.' Mot. at 18.  As

10   explained above, a reasonable trier of fact could find, based on Porter's testimony and video

11   recorded by the officers' dashboard and body cameras, that Porter was complying with the

12   officers' instructions to return to the car, as explained above.  A jury could also reasonably find,

13   after watching the video and listening to Porter's testimony, that McCampbell saw Porter had

14   begun to follow the officers' instructions to return to the car when the officers precipitously

15   decided to detain her.  If the jury reached these conclusions, it could then decide McCampbell

16   lied when he told others on the scene that Porter had not actually complied with his and

17   McDowell's instructions.  McDowell, in turn, would then have been an "integral participant"—

18   she said nothing to correct the lie, then helped carry out Porter's arrest and detention.  *See Peck*,

19   51 F.4th at 888–92 (summarizing integral participation standards); *Reynaga Hernandez v.*

20   *Skinner*, 969 F.3d 930, 942 (9th Cir. 2020) (same).  In evaluating Solano defendants' motion, the

21   court must assume at this stage that the jury would reach these conclusions.  *See Matsushita*,

22   475 U.S. 587–88; *Adickes*, 398 U.S. at 157.

23         Second, Porter contends McCampbell falsely told other officers Porter had hit him, fought

24   with him, "clocked" him and "punched [him] in the face."  Opp'n to Solano Defs.' Mot. at 20.

25   Porter would testify at trial that she "did not punch, hit, or strike anyone."  Porter Decl. Pls.' Mot.

26   ¶ 8, ECF No. 153-3.  At this stage, the court must assume a jury would credit that testimony.  If it

27   did, then it could also reasonably conclude McCampbell lied when he claimed otherwise, and

28   McDowell could again be an integral participant.  The jury could reasonably find she saw that

1    Porter had not hit McCampbell but said nothing when he claimed otherwise.  The court must

2    again assume at this stage that the jury would reach these conclusions considering the remaining

3    disputes of material fact.

4            Third, Porter contends both McDowell and McCampbell claimed falsely on the scene that

5    they had pulled her over in a "traffic enforcement stop."  Opp'n to Solano Defs.' Mot. at 20.

6    Porter does not cite specific portions of the record to show the officers made oral claims to this

7    effect, but video camera footage McCampbell explaining to Carter and Hamilton that McDowell

8    "initiated the traffic stop."  McCampbell Body Cam. at 18:00–18:10.  But describing the

9    encounter as a "traffic enforcement stop" by itself is not an unconstitutional lie.  Porter was in her

10   car.  McDowell was in hers.  She turned on her flashing lights to make a "stop"—to communicate

11   that Porter should not leave—so the two officers could investigate the mismatched plates.  At

12   worst, assuming Porter had put the car in "park" before McDowell activated her patrol lights, the

13   phrase "traffic enforcement stop" was inapt.  Inapt descriptions such as this cannot support a

14   constitutional claim of fabricated evidence.  In *Gausvik v. Perez*, for example, the defendant

15   officer described specific test results as "positive" when it would have been more accurate to say

16   those results were "suggestive" or "consistent."  345 F.3d 813, 817 (9th Cir. 2003).

17   McCampbell's inaccurate description could show he was careless, but not that he deliberately

18   fabricated evidence in violation of the Due Process Clause.  *See id.*  So too in this case: it might

19   have been careless to call the stop a "traffic stop" or something similar, but a reasonable jury

20   could not find it was a deliberate falsification, even when the evidence is viewed in the light most

21   favorable to Porter.

22           What remains, then, is causation: for the claims against McCampbell and McDowell,

23   could a jury find the two uncorrected, false oral statements about Porter's purported disobedience

24   and physically resisting arrest were but-for and legal causes of Porter's overnight detention?

25   Porter's booking report cites one statute as the basis for her detention: California Penal Code

26   section 69.  *See* Booking Report.  That section punishes anyone "who attempts, by means of any

27   threat or violence, to deter or prevent an executive officer from performing any duty imposed

28   upon the officer by law, or who knowingly resists, by the use of force or violence, the officer, in

1    the performance of his or her duty." Cal. Pen. Code § 69(a).  With that language in mind, a jury

2    could reasonably find that if McCampbell had not told other officers that Porter resisted,

3    disobeyed and punched or struck him—or if McDowell had corrected him—then Porter would

4    not have been held overnight on suspicion of violating section 69.  A jury could also find a

5    reasonable person in McCampbell's and McDowell's shoes would have understood that claims of

6    resistance and violence toward an officer would lead to detention in the county jail.  Genuine

7    disputes of material fact therefore remain to be resolved based on Porter's allegation that

8    McCampbell and McDowell falsely told other officers she was noncompliant, refused to follow

9    their instructions, hit or punched McCampbell, and made similar statements on the scene.

10             **2.    Written Reports**

11             Beyond alleging the officers made false statements at the scene, Porter also asserts

12    McCampbell, McDowell and Stockton lied about what happened in their written reports prepared

13    after the incident.  *See* Opp'n to Solano Defs' Mot. at 17–20.  McCampbell's and McDowell's

14    reports are dated August 7, 2020, the day after Porter's arrest.  McDowell Report, Almadani Decl.

15    Ex. 12, ECF No. 162; McCampbell Report, Almadani Decl. Ex. 10, ECF No. 162.  The parties do

16    not offer evidence to show what time those reports were completed, and the reports bear no

17    timestamp, though Stockton states without contradiction the two line officers completed their

18    reports "before going off shift" the night of the arrest.  Stockton Decl. ¶ 29.  Stockton approved

19    those reports on August 7, 2020, *see* McDowell Report; McCampbell Report, and he prepared his

20    own "use of force report" that same day as well, *see* Opp'n to Stockton Mot. at 17; Stockton Rep.

21    at 4, Almadani Decl. Ex. 92, ECF No. 162.  Again, the record does not show the exact time

22    Stockton completed his own report, but in his declaration, he states it was "several hours after

23    Ms. Porter had been booked into the County jail."  Stockton Decl. ¶ 29.  Porter cites no evidence

24    to the contrary.

25             As with the allegations reviewed above, Porter must connect any falsehoods in the three

26    written reports to specific deprivations of her constitutionally protected interests in liberty and

27    property.  Porter was never charged with any crime based on her encounter with McCampbell and

1    McDowell.  She argues she nevertheless suffered three types of harm as a result of the officers'

2    written reports.

3        First, she cites her overnight detention in the county jail.  *See* Opp'n to Solano Defs. Mot.

4    at 21–22.  On this record, she could not prove at trial that any falsehoods in the officers' written

5    reports caused that detention.  She was booked into the jail in the early morning hours of August

6    7, 2020.  *See* Booking Report at 1; Porter Decl. ¶ 2.  She has not cited evidence showing whether

7    the officers had completed their reports by that time.  Nor does she dispute Stockton's claim that

8    he completed his review after she was booked.  If the reports were prepared after Porter was

9    booked, then any false statements within those reports could not have caused her detention.  But

10   more fundamentally, even if Porter had cited evidence that could show she was booked after the

11   reports were prepared, she would also need to cite evidence to support her allegation that she

12   would not have spent a night in the jail if the written reports had said something different.  She

13   has not cited that evidence.  It is impossible to connect the reports to the booking and overnight

14   detention without engaging in speculation.  "[M]ere allegation and speculation do not create a

15   factual dispute for purposes of summary judgment."  *Nelson v. Pima Cnty. Coll.*, 83 F.3d 1075,

16   1081–82 (9th Cir. 1996) (citing *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir.1995)).  Porter

17   cannot rely on her allegation that she was detained as a result of any falsehoods in the written

18   reports.

19       Second, Porter cites the $2,500 bail bond fee she paid to secure her release on bail.  *See*

20   Opp'n to Solano Defs.' Mot. at 21.  Porter would have to overcome three obstacles before she

21   could successfully rely on this fee to support her claim at trial.  First, she would need to prove she

22   paid the fee.  She has not identified evidence she would rely on to do so.  It is unclear who paid

23   the fee.  Her declaration suggests others paid.  She uses the pronoun "we," not "I."  *Cf.* Porter

24   Decl. ¶ 2 ("[W]e had to pay $2,500 as a bail bond fee.").  Second, she has not cited evidence

25   showing when the fee was paid: before or after the written reports were prepared.  *See* Opp'n to

26   Solano Defs' Mot. at 21; Booking Report at 1; *see also* Porter Decl. Opp'n ¶ 2 (confirming

27   booking, release, bail and deferral dates).  As explained above, the timing is critical to the claims

28   at hand: if Porter paid the fee before the written reports were prepared, then the reports could not

1   have caused anyone to pay the fee. Third, setting aside timing, Porter has not cited evidence to

2   show she or another person would not have paid the fee if the officers' reports had not contained

3   any of the alleged fabrications. She does not offer evidence to show, for example, that any jail

4   staff, court staff, magistrate, or another person made decisions about her detention, bail or release

5   based on the three allegedly falsified reports. For these reasons, Porter has not identified any

6   genuine dispute of material fact related to the bail bond fee so as to defeat defendants' motion in

7   this respect.

8         Third, Porter argues her ongoing "anxiety, depression, paranoia, loss of sleep, nightmares,

9   and a host of other trauma and injury" are unconstitutional deprivations of "liberty" that could

10   support her claim about the false written reports at trial. Opp'n to Solano Defs.' Mot. at 21–22;

11   Porter Decl. Opp'n ¶ 3. The three officers do not question her implicit assumption that

12   falsehoods in the reports caused these harms. They contend instead that Porter cannot rely on

13   emotional or psychological trauma to support a constitutional claim based on falsified evidence.

14   *See, e.g.*, Solano Defs.' Reply at 15. In response, Porter cites no case in which a plaintiff has

15   successfully supported a § 1983 claim of unconstitutionally falsified evidence based on similar

16   mental or psychological distress. The cases cited in her filings all focus on long-recognized

17   deprivations of liberty and property, such as incarceration and the loss of government licenses.

18   *See Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *1 (9th Cir.

19   Oct. 11, 2023) (unpublished), *aff'g* No. 19-1273, 2022 WL 4017055 (D. Nev. Sept. 1, 2022)

20   (incarceration); *Caldwell*, 889 F.3d at 1108 (incarceration); *Spencer*, 857 F.3d at 796

21   (incarceration); *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir.

22   2015) (incarceration); *Costanich*, 627 F.3d at 1111 (loss of foster care license); *Devereaux*,

23   263 F.3d at 1074–75 (loss of foster care license and limits on employment). The court's own

24   searches have yielded no authority on point. The most closely analogous cases cut against

25   Porter's position. For example, the Supreme Court and Ninth Circuit have held that reputational

26   and emotional harms are not losses of "liberty" or "property" in disputes about whether the

27   government deprived a person of procedural protections. *See, e.g.*, *Krainski v. Nev. ex rel. Bd. of*

28   *Regents of Nev. Sys. of Higher Ed.*, 616 F.3d 963, 970–71 (9th Cir. 2010) (collecting authority).

This is not to say it is impossible for plaintiffs—including these plaintiffs—to recover damages in a § 1983 case if they have suffered emotional distress and other similar harms. Those types of damages are available, but they must be tied to a "deprivation" of a "constitutional right." *Carey v. Piphus*, 435 U.S. 247, 265 (1978); *see also Anderson v. Central Point Sch. Dist. No. 6*, 746 F.2d 505, 508 (9th Cir. 1984) (distinguishing "cause of action" from "the nature of the damages suffered" in § 1983 cases). But Porter has not shown the freedom from emotional and psychological trauma is a protected "liberty" interest that could support her claim under the Fourteenth Amendment.

For these reasons, the individual officers are entitled to summary judgment of Porter's fourth claim inasmuch as it rests on the deputies' written reports, but not to the extent it rests on deputies' statements at the scene.

The court therefore grants in part and denies in part McCampbell and McDowell's and Stockton's motions with respect to Porter's fourth claim:

- The court grants Stockton's motion for summary judgment of the fourth claim.
- The court grants McCampbell and McDowell's motion for summary judgment of the fourth claim in part to the extent it rests on allegedly deliberate fabrications within their written reports.
- Solano defendants' motion for summary judgment of claim four is otherwise denied.

## F.    Equal Protection (Caim Five)

All plaintiffs bring a § 1983 claim alleging individual defendants McCampbell, McDowell and Stockton violated the Equal Protection Clause when, acting under the color of state law, they "intentionally deprived plaintiffs of rights, privileges, and immunities secured by the Constitution and laws of the United States . . . by unreasonably pointing a gun at, handcuffing, detaining, and assaulting Plaintiffs, and additionally jailing and fabricating evidence against Plaintiff Porter and submitting her case for prosecution." FAC ¶ 164. Defendants argue that "[p]laintiffs' race played no role in any of the Defendants' actions" and move for summary judgment. Solano Defs.' Mot. at 28–29; Stockton Mot. at 29 ("Plaintiffs in this case have no evidence at all to show

1  their rights were violated because of any racial discrimination to establish an equal protection

2  violation.").  Plaintiffs oppose summary judgment, arguing there is a dispute of material fact over

3  whether these defendants denied them equal protection of the law on account of their race.

4        "The Equal Protection Clause . . . commands that no State shall 'deny to any person

5  within its jurisdiction the equal protection of the laws,' which is essentially a direction that all

6  persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473

7  U.S. 432, 439 (1985) (citation omitted).  When a state actor denies someone equal protection of

8  the law, the denial is actionable under § 1983.  To succeed on a § 1983 equal protection claim, a

9  plaintiff must show the defendant "acted in a discriminatory manner and that the discrimination

10  was intentional."  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000)

11  (citation omitted).  "Courts determine whether a government action was motivated by

12  discriminatory purpose by engaging in the sensitive inquiry into such circumstantial and direct

13  evidence of intent as may be available."  *Ballou v. McElvain*, 29 F.4th 413, 425 (9th Cir. 2022)

14  (citations and internal marks omitted).  A plaintiff must show that each defendant "through his

15  own individual actions has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663

16  (2009).

17        Considering the variations in the alleged actions of each defendant, the court will address

18  defendants' motion by evaluating plaintiffs' allegations against each individual defendant.

19              **1.      McCampbell**

20        Plaintiffs allege McCampbell arrested Porter and struck her in the face and abdomen

21  causing her to become unconscious, and then illegally detained her.  FAC ¶ 2.  Plaintiffs also

22  allege McCampbell used a racial slur when speaking to Powell and forced him to walk backwards

23  towards the police car in a humiliating fashion and then illegally detained him.  *Id.* ¶¶ 57–58.

24  Plaintiffs further allege McCampbell mistreated Porter's children by shining his flashlight into

25  their eyes for approximately forty-five minutes while he searched the vehicle.  *Id.* ¶ 61.  Plaintiffs

26  argue their alleged mistreatment by McCampbell was racially motivated.  *Id.* ¶ 164.

27  To support this claim, plaintiffs argue McCampbell used racist language toward Powell during

28  the confrontation between Porter and her family and the Solano Sheriff's department.  *Id.* ¶ 58.

43

1    McCampbell referred to Powell as "young man" even though he was over sixty years old at the

2    time. *Id*. The meaning of McCampbell's phrase is contested. Porter and Powell claim it was a

3    racist slur, akin to using the word "boy" toward a black man. *Id*. ¶ 164. McCampbell on the

4    other hand claims he used the phrase to "reestablish some kind of peaceful contact" and had no

5    knowledge of the possible racist connotations the phrase carried. Solano Defs.' Reply at 17.

6    McCampbell therefore asserts that using the phrase "young man" is not a racial slur and is not

7    enough for the plaintiffs to survive summary judgment. *Id.*

8         This Circuit has denied summary judgment for defendants on equal protection claims

9    based on disputed evidence that defendant had uttered a racial slur. *See Serrano v. Francis*,

10   345 F.3d 1071, 1083 (overturning district court's grant of summary judgment for defendant

11   because plaintiff had introduced disputed evidence defendant had used racial slur against him); *see*

12   *also Brown v. Schnoor*, No. 14-5099, 2015 WL 2062604, at *1 (W.D. Wash. Mar. 16, 2015)

13   (holding alleged use of racial slur was enough evidence to survive summary judgment on Equal

14   Protection Clause claim). Drawing all reasonable inferences in favor of the plaintiffs, the phrase

15   "young man" is sufficiently similar to the historical slur "boy" that a jury could find the phrase to

16   be a racial slur.

17        Plaintiffs have thus shown that there is a dispute of material fact over whether

18   McCampbell violated the Equal Protection Clause when he allegedly confined and assaulted

19   Porter and when he confined Powell. Plaintiffs have not shown, however, there is a dispute of

20   material fact over whether McCampbell violated the Equal Protection Clause based on his

21   treatment of Porter's children. Plaintiffs do not point to comparator or statistical evidence that the

22   children were treated differently than white children placed in a similar situation. While

23   comparator evidence is not required, *see Ballou*, 29 F.4th at 425, the burden is on the plaintiff to

24   provide some evidence to support the conclusion the children were deprived of the equal

25   protection of the laws.

26        **2.    McDowell**

27        Plaintiffs argue McDowell also denied them the equal protection of the laws by being

28   "present when McCampbell was referring to Powell in a racially insensitive manner" and by

1   doing "nothing to stop it."  Opp'n to Solano Defs' Mot. at 23–24.  Merely being present while

2   another is violating the Equal Protection Clause is not enough.  Plaintiffs must show McDowell

3   had the specific intent to deprive them of the equal protection of the laws.  *See OSU Student*

4   *Alliance v. Ray*, 699 F.3d 1053, 1070 (9th Cir. 2012) ("Invidious discrimination claims require

5   specific intent.").  They have not shown there is a dispute of material fact that McDowell

6   specifically intended to deprive them of the equal protection of the laws.  Solano defendants'

7   motion for summary judgment on plaintiffs' equal protection claim as to McDowell is granted.

8                    **3.    Stockton**

9        Plaintiffs argue Stockton deprived them of the equal protection of the laws by overseeing

10  McCampbell and McDowell's unlawful acts and approving written reports of the incident that

11  would lead to the prosecution of Porter.  FAC ¶ 165.  In their opposition to Stockton's motion for

12  summary judgment, plaintiffs modify their position to argue that Stockton, from 2016 until the

13  time of the incident in August 2020, created an atmosphere of racism and "extremist views"

14  within SCSO by posting images and objects tied to the private militia, the "Three Percenters,"

15  who plaintiffs allege espouse "white supremacist ideology."  Opp'n to Stockton Mot. at 22.

16       Even if Stockton's alleged ties to the Three Percenters created a dispute of material fact

17  regarding whether he holds extremist racist views, the plaintiffs do not present evidence tying

18  these views to any alleged deprivation of equal protection Stockton committed.  He was not

19  present when the alleged assault of Porter took place nor when both she and Powell were initially

20  detained.  Stockton Decl. ¶ 7.  While a reasonable jury could conclude Stockton unreasonably and

21  unconstitutionally prolonged Powell, L.P. and A.P.'s seizures, there is no evidence that any

22  alleged racist views motivated his actions.  Further, plaintiffs' original theory—that Stockton

23  helped cover up the incident by approving false reports written by McCampbell and McDowell—

24  is also flawed.  FAC ¶ 165.  Even if the court were to take plaintiffs' theory as true that Stockton

25  covered up the incident by allowing his subordinates to write false reports to the district

26  attorney's office, plaintiffs cannot show harm as they were not prosecuted.  FAC ¶ 3.  Because

27  plaintiffs offer no evidence connecting any alleged extremist or racist views to Stockton's actions,

45

1    the court grants Stockton's motion for summary judgment as to the plaintiffs' equal protection

2    claim.

3        The court therefore grants in part and denies in part defendants' motions with respect to

4    plaintiffs' fifth claim:

5        • The court grants Stockton's motion for summary judgment of claim five.

6        • The court grants McDowell's motion for summary judgment of claim five.

7        • The court grants McCampbell's motion in part to the extent it rests on L.P. and

8          A.P.'s claim of violations of their equal protection rights.  McCampbell's motion

9          for summary judgment of claim five is otherwise denied.

10       **G.    Affirmative Defense of Qualified Immunity**

11       Individual Solano defendants and Stockton broadly assert qualified immunity "to all of

12   Plaintiffs' federal claims."  Solano Defs.' Mot. at 32–33.[12]  In their briefing, McCampbell and

13   McDowell assert that "[p]laintiffs cannot identify a *particular* case that 'squarely governs' a case

14   in which a routine traffic stop escalates with defiance of commands, physical resistance to

15   officers, including an injury to an officer where the officers were not permitted to use force in

16   response."  *Id.* (emphasis in original).  Stockton asserts the same broad immunity from those

17   claims brought against him in his individual capacity.  Stockton Mot. at 30 ("Stockton is entitled

18   to qualified immunity from Plaintiffs' § 1983 claims.").

19       The two-pronged test courts use in assessing whether qualified immunity applies was first

20   articulated in *Saucier v. Katz*, 533 U.S. 194 (2001).  *See also Pearson v. Callahan*, 555 U.S. 223,

21   232 (2009) (citing *Saucier*, 533 U.S. at 201).  Under that test, the court may opt to first "decide

22   whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional

23   right."  *Pearson*, 555 U.S. at 232 (internal citations omitted).  Then, "if the plaintiff has satisfied

24   this first step, the court must decide whether the right at issue was 'clearly established' at the time

25   of defendant's alleged misconduct."  *Id.* (citing *Saucier*, 533 U.S. at 201).  "[U]nder either prong,

---

[12] Solano defendants and Stockton also assert immunity under California Government Code section 821.6, but only as to Porter's state law claims.  *See* Solano Defs.' Mot. at 29; Stockton Mot. at 39–40.

1    courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."

2    *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citations omitted).  "[W]hen there are disputed factual

3    issues that are necessary to a qualified immunity decision, these issues must first be determined

4    by the jury before the court can rule on qualified immunity."  *S.R. Nehad v. Browder*, 929 F.3d

5    1125, 1140 (9th Cir. 2019) (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)).  Since

6    *Pearson*, courts are "permitted to exercise their sound discretion in deciding which of the two

7    prongs of the qualified immunity analysis should be addressed first in light of the circumstances

8    in the particular case at hand."  555 U.S. at 236.  Here, this court exercises its discretion in

9    addressing the first prong of qualified immunity first and addresses the broad assertions of

10   qualified immunity for each of plaintiffs' five § 1983 claims.

11          **1.      Unlawful Seizure (Claim One) & Excessive Force (Claim Two)**

12          Defendants argue McCampbell, McDowell and Stockton are shielded by qualified

13   immunity to plaintiffs' claims for unlawful seizure and excessive force because deputies' actions

14   were "objectively reasonable under the circumstances" and therefore, no constitutional violation

15   occurred.  Solano Defs.' Mot. at 22, 24, 36, 38–41; Stockton Mot. at 21, 22, 26.  Individual

16   defendants also assert that no clearly established caselaw governs the circumstances if an alleged

17   constitutional violation did occur.  Solano Defs.' Mot. at 21–33; Stockton Mot. at 30.

18          The factual disputes regarding whether officers had reasonable suspicion to arrest Porter,

19   detain Powell and seize L.P. and A.P.—and therefore, whether plaintiffs' constitutional rights

20   were violated—prevent the court from resolving the first qualified immunity prong in defendants'

21   favor at this stage.  These factual disputes must be resolved to clarify the factual scenario for

22   purposes of identifying the applicable clearly established law to support the required analysis on

23   the second prong.  *S.R. Nehad*, 929 F.3d at 1140.  Moreover, in claiming that no case squarely

24   governs, defendants invoke the various unresolved factual disputes reviewed above.  Without

25   resolution of these factual disputes, the court cannot reach at this time the defendants' qualified

26   immunity defense, which may be renewed at trial.  *Id.*

1          2.      **Search**

2          As explained above, McCampbell and McDowell broadly assert qualified immunity "to

3    all of [p]laintiffs' federal claims."  Solano Defs.' Mot. at 32–33.  In their brief discussion of

4    unlawful search and qualified immunity, defendants explain "[t]he Supreme Court has found that

5    unlawful search and seizure is an area of law 'in which the results depend very much on the facts

6    of each case,' and thus officers are entitled to qualified immunity unless existing precedent

7    'squarely governs' the specific facts at issue."  *Id.* (citing *Kisela v. Hughes,* 584 U.S. 100, 104–

8    105 (2018)).  McCampbell and McDowell further assert that "[p]laintiffs cannot identify case

9    authority that a cursory search of a vehicle that was subject to a lawful traffic stop, with young

10   children in the backseat without their parent or guardian, constituted an unlawful search."  Solano

11   Defs.' Mot. at 33.  Defendants say nothing more in support of their assertion of qualified

12   immunity as to plaintiffs' claim of unlawful search.

13         Since at least 1982, the law has been clearly established, that officers' search based on the

14   automobile exception to the warrant requirement must be "defined by the object of the search and

15   the places in which there is probable cause to believe that it may be found."  *Ross*, 456 U.S. at

16   820–24.  Deputies clearly defined the area comprising the object of their search when

17   McCampbell ordered deputies to confirm the children were alright, explaining they were seated in

18   the backseat of the vehicle.  As explained above, the undisputed facts in the record show

19   McCampbell performed an unconstitutional search in violation of the Fourth Amendment.  The

20   clearly established caselaw does not support his assertion of qualified immunity and plaintiffs'

21   motion for summary judgment of that claim is granted to the extent the claim is brought against

22   McCampbell.  Plaintiffs' claim against McDowell, however, invokes disputed factual assertions.

23   It is for a jury to determine if McDowell performed, or integrally participated in an

24   unconstitutional search.  Clarity as to these factual circumstances is required to identify the

25   applicable clearly established law to support the required analysis on the second prong.

26         McCampbell is not entitled to qualified immunity for his unconstitutional search of

27   Porter's vehicle.  McDowell may renew her assertion of qualified immunity at trial.

### 3.  False Statements

As explained above, Porter's fourth claim against Stockton cannot, as a matter of law, survive Stockton's motion for summary judgment.  The court therefore need not proceed to an analysis of Stockton's assertion of qualified immunity.

In McDowell and McCampbell's broad assertion of qualified immunity, deputies do not identify the fourth claim specifically in their briefing.  Nor do they mention Porter's allegations of falsified evidence in their discussion of qualified immunity.  *See* Solano Defs.' Mot at 32–33; Solano Defs.' Reply at 21.  It is the burden of a party who moves for summary judgment to explain as a threshold matter why it is "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "If a moving party fails to carry [that] initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  McCampbell and McDowell have not carried their initial burden with respect to qualified immunity here.

Even if they had carried that burden, however, it has long been "clearly established" that officers may not lie about what a suspect did in an attempt to secure a charge and conviction.  *Caldwell*, 889 F.3d at 1112 (quoting *Devereaux*, 263 F.3d at 1074–75).  "[N]o sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence."  *Spencer*, 857 F.3d at 800 (collecting authority to support this holding; quoting *Halsey v. Pfeiffer*, 750 F.3d 273, 292–93 (3d Cir. 2014)).  Individual Solano defendants' assertion of qualified immunity as to Porter's fourth claim is denied.

### 4.  Equal Protection

As explained above, plaintiffs' fifth claim against McDowell and Stockton cannot, as a matter of law, survive defendants' motions for summary judgment.  The court therefore does not proceed to an analysis of McDowell's and Stockton's assertions of qualified immunity.

McCampbell argues he is entitled to qualified immunity because his "actions were objectively reasonable."  Solano Defs.' Mot. at 28.  For the same reasons explained in this section, the factual disputes regarding McCampbell's actions on the scene prevents the court from

1    resolving the first qualified immunity prong in his favor at this stage.  Without a resolution as to

2    these factual disputes, the court cannot find McCampbell is immune from liability under a theory

3    of qualified immunity. *See, e.g.*, *S.R. Nehad*, 929 F.3d at 1140.  McCampbell may renew his

4    assertion of qualified immunity at trial.

5            **H.**      ***Monell* Liability (Claim Six)**

6            Section 1983 provides that "[e]very person who, under color of [law] . . . subjects, or

7    causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or

8    immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."

9    42 U.S.C. § 1983.  This section has been applied to cover municipalities and other local

10   governments as "persons" who are subject to liability.  *Monell*, 436 U.S. at 690.  But

11   municipalities "are responsible only for their own illegal acts."  *Connick v. Thompson*, 563 U.S.

12   51, 60 (2011) (citations omitted).  Municipalities "cannot be held liable [for the actions of their

13   employees] under § 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.  Instead, the

14   constitutional injury must occur during the execution of an official "policy or custom."  *Id.* at 694.

15          Ultimately, to establish municipal liability under *Monell*, a plaintiff must prove: "(1) that

16   [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the

17   municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

18   constitutional right; and, (4) that the policy is the moving force behind the constitutional

19   violation."  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v.*

20   *Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).  "Official municipal policy

21   includes the decisions of a government's lawmakers, the acts of its policymaking officials, and

22   practices so persistent and widespread as to practically have the force of law."  *Connick*, 536 U.S.

23   at 61 (citations omitted).  The Ninth Circuit recognizes four theories that establish municipal

24   liability under *Monell*: "(1) an official policy; (2) a pervasive practice or custom; (3) a failure to

25   train, supervise, or discipline; or (4) a decision or act by a final policymaker."  *Horton by Horton*

26   *v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).  Cases often refer to the fourth

27   theory as "ratification" by a final policymaker.

1    Where there are factual disputes surrounding the alleged constitutional violation, as here,

2    a district court may still evaluate the basis for *Monell* liability in determining whether these

3    claims should proceed to trial.  *See, e.g., McFarland v. City of Clovis*, No. 15-1530, 2017

4    WL 1348934 (E.D. Cal. Apr. 10, 2017).  Drawing reasonable inferences in favor of the plaintiffs,

5    as the court must do when evaluating defendants' motion for summary judgment, the court

6    evaluates *Monell* liability as it applies to the alleged Fourth Amendment violations, violations of

7    the Equal Protection Clause and falsification of documents.

8                    **1.        Fourth Amendment Claims**

9        To support their claim of *Monell* liability for the alleged Fourth Amendment violations in

10   the form of unlawful search and seizure and excessive force, plaintiffs allege the County delayed

11   any investigation into the allegations and then conducted a faulty investigation, failed to convene

12   the required Use-of-Force Board and issued public press statements defending deputies' actions,

13   and thereby ratified the constitutional violations.  *See* FAC ¶¶ 179–182.  Plaintiffs point to

14   evidence that when viewed in the light most favorable to their claims would show:

15        • County Undersheriff DeWall investigated the incident soon after it occurred,

16            including by reviewing the body and dashboard camera videos, and he decided

17            there was no violation of County policy.  *See* DeWall 30(b)(6) Dep. at 28–29;

18            DeWall Dep. at 34–35, 38–39.

19        • A compliance officer within SCSO also conducted a review, including a review of

20            the body camera videos, and he found no violation of County policy.  *See* DeWall

21            30(b)(6) Dep. at 32–34.

22        • A few days after Porter filed her original complaint in this case, the Sheriff's

23            Office created a Facebook post and issued a press release about her allegations and

24            arrest.  *See* Almadani Decl. Exs. 189–190.  The post and press release claimed

25            Porter had "refused" to get back in the car, "resisted the deputies, slipped her right

26            hand out of her handcuffs, and struck a deputy in the face."  *Id.*  Sheriff Ferrara

27            watched the body camera videos of the arrest and approved the press release

1    before it was issued, as is normally required by the Sheriff's Office's policy.

2    Ferrara Dep. at 64–65; Elbert 30(b)(6) Dep. at 86–87.

3    •   After Porter filed her original complaint, a sergeant and captain within SCSO

4        conducted a further review of the arrest, including of the video.  *See* DeWall

5        30(b)(6) Dep. at 20–25, 34, 45.

6    •   SCSO ultimately decided no internal investigation was necessary because its

7        deputies had followed its policy.  *See* Elbert 30(b)(6) Dep. at 66–67, 72–76.

8    •   Allegations of excessive force were not promptly or adequately investigated by the

9        County.  Opp'n to Solano Defs.' at 24–25; Almadani Decl. Ex. 300 at 175–97,

10       ECF No. 162.[13]

11   •   McCampbell was not disciplined for his actions on the night of Porter's arrest, and

12       he was later promoted to sergeant.  Elbert 30(b)(6) Dep. at 72–73.

13       Plaintiffs' evidence is sufficient to create a genuine issue of material fact precluding

14   summary judgment in Solano defendants' favor on the *Monell* claim as it relates to the alleged

15   violations of their Fourth Amendment rights.  A reasonable jury could find SCSO has a custom of

16   tolerating excessive force and unreasonable search and seizure, failing to investigate and failing

17   to discipline.  "A policy is [a] 'deliberate choice to follow a course of action . . . made from

18   among various alternatives by the official or officials responsible for establishing final policy

19   with respect to the subject matter in question.'"  *Id.* (quoting *Long v. County of Los Angeles*,

20   442 F.3d 1178, 1185 (9th Cir. 2006)).  As is alleged here, a "policy of inaction" may give rise to

---

[13] Plaintiffs submit a table with past incidents of alleged excessive force, which includes statistical evidence they assert shows SCSO has a custom of failing to investigate and discipline officers involved in allegations of excessive force.  Repeated constitutional violations must be substantially similar in character to establish a *Monell* claim.  *See McCoy v. City of Vallejo*, No. 19-001191, 2020 WL 374356, at *4 (E.D. Cal. Jan. 23, 2020).  The court does not consider those listed incidents involving allegations of excessive force against corrections staff to show a practice or longstanding custom of using excessive force.  *See, e.g.*, *Raudelunas v. City of Vallejo*, No. 21-00394, 2022 WL 329200 (E.D. Cal. Feb. 3, 2022).  The court does, however, give weight to the information in this table as it relates to plaintiffs' assertion that the County has a practice of delaying or failing to investigate allegations of excessive force because those allegations are substantially similar.  *See id.*

1  liability if the inaction "amounts to a failure to protect constitutional rights." *Oviatt v. Pearce*,

2  954 F.2d 1470, 1474 (9th Cir. 1992).

3      Plaintiffs' evidence also creates a dispute of material fact regarding ratification by policy-

4  making officials.  Ratification requires proof that an official with "final policy-making authority"

5  ratified a subordinate's unconstitutional decision or action and the basis for it.  *Gillette v.*

6  *Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (per curiam).  A single constitutional violation

7  ordinarily is insufficient to establish a longstanding practice or custom, *Christie v. Iopa*, 176 F.3d

8  1231, 1235 (9th Cir. 1999), but there are situations in which isolated constitutional violations are

9  sufficient to establish a municipal "policy."  *See id.*  One such situation is when the final

10  policymaker "ratifie[s]" a subordinate's actions and the basis for it.  *Id.* at 1238–39 (quoting *City*

11  *of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  Thus, ratification requires knowledge of

12  the alleged constitutional deprivation. *Id.* at 1239.  Plaintiffs present evidence Sheriff Ferrara and

13  Undersheriff DeWall reviewed video footage of the incident and subsequently issued a press

14  release declaring there had been no wrongdoing.  A reasonable jury could find such statements

15  constituted ratifications of subordinates' actions and reflected a municipal policy sufficient to

16  support *Monell* liability.

17      Solano defendants' motion for summary judgment is denied as it relates to *Monell* liability

18  for plaintiffs' Fourth Amendment claims.

19          **2.      Falsifying Documents**

20      Beyond her allegations against the individual officers, Porter asserts her fourth claim

21  against the County as well.  *See* FAC ¶ 160.  She alleges the County either maintained deliberate

22  ignorance of the individual officers' fabrications, ratified their lies, or attempted to cover them up.

23  *See id.* ¶¶ 176, 180.  Plaintiffs cite the same evidence outlined above to support their claim.

24      If the jury ultimately finds McCampbell lied based on its review the video and weighing

25  of the conflicting testimony from plaintiffs and deputies, the evidence summarized in the list

26  above would permit a jury to find also that the Sheriff and SCSO condoned that lie.  As

27  summarized above, a county can be liable under § 1983 if an official with final authority

28  "delegated that authority to, or ratified the decision of, a subordinate" by approving the

1     subordinate's decision and the basis for it. *Ulrich v. City & County of San Francisco*, 308 F.3d

2     968, 984–85 (9th Cir. 2002). "Municipal decisionmakers may not insulate themselves from

3     liability by attempting to delegate themselves out of all responsibility." *Hammond v. County of*

4     *Madera*, 859 F.2d 797, 802 (9th Cir. 1988), *abrogated on other grounds by L.W. v. Grubbs*, 92

5     F.3d 894, 897–98 (9th Cir. 1996), *as stated in Pasadena Repub. Club v. W. Justice Ctr.*, 985 F.3d

6     1161, 1172 (9th Cir. 2021). The evidence must demonstrate the authorized policymaker made a

7     "conscious, affirmative choice." *Gillette*, 979 F.2d at 1346–47. Evidence showing a police chief

8     or sheriff personally approved a decision or statement can satisfy that requirement. *See, e.g.*,

9     *Watkins*, 145 F.3d at 1093; *Larez v. City of Los Angeles*, 946 F.2d 630, 646–47 (9th Cir. 1991).

10    Evidence that an official "took no steps to reprimand or discharge" a subordinate and "failed to

11    admit the [officer's] conduct was in error" can also show the conduct reflected an official policy

12    or custom. *McRorie v. Shimoda*, 795 F.2d 780, 784 (9th Cir. 1986). So can an official's failure

13    "to take any remedial steps after the violations." *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir.

14    2001) (quoting *Larez*, 946 F.2d at 647).

15        Solano defendants' motion for summary judgment of the sixth claim is denied to the

16    extent that claim rests on false statements at the scene of the arrest.

17               **3.      Equal Protection**

18        Plaintiffs also assert their equal protection claim against the County as well. *See* FAC

19    ¶¶ 169, 174–75. Plaintiffs allege the County ratified the officers' violation of the Equal

20    Protection Clause and engaged in a pattern and practice of use-of-force violations against

21    "minorities who are people of color" in general and Black people in particular. *See* Opp'n to

22    Solano Defs.' Mot. at 24. These violations arose from a culture allegedly permeated with racism.

23    *See id.* at 16–19. Plaintiffs rely on the same evidence outlined above and cite additional evidence

24    that when viewed in the light most favorable to plaintiffs' claims would show:

25           •   72% of complaints of excessive force in Solano County from 2016–2023 are made

26               by people of color. Opp'n to Solano Defs. Mot. at 24; Almadani Decl. Ex. 300 at

27               175–97.

- 49% of complaints of excessive force in Solano County from 2016–2023 come from Black people who only comprise 10% of the population in Solano County. Opp'n to Solano Defs.' Mot. at 24.
- Various members of SCSO posted racist content online including Sheriff Ferrara, Sergeant Stockton, Sergeant Cully Pratt and Sergeant Dale Matsuoka. *Id.* at 25–27.
- After an outcry relating to SCSO's racist media posts, Sheriff Ferrara shut down an internal investigation into the online posts although he testified, he ordered an internal affairs investigation. *Id.* at 26.

As noted above, if a jury finds that McCampbell violated the Equal Protection Clause, the evidence summarized in the list above would permit a jury to also find the Sheriff and SCSO condoned that lie. Plaintiffs also have alleged sufficient facts to show that SCSO engaged in a pattern and practice of using excessive force disproportionately against people of color in general and Black people in particular. Generally, the filing of complaints or lawsuits "does not support the existence of a policy, custom, or practice of allowing excessive force by police officers." *Gillam v. City of Vallejo*, 2016 No. 14-2217, WL 4059184, at *7 (E.D. Cal. May 26, 2016) (citations omitted). However, the statistical disparity when comparing the number of excessive force complaints filed by people of color versus the number of excessive force complaints filed by people who are white, combined with the allegations of pervasive racism in SCSO over a sustained period of time, could support a reasonable jury's finding SCSO had a pattern and practice of depriving Black people specifically and people of color generally the equal protection of the laws. *See id.* (noting policies and practices must be of long duration).

For those surviving elements of claims one, two, three, four, and five described in the foregoing sections a reasonable jury could find the entity defendants liable under a theory of *Monell* liability. Solano defendants' motion for summary judgment of claim six is denied.

**I.    Bane Act Violations (Claim Seven)**

The Bane Act, section 52.1 of the California Civil Code, authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been

1  interfered with by threats, intimidation or coercion.  Cal. Civ. Code § 52.1(b).  "Claims under

2  section 52.1 may be brought against public officials who are alleged to interfere with protected

3  rights, and qualified immunity is not available for those claims."  *Reese v. County of Sacramento*,

4  888 F.3d 1030, 1040–41 (9th Cir. 2018).  Because the court has granted summary judgment to

5  Carter and Hamilton on Powell's § 1983 constitutional claims, those defendants are not liable for

6  any corollary violations of the Bane Act.  Individual defendants McCampbell and McDowell,

7  however, may still be liable for any violations of Porter's constitutional rights and McCampbell,

8  McDowell and Stockton may still be liable under for the alleged violations of Powell's

9  constitutional rights.  *See* Joint Statement at 4.

10  The Ninth Circuit has held plaintiffs alleging a Bane Act violation must show defendants

11  had the "specific intent to violate protected rights" but need not show "'transactionally

12  independent' threats, intimidation, or coercion separate from the Fourth Amendment violation."

13  *Sandoval v. Cnty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (quoting *Reese*, 888 F.3d at

14  1043–1044).   As discussed above, there is a genuine dispute regarding whether defendants

15  violated Porter's and Powell's rights against unlawful seizure and excessive force, equal

16  protection rights or falsified documents.  While McCampbell, as a matter of law, violated Porter

17  and Powell's constitutional rights against unlawful search, it is not clear from the record whether

18  he had the specific intent to violate those rights.

19  Taking the facts in the light most favorable to plaintiffs, a reasonable jury could find

20  defendants' seizure, search, use of excessive force, equal protection violations and/or falsification

21  of documents was so "unnecessary that it amounted to a reckless disregard of [or specific intent to

22  violate] [plaintiff's] rights" under the Bane Act.  *Roberson v. City of Hawthorne*, 516 F. Supp. 3d

23  1033, 1047 (C.D. Cal. 2021), *aff'd in part, rev'd in part, dismissed in part*, No. 21-55134, 2023

24  WL 2596834 (9th Cir. Mar. 22, 2023); *Acevedo v. City of Farmersville*, No. 18-01747, 2019 WL

25  3003996, at *14 (E.D. Cal. July 10, 2019) (collecting cases discussing what needed to show

26  specific intent to violate individual's Fourth Amendment rights).  When taking the facts in the

27  light most favorable to defendants, a reasonable jury could reach the opposite conclusion.

1    The court therefore grants in part and denies in part Solano defendants' motion and denies

2   Stockton's motion with respect to plaintiffs' seventh claim:

3    • Stockton's motion for summary judgment of claim seven is denied.

4    • The court grants Carter and Hamilton's motion for summary judgment of the

5      seventh claim.

6    • Solano defendants' motion for summary judgment of claim seven is otherwise

7      denied.

8   Plaintiffs' motion for summary judgment of claim seven is denied.

9    **J.    Ralph Civil Rights Act Violation (Claim Eight)**

10   Porter and Powell also allege Ralph Act violations.  Porter brings her claim against

11  McCampbell, McDowell and the County, based on a theory of vicarious liability, for

12  "intentionally commit[ing] violence and intimidation by threat of violence against Plaintiffs on

13  account of their race, color, and ancestry by unlawfully pointing a gun at, handcuffing, detaining,

14  searching, and assaulting Plaintiffs, and additionally jailing and fabricating evidence against

15  Porter."  FAC ¶ 195.  Powell asserts his claim against all plaintiffs.  Joint Statement at 4.  Solano

16  defendants move for summary judgment arguing that Porter and Powell's claims that defendants

17  held racial animus towards them are conclusory.  Solano Defs.' Mot. at 35.  Solano defendants

18  further assert that Carter and Hamilton cannot be held vicariously liable for any alleged Ralph Act

19  violations.  Stockton also moves for summary judgment, arguing Powell has "no evidence at all to

20  show Stockton used any violence or threatened violence against them because of their race."

21  Stockton Mot. at 35.

22   The Ralph Act provides "[a]ll persons within [California] have the right to be free from

23  any violence, or intimidation by threat of violence, committed against their persons or property

24  because of [race]."  Cal. Civ. Code §§ 51.7(a) & 51(b).  To establish a Ralph Act claim, "a

25  plaintiff must show (1) the defendant threatened or committed violent acts against the plaintiff;

26  (2) the defendant was motivated by his perception of plaintiff's race; (3) the plaintiff was harmed;

27  and (4) the defendant's conduct was a substantial factor in causing the plaintiff's harm."  *Warren*

28  *v. Marcus*, 78 F. Supp. 3d 1228, 1248 (N.D. Cal. 2015).

Plaintiffs' Ralph Act claims survive against McCampbell. As noted above, there is a dispute of material fact over whether McCampbell used a racial slur when speaking with Powell during the event in question. Thus, a jury could find McCampbell has the racial animus required for a Ralph Act violation. A jury also could find he threatened Porter and Powell with violence and committed violence against Porter. Both plaintiffs have presented sufficient evidence of harm: Porter experienced physical injuries while both Porter and Powell were deprived of their liberty. Both plaintiffs also present evidence of emotional distress injuries because of their experience with McCampbell. Both present evidence that those injuries arose from McCampbell's pointing of a gun at them, detaining them, and physically assaulting Porter.

As noted above, Porter and Powell have not presented sufficient evidence to survive summary judgment on their claims that McDowell possessed racial animus towards them. Similarly, for the reasons explained above, Powell does not produce evidence Carter or Hamilton participated in the alleged violations so as to hold them vicariously liable. Further, as explained above, Powell has not pointed to sufficient evidence to show Stockton's actions were motivated by his perception of plaintiffs' race. Stockton Mot. at 35. Because plaintiffs have not established a question of material fact regarding racial animus on the part of McDowell or Stockton, the court grants these defendants' motions for summary judgment of this claim.

The court therefore grants in part and denies in part Solano defendants' motion for summary judgment and grants Stockton's motion:

- The court grants Stockton's motion for summary judgment on plaintiffs' eighth claim.
- The court grants Carter and Hamilton's motion for summary judgment on the eighth claim.
- The court grants McDowell's motion for summary judgment on the eighth claim.
- Solano defendants' motion for summary judgment of claim eight is otherwise denied.

**K.    County Liability under Section 815.6 (Claim Nine)**

Plaintiffs Porter and Powell also contend the entity defendants are liable based on a theory of respondeat superior. Under Government Code section 815.6:

> [If] a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Cal. Gov. Code § 815.6. Porter and Powell pursue this claim against the County for violations of California Penal Code sections 853.5(a)[14] and 149[15]. California Penal Code section 853.5 curtails "the authority [of officers] to execute custodial arrests for offenses so minor that they are designated as infractions," *United States v. Mota*, 982 F.2d 1384, 1388 (9th Cir. 1993), by allowing an officer to take an arrestee into custody only if the arrestee first fails to produce satisfactory evidence of his or her identity. California Penal Code section 149 makes it a crime for public officers to assault or beat any person without lawful necessity. The Penal Code defines an assault in particular as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another"; it defines a battery as "any willful and unlawful use of force or violence upon the person of another." Cal. Pen. Code § 149.

In claim nine, plaintiffs assert the entity defendants, Solano County and Ferrara in his official capacity, are liable for deputies' violations of sections 853.5(a) and 149.[16] FAC ¶¶ 203–205. Government Code section 815.6 provides a private right of action against a public entity for

---

[14] Section 853.5(a) states in relevant part, "[i]n all cases, except as specified in Sections 40302, 40303, 40305, and 40305.5 of the Vehicle Code, in which a person is arrested for an infraction, a peace officer shall only require the arrestee to present his or her driver's license or other satisfactory evidence of his or her identity for examination and to sign a written promise to appear contained in a notice to appear . . . Only if the arrestee refuses to sign a written promise, has no satisfactory identification, or refuses to provide a thumbprint or fingerprint may the arrestee be taken into custody." Cal. Pen. Code § 853.5(a).

[15] Section 149 states, "[e]very public officer who, under color of authority, without lawful necessity, assaults or beats any person, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment in a county jail not exceeding one year, or pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment." Cal. Pen. Code § 149.

[16] Plaintiffs' opposition to Solano defendants' motion indicates they have abandoned a claim under section 815.6 based on a violation of Penal Code section 118.1. Opp'n to Solano Defs.' Mot. at 36 n.10.

1    breach of a mandatory duty, prescribing three discrete requirements that must be met before

2    governmental entity liability may be imposed: "(1) an enactment must impose a mandatory duty;

3    (2) the enactment must be meant to protect against the kind of risk of injury suffered by the party

4    asserting section 815.6 as a basis for liability; and (3) breach of the mandatory duty must be a

5    proximate cause of the injury suffered." *San Mateo Union High Sch. Dist. v. County of San*

6    *Mateo*, 213 Cal. App. 4th 418, 428 (2013). An entity defendant is not liable if it "establishes that

7    it exercised reasonable diligence to discharge the duty." *Id.*

8         The Solano defendants contend summary judgment must be granted to the extent claim

9    nine rests on a violation of section 852.5(a) because Porter's arrest was not based on a violation

10   of Vehicle Code section 5200(a), the statute requiring matching license plates, but instead based

11   on her resistance to arrest and obstruction in violation of California law. Defendants further

12   assert Powell was not arrested. Plaintiffs' assertion of violations related to section 149 must also

13   be dismissed, defendants assert, because "the use of force was objectively reasonable." Solano

14   Defs.' Mot. at 36. As explained above, Solano defendants cite to evidence that is, at best,

15   disputed. A reasonable jury could disagree regarding the predicate violation prompting Porter's

16   arrest and eventual beating, and whether Powell was arrested. Moreover, a reasonable jury could

17   find SCSO policy makers evaluated the video evidence and endorsed the unlawful conduct after

18   the fact and can therefore be held liable under section 815.6.

19        The Solano defendants' motion for summary judgment of the ninth claim is denied.

20        **L.    False Imprisonment (Cal. Gov't Code § 815.2) (Claim Ten)**

21        Plaintiffs Porter and Powell also assert claims for false imprisonment. Porter brings her

22   claim against McCampbell, McDowell and the County. FAC ¶¶ 210–215. Powell brings his

23   claim against all defendants. *Id.* The parties cross move for summary judgment of this claim.

24        "Under California law, the elements of a claim for false imprisonment are: '(1) the

25   nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an

26   appreciable period of time, however brief.'" *Young*, 655 F.3d at 1169 (quoting *Easton v. Sutter*

27   *Coast Hosp.*, 80 Cal. App. 4th 485, 496 (2000)). False arrest and false imprisonment are the same

28   tort. *Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 753 n.3 (1997). A police officer is not

immune from liability for false imprisonment, *id.* at 752, unless the officer, "acting within the scope of his or her authority . . . at the time of the arrest, had reasonable cause to believe the arrest was lawful," *see* Cal. Pen. Code § 847(b).

"Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004); *Mendez,* 581 U.S. at 429. "Reasonable cause" or "probable cause" is a "well-established" legal standard under California law. *People v. Adair*, 29 Cal. 4th 895, 904 (2003). "Reasonable or probable cause means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused." *People v. Mower*, 28 Cal. 4th 457, 473 (2002) (citations and marks omitted). "Reasonable and probable cause may exist although there may be some room for doubt." *Id.* (citations and marks omitted). It is an objective standard; the defendant need not show the officers had enough information to conclude the plaintiff actually committed a crime. *Adair*, 29 Cal. 4th at 904–05; *Levin v. United Airlines*, 158 Cal. App. 4th 1002, 1018 (2008). A person may be factually innocent, yet an officer could still have probable or reasonable cause to arrest him. *Buckheit v. Dennis*, No. 09-5000, 2012 WL 1166077, at *28–29 (N.D. Cal. Apr. 6, 2012) (citing *Adair*, 29 Cal. 4th at 905), *aff'd in relevant part*, 573 F. App'x 662 (9th Cir. 2014).

This is essentially the same standard as the federal constitutional standard. *Davis v. County. of San Bernardino*, No. 08–1262, 2009 WL 3838287, at *5 (C.D. Cal. Nov. 13, 2009) (citing, inter alia, *Mower*, 28 Cal. 4th at 473, and *Adair*, 29 Cal. 4th at 904–05), *aff'd*, 442 F. App'x 300 (9th Cir. 2011). The County is liable under a respondeat superior theory to the same extent as the individual officers. *See Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 209 (1991) ("Tortious conduct that violates an employee's official duties . . . may nonetheless be within the scope of employment.").

### 1.    Porter's Claim

As explained above, there is a genuine dispute of material fact regarding deputies' legal authority—and reasonable belief in the need—to detain Porter. If McCampbell and McDowell

1  did not have "reasonable, articulable suspicion that justified their detention of [p]laintiff," a

2  reasonable juror could find plaintiffs were falsely imprisoned. *Ciampi v. City of Palo Alto*,

3  790 F. Supp. 2d 1077, 1110 (N.D. Cal. 2011); *Lomeli v. County of San Diego*, No. 22-0684,

4  2022 WL 15524620, at *15–16 (S.D. Cal. Oct. 27, 2022). Thus, the court denies defendants' and

5  plaintiffs' motions on this claim.

6  **2.    Powell's Claim**

7      Powell brings his claim of false imprisonment against McCampbell and McDowell in

8  their individual capacities, against the County under a theory of respondeat superior and against

9  Carter, Hamilton and Stockton under a theory of aiding and abetting. FAC ¶ 210. Genuine

10  disputes of material fact also exist related to the legal authority of McCampbell and McDowell to

11  detain Powell.

12      No such dispute exists, however, surrounding the liability of Carter, Hamilton or

13  Stockton. Under California law, "[l]iability may . . . be imposed on one who aids and abets the

14  commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach

15  of duty and gives substantial assistance or encouragement to the other to so act or (b) gives

16  substantial assistance to the other in accomplishing a tortious result and the person's own

17  conduct, separately considered, constitutes a breach of duty to the third person." *See Fiol v.*

18  *Doellstedt*, 50 Cal. App. 4th 1318, 1325–26 (1996) (citing *Saunders v. Superior Court*,

19  27 Cal. App. 4th 832, 846, (1994); Rest. 2d Torts, § 876). For the reasons explained above, it is

20  undisputed that Carter and Hamilton did not offer any substantial assistance in carrying out their

21  alleged violations of Powell's rights or resulting tortious conduct. Carter and Hamilton,

22  therefore, did not aid and abet any intentional tort committed by other defendants against Powell.

23  Remaining disputes of fact remain, however, as to Stockton's role in Powell's detention.

24      The remaining individual defendants, McCampbell, McDowell and Stockton acknowledge

25  they are not shielded from liability under California Government Code section 821.6. Solano

26  Defs.' Mot. at 39; Stockton Mot. at 35–36. The court therefore grants in part and denies in part

27  Solano defendants' motion and denies Stockton's motion with respect to plaintiffs' tenth claim:

28      • The court denies Stockton's motion for summary judgment of the tenth claim.

- The court grants Carter and Hamilton's motion for summary judgment of the tenth claim.

- Solano defendants' motion for summary judgment of claim ten is otherwise denied.

Plaintiffs' motion for summary judgment of claim ten is denied.

**M.    Assault and Battery (Claim Eleven)**

Plaintiffs Porter and Powell also bring a claim for assault and battery against McCampbell, McDowell and the County.  Plaintiffs and Solano defendants cross move for summary judgment of this claim.

For plaintiff to succeed on an assault and battery claim against an officer, the officer must have used unreasonable force, and "the same standards apply to both state law assault and battery and Section 1983 claims" of excessive force.  *See Nelson v. City of Davis*, 709 F. Supp. 2d 978, 992 (E.D. Cal. 2010).  McCampbell and McDowell acknowledge here as well they are not shielded from liability under California Government Code section 821.6.  Solano Defs.' Mot. at 39.  The County would be liable under a respondeat superior theory to the same extent as the individual officers.  *See Mary M.*, 54 Cal. 3d at 209.

Here, as explained above, given the factual disputes regarding the use of excessive force, the court denies Solano defendants' and plaintiffs' motions on plaintiffs' eleventh claim of assault and battery.

**N.    Intentional Infliction of Emotional Distress (Claim Twelve)**

Plaintiffs Porter and Powell also assert a claim of intentional infliction of emotional distress.  Porter asserts her claim against McCampbell, McDowell and the County.  Powell asserts his claim against all defendants.  Joint Statement at 5.  In California, invasion of peace of mind is an independent tort giving rise to liability.  *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*, 129 Cal. App. 4th 1228, 1259 (2005).  To ultimately prove their claim, plaintiffs "must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the

1  emotional distress by the defendant's outrageous conduct." *Id.* Where a "plaintiff fails to

2  establish a Fourth Amendment violation, the officer's behavior is generally not outrageous."

3  *Burke v. County of Alameda*, 352 F. App'x 216, 219 (9th Cir. 2009). The County is liable under a

4  respondeat superior theory to the same extent as the individual officers. *See Mary M.*, 54 Cal. 3d

5  at 209. Individual defendants argue they are immune from plaintiffs' claims because they

6  exercised due care in effecting Porter's arrest and in Powell's detention. Solano Defs.' Mot. at

7  38; Cal. Gov't Code § 820.4. As explained above, genuine disputes of fact preclude the court

8  from deciding as a matter of law regarding McCampbell, McDowell and Stockton's

9  reasonableness in carrying out the seizure and use of force, so the court denies Solano defendants'

10  and Stockton's motions on this claim.

11  There is no evidence, however, from which a reasonable jury could find that Carter or

12  Hamilton acted in outrageous ways or otherwise aided and abetted the alleged tortious conduct

13  against Powell.

14  The court therefore grants in part and denies in part the Solano defendants' motion and

15  denies Stockton's motion with respect to plaintiffs' twelfth claim:

16  - The court denies Stockton's motion for summary judgment of the twelfth claim.

17  - The court grants Carter and Hamilton's motion for summary judgment of the

18      twelfth claim.

19  - Solano defendants' motion for summary judgment of claim twelve is otherwise

20      denied.

21  **O.      Negligence *Per Se* (Claim Thirteen)**

22  Plaintiffs Porter and Powell bring a claim of negligence *per se* for alleged violations of

23  California Penal Code section 853.5. FAC ¶ 231. Porter brings her claim against McCampbell,

24  McDowell and the County. Powell brings his claim against all defendants. Joint Statement at 6.

25  To establish negligence *per se*, "plaintiff must show that (1) defendant violated a statute,

26  ordinance or regulation of a public entity, (2) the violation proximately caused his injury, (3) the

27  injury resulted from an occurrence of the nature which the statute was designed to prevent; [and]

28  (4) he was one of the class of persons for whose protection the statute was adopted." *Sierra-Bay*

1   *Fed. Land Bank Assn. v. Superior Court*, 227 Cal. App. 3d 318, 336 (1991). As previously

2   explained, section 853.5 curtails "the authority [of officers] to execute custodial arrests for

3   offenses so minor that they are designated as infractions." *Mota*, 982 F.2d at 1388. Under

4   section 853.5, an officer may arrest an individual for a minor traffic infraction only if the arrestee

5   first fails to produce satisfactory evidence of his identity. *Id.*

6        There remain genuine disputes of fact surrounding the arrest of Porter and detention of

7   Powell and the credibility of the defendants' alleged legal authority to do so. A jury must clarify

8   the remaining disputes of material fact, including whether Porter and Powell resisted arrest or

9   otherwise violated the law apart from an initial vehicle code violation. Cal. Veh. Code § 5200(a).

10   For the reasons explained above, however, Carter and Hamilton cannot be liable for any claims of

11   negligence *per se*, either individually or under a theory of aiding and abetting.

12        • The court denies Stockton's motion for summary judgment of the thirteenth claim.

13        • The court grants Carter and Hamilton's motion for summary judgment of the

14          thirteenth claim.

15        • Solano defendants' motion for summary judgment of claim thirteen is otherwise

16          denied.

17     **P.**    **Negligence (Claim Fourteen)**

18        Plaintiffs Porter and Powell's fourteenth claim alleges negligence. FAC ¶ 247. Porter

19   brings her claim against McCampbell, McDowell and the County. Powell asserts his claim

20   against all defendants. Joint Statement at 6. The elements of a negligence claim against a police

21   officer are: "(1) the officer owed plaintiff a duty of care; (2) the officer breached that duty by

22   failing to use such skill, prudence, and diligence as other members of the profession commonly

23   possess; (3) proximate cause between the negligent conduct and the resulting injury; and (4)

24   actual loss or damage resulting from the officer's negligence." *Ramos v. Orange Cty. Sheriff's*

25   *Dep't*, No. 13-1140, 2014 WL 12575767, at *7 (C.D. Cal. July 25, 2014) (citing *Harris v. Smith*,

26   157 Cal. App. 3d 100, 104 (1984)). As explained above, there are genuine disputes of material

27   fact regarding whether McCampbell, McDowell and Stockton—and therefore the County under a

28   respondeat superior liability—acted in an unreasonable way that would constitute a breach of

duty.  There is no dispute, however, that Carter and Hamilton did not participate in any tortious conduct or otherwise aid and abet in such conduct.

The court therefore grants in part and denies in part Solano defendants' motion and Stockton's motions with respect to plaintiffs' fourteenth claim:

- The court denies Stockton's motion for summary judgment of the fourteenth claim.
- The court grants Carter and Hamilton's motion for summary judgment of the fourteenth claim.
- Solano defendants' motion for summary judgment of claim fourteen is otherwise denied.

**Q.     Solano Defendants' & Stockton's Affirmative Defense Based on California Government Code Section 821.6**

Solano defendants again broadly assert they are shielded from liability under California Government Code section 821.6 in the face of plaintiffs' claims asserting violations of the Bane Act, Ralph Act and California Government Code section 815.6, and infliction of intentional infliction of emotional distress and negligence.  Solano Defs.' Mot. at 39–40.  Stockton asserts the same affirmative defense to those claims enumerated above.  Stockton Mot. at 39–40.  While defendants acknowledge that section 821.6 cannot shield them from liability on plaintiffs' false imprisonment or assault and battery claims, defendants claim "the remainder of [p]laintiffs' state law claims specifically implicate an allegation of the falsification of police reports."  Solano Defs.' Mot. at 39.  The "principal function" of section 821.6 "is to provide relief from malicious prosecution."  *Blankenhorn*, 485 F.3d at 488–89 (citing *Kayfetz v. California*, 156 Cal. App. 3d 491 (1984)).  The statute extends protections to actions "taken in preparation for formal proceedings, including actions incidental to the investigation of crimes."  *Id.* (internal citations and quotations omitted).  But section 821.6 "is limited to actions taken in the course or as a consequence of an investigation" and does not make defendants immune from "acts that allegedly happen during [their] arrest."  *Id.* (internal citations and quotations omitted) (finding plaintiff's claims for assault and battery, negligence, and intentional infliction of emotional distress are not

1    barred under section 821.6). Specifically, California courts have held section 821.6 does not

2    provide immunity from liability for false arrest or false imprisonment. *See, e.g.*, *Asgari v. City of*

3    *Los Angeles*, 15 Cal. 4th 744 (1997), *as modified on denial of reh'g* (Mar. 17, 1997).

4         What remains, therefore, is defendants' assertion of immunity for alleged violations of the

5    Bane Act (claim seven), the Ralph Act (claim eight), intentional infliction of emotional distress

6    (claim twelve), negligence per se (claim thirteen) and negligence (claim fourteen). Defendants

7    contend that all of plaintiffs' state law claims—except for false imprisonment and assault and

8    battery—are premised upon an alleged fabrication of evidence and are therefore barred under

9    section 821.6. Plaintiffs oppose summary judgment on this basis, arguing that defendants'

10   application of section 821.6 is overbroad and inapplicable to the claims brought. *See* Opp'n to

11   Solano Defs.' Mot. at 38.

12        Recognizing California courts' mandate to construe section 821.6 "broadly in furtherance

13   of its purpose to protect public employees in the performance of their prosecutorial duties from

14   the threat of harassment through civil suits," *County of Los Angeles v. Superior Ct.*,

15   181 Cal. App. 4th 218, 228 (2009), *as modified* (Jan. 22, 2010), the court looks for evidence that

16   plaintiffs' claims are based solely on officers' "actions incidental to the investigation of crimes"

17   as opposed to actions that did not further the officers' investigation. *Blankenhorn*, 485 F.3d at

18   488–89. The record does not reflect that plaintiffs' remaining state law claims rest solely on their

19   allegations of falsified reports or other actions incidental to the investigation. For each of their

20   state law claims, plaintiffs point to ample evidence of conduct that occurred during their arrests

21   and detention, before any investigatory actions commenced. Viewing the evidence in the light

22   most favorable to plaintiffs, as the court must do at this stage, the record on which they rely

23   supplies ample support for their state law claims outside of any alleged investigatory actions

24   protected under section 821.6.

25        The court denies Solano defendants' and Stockton's motion for summary judgment to the

26   extent it rests on an affirmative defense under section 821.6.

1     **R.      Motion to Seal**

2          Defendants request an order sealing Exhibit 517 in connection with their motion for

3     summary judgment. *See* Req., ECF No. 174-1 (submitted for *in camera* review). The exhibit

4     contains Porter's sensitive medical information. The court ordered plaintiffs to submit a redacted

5     version of the documents, for filing on the public docket, even as it signaled it would entertain

6     full sealing of the complete medical records.

7          The legal standard for requests to seal depends on whether the request is tied to a

8     "dispositive" motion, i.e., a motion that is "more than tangentially related to the merits of a case."

9     *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). Because the

10    pending request to seal is tied to a "dispositive" motion, it can be granted only if the parties offer

11    "a compelling reason" to keep the information in question from the public. *Center for Auto*

12    *Safety*, 809 F.3d at 1096–97 (quoting *Kamakana v. City & County of Honolulu*, 447 F.3d 1172,

13    1179 (9th Cir. 2006)). To decide whether the party requesting a seal has carried that burden, the

14    court balances the reasons for secrecy with the public's interests in disclosure. *See Kamakana*,

15    447 F.3d at 1179. If a court decides to grant a request to seal, it must explain its reasons and may

16    not rely on "hypothesis or conjecture." *Id.* (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434

17    (9th Cir. 1995)). In light of the strong presumption in favor of access to court records and given

18    the frequency and overbreadth of many motions to seal, federal courts deny motions to seal that

19    merely cite "a general category of privilege." *See id.* at 1184. A party that wishes to keep its

20    documents secret must point out a "specific linkage" between its interests in secrecy and those

21    documents. *See id.* "[C]onclusory offerings do not rise to the level of 'compelling reasons'

22    sufficiently specific to bar the public access to the documents." *Id.* at 1182.

23         Courts in this circuit have "recognized that the need to protect medical privacy qualifies as

24    a 'compelling reason' for sealing records." *Chester v. King*, No. 16-01257, 2019 WL 5420213, at

25    *2 (E.D. Cal. Oct. 23, 2019). Here, the filed redacted version serves the compelling interest in

26    protecting the medical privacy of Porter, without withholding information in question from the

27    public.

Defendants' motion to seal the unredacted exhibit is **granted**. A redacted copy of the exhibit shall appear on the docket.

## IV.    CONCLUSION

For the reasons above, the court denies plaintiffs' motion in part and grants it in part:

- The court grants plaintiffs' motion on claim three for unlawful search against individual defendant McCampbell. Summary judgment on claim three is denied to the extent plaintiffs bring the claim against McDowell.
- The court otherwise denies plaintiffs' motion.

The court grants Solano defendants' motion in part and denies the motion in part:

- The court grants Carter and Hamilton's motion.
- The court grants McCampbell and McDowell's motion for summary judgment of the fourth claim in part to the extent it rests on allegedly deliberate fabrications within their written reports.
- The court grants summary judgment for all equal protection claims against McDowell.
- Solano defendants' motion is otherwise denied.

The court grants Stockton's motion in part and denies it in part:

- The court grants Stockton's motion on claim four, five and eight.
- Stockton's motion is otherwise denied.

The court grants Solano defendants' motion to seal. The Clerk of Court is **directed to file the redacted copy of the exhibit on the public docket.**

The Clerk of Court also is **directed to correct the caption of this matter**. O.P. shall be removed as a plaintiff to the case. Solano County Sheriff's Office shall be removed as a defendant to the case. Parties are directed to submit future filings with the caption reflecting these changes.

A final pretrial conference is set for **March 27, 2025, at 10:00 a.m**. The parties shall meet and confer and file a joint status report **7 days prior** to the final pretrial conference addressing matters the court should consider in setting a trial date, including whether they request referral to

1    a magistrate judge to conduct a further court-convened settlement before the final pretrial

2    conference.  *See* E.D. Cal. L.R. 282; Fed. R. Civ. P. 16.

3          This order resolves ECF Nos. 150, 152, 153 & 174.

4          IT IS SO ORDERED.

5    DATED:  February 25, 2025.

SENIOR UNITED STATES DISTRICT JUDGE